UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
NURSAN METALURJI ENDUSTRISI A.S.,

                              Plaintiff,

                                                    Case No.: 07 CIV 7687 (GBD)

            -against-

M/V "TORM GERTRUD" her engines, tackle,
boilers, etc. *in rem*, M/V "NEW FLAME" her engines,
tackle, boilers, etc. *in rem,*
A/S DAMPSKIBSSELSKABET TORM, TRANSMAR
SHIPPING CO. S.A., GLADIATOR NAVIGATION S.A.,
*in personam*,

                              Defendants.
------------------------------------------------------------------------x


### DEFENDANT A/S DAMPSKIBSSELSKABET TORM'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FORUM NON CONVENIENS


NICOLETTI HORNIG & SWEENEY
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
Tel: (212) 220-3830
Fax: (212) 220-3780

*Attorneys for Defendant*
*A/S DAMPSKIBSSELSKABET TORM*

Of Counsel:

    James F. Sweeney (JS-7745)
    Terry L. Stoltz (TS-7650)

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

FACT STATEMENT ........................................................................................................... 1

POINT I ............................................................................................................................ 4

    THE COURT LACKS PERSONAL
    JURISDICTION OVER TORM ........................................................................................ 4

        A.   General Jurisdiction ........................................................................................ 5

        B.   Long Arm Jurisdiction ................................................................................... 8

POINT II ........................................................................................................................... 9

    THE COURT LACKS *IN REM*
    JURISDICTION OVER TORM GERTRUD .......................................................................... 9

POINT III ......................................................................................................................... 10

    THE ACTION AGAINST TORM SHOULD BE
    DISMISSED FOR FORUM NON CONVENIENS ................................................................ 10

        A.   Private Interest Factors .................................................................................. 15

        B.   Public Interest Factors................................................................................... 17

        C.   Other Factors................................................................................................. 18

CONCLUSION.................................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*ADP Investor Commc'n Servs., Inc. v. In House Attorney Servs., Inc.*,
  390 F. Supp. 2d 212 (E.D.N.Y. 2005) ........................................................ 4

*Aguirda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002) ................................. 14

*Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147 (2d Cir. 1980)............................ 14

*American Dredging Co. v. Miller*,
  510 U.S. 443, 114 S. Ct. 981, 127 L. Ed. 2d 285 (1994)........................... 14

*Bank Brussels Lambert v. Fiddler Gonzales & Rodriguez*,
  171 F.3d 779 (2d Cir. 1999).......................................................................... 4

*Black Diamond S.S. Corp. v. Robert Stewart & Sons (The NORWALK VICTORY)*,
  336 U.S. 386, 69 S. Ct. 622, 93 L. Ed. 754 (1949).............................. 21-22

*Burns Bros. v. Long Island R. Co.*,
  176 F.2d 950 (2d Cir. 1949)........................................................................ 10

*Carta Cartoni Cellulosa, S.P.A. v. M.V. Costa Atlantica*,
  No. 84-CIV-8673, 1986 WL 3521 (S.D.N.Y. Mar. 14, 1986)................... 13

*Chubb Inc. Co. of Europe S.A. v. M/V HUMBOLDT EXPRESS*,
  No. 02-CV-1294, 2003 WL 22434092 (S.D.N.Y. Oct. 24, 2003)....................12-13

*Dluhos v. Floating & Abandoned Vessel, Known as New York*,
  162 F.3d 63 (2d Cir. 1998)........................................................................ 10

*ESI, Inc. v. Coastal Corp.*,
  61 F. Supp. 2d 35 (S.D.N.Y. 1999)............................................................. 4

*Eskofot A/S v. E.I. Du Pont De Nemours & Co.*,
  872 F. Supp. 81 (S.D.N.Y. 1995)............................................................... 13

*GTFM, Inc. v. Int'l Basic Source, Inc.*,
  No. 01-CIV-6203, 2002 WL 31050840 (S.D.N.Y. Sept. 12, 2002) ........... 8

*Gulf Oil Corp. v. Gilbert*,
  330 U.S. 501, 67 S. Ct. 839, 91 L. Ed. 1055 (1988).................14-15, 17, 18

*Hanson v. Denkla*,
  357 U.S. 235, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)............................. 4

*Hellenic Lines Ltd. v. Rhoditis*,
 398 U.S. 306, 90 S. Ct. 1731, 26 L. Ed. 2d 252 (1970) ....................................... 19, 20

*Int'l Shoe Co. v. Washington*,
 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945) ................................................... 4

*Int'l Terminal Operating Co. v. Skibs A/S Hidlefjord*,
 63 F.R.D. 85 (S.D.N.Y. 1973) .......................................................................... 6, 7

*Iragorri v. United Techs. Corp.*,
 274 F.3d 65 (2d Cir. 2001) ................................................................................. 13

*Keramchemie GmbH v. Keramchemie (Canada) Ltd.*,
 771 F. Supp. 618 (S.D.N.Y. 1991) ...................................................................... 8

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro In
 Amministrazione Straordinaria*,
 937 F.2d 44 (2d Cir. 1991) ................................................................................. 4

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*,
 77 N.Y.2d 28, 565 N.E.2d 488, 563 N.Y.S.2d 739 (1990) .................................... 5, 8

*Lauritzen v. Larson*,
 345 U.S. 571, 73 S. Ct. 921, 97 L. Ed. 1254 (1953) .......................................... 19, 20

*Lynch v. National Prescription Admin.*,
 No. 03-CIV-1303, 2004 WL 385156 (S.D.N.Y. Mar. 1, 2004) ................................ 18

*The MANDU*,
 102 F.2d 459 (2d Cir. 1939) ............................................................................ 20, 21

*Man Ferrostaal, Inc. v. M/V VERTIGO*,
 447 F. Supp. 2d 316 (S.D.N.Y. 2006), *reconsideration denied*,
 2006 WL 2669315 (S.D.N.Y. Sept. 18, 2006) ..................................................... 20, 21

*Mareno v. Rowe*,
 910 F.2d 1043 (2d Cir. 1990) ............................................................................. 5

*Miles v. Apex Marine Corp.*,
 498 U.S. 19, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990) ......................................... 19

*Murray v. British Broad. Corp.*,
 81 F.3d 287 (2d Cir. 1996) ................................................................................. 13

iii

*Mutualidad Seguros Del Institutuo Nacional De Industria v. M.V. Luber*,
  1999 A.M.C. 824 (S.D.N.Y. 1998) ........................................................................... 7

*Otal Invs. Ltd. v. M/V CLARY*,
  494 F.3d 40 (2d Cir. 2007) .................................................................................... 22

*Piper Aircraft Co.*,
  454 U.S. 235, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981) ........................................... 18

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
  329 F.3d 64 (2d Cir. 2003) .................................................................................... 13

*Porina v. Marward Shipping Co.*,
  2006 A.M.C. 2489 (S.D.N.Y. 2006) ......................................................................... 7

*Romero v. International Terminal Operating Co.*,
  358 U.S. 354, 79 S. Ct. 468, 3 L. Ed. 2d 368 (1959) .............................................. 19

*S.E.C. v. KPMG, LLP*,
  No. 03-CIV-671, 2003 WL 1842871 (S.D.N.Y. Apr. 9, 2003) ................................. 13

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980) ............................................ 4

## **STATUTES & RULES**

Fed. R. Civ. P. 12 ....................................................................................................... 9, 23

Fed. R. Civ. P. Supp. Admiralty Rule E ........................................................................ 9

N.Y. C.P.L.R. § 301 (McKinney 2001) .......................................................................... 5

N.Y. C.P.L.R. § 302 (McKinney 2001) ........................................................................ 8, 9

## INTRODUCTION

This plaintiff is forum shopping for one reason – to enhance its monetary recovery.[1]  That does not justify the continuance of this lawsuit in New York.

Nursan Metalurji Endustrisi A.S. is an alien corporation with a principal place of business in Hatay, Turkey.  (Verified Complaint ¶ 2).  It has brought suit in this Court against defendant A/S Dampskibsselskabet Torm ("Torm"), another alien corporation resident in Hellerup, Denmark.  (Verified Complaint ¶ 5).  The lawsuit involves a vessel collision that occurred in the territorial waters of Gibraltar between Danish and Panamanian flagged vessels.  (Verified Complaint ¶¶ 3, 4 & 8).  The foreign plaintiff, the foreign defendant and the subject matter of the action all have nothing to do with New York.

Because this Court lacks personal jurisdiction over Torm and *in rem* jurisdiction over the TORM GERTRUD, and because the doctrine of *forum non conveniens* applies, the action must be dismissed.

## FACT STATEMENT

On July 31, 2007, the M/V NEW FLAME, a Panamanian-flagged bulk carrier owned by Greek interests, sailed from Claremont Terminal in Port Newark, New Jersey with a cargo of metal scrap bound for Turkey.  (Sweeney Decl. Exh. C).[2]  En route to Turkey, the vessel made a port call in Gibraltar.  In the early morning hours of August 12, 2007, the NEW FLAME sailed from Gibraltar (reportedly without clearance).  (Triay Decl. Exh. A).  Off Europa Point, in the

---

[1]  Plaintiff is motivated by its hope of having this Court apply the "innocent cargo rule" to its alleged loss.  (Verified Complaint, ¶ 12).  But the "innocent cargo rule," which permits a cargo owner to fully recover its loss from the non-carrying ship in a collision situation, is inapplicable.  *See* Point III, sub-section 3, pp. 20-21, *infra*.

[2]  "Sweeney Decl." refers to the declaration of James F. Sweeney executed on December 7, 2007; "Triay Decl." refers to the declaration of Julian Richard Triay executed on December 5, 2007; "Hansen Decl." refers to the declaration of Anne Mentz Hansen executed on December 6, 2007, and the exhibits annexed to the respective declarations.

territorial waters of Gibraltar, the NEW FLAME collided with the TORM GERTRUD.  (Verified Complaint ¶ 8).

The TORM GERTUD, a Danish-flagged clean product tanker owned by Torm, a Danish shipowner, was outbound from Augusta, Italy with a full cargo of unleaded gasoline bound for the East Coast of the United States for final discharge orders.  (Hansen Decl. ¶ 9).  The TORM GERTRUD's voyage charterer had preliminarily indicated that the port of discharge was to be Port Everglades, Florida.  (Hansen Decl. ¶ 9).  She was at the time of the collision nearing Algeciras, Spain to perform a crew change.  (Hansen Decl. ¶ 9)

The movements of the NEW FLAME and the TORM GERTRUD were being tracked on radar by the UK Ministry of Defence Maritime Data Centre, Windmill Hill Signal Station located in Gibraltar.  (Triay Decl. ¶ 6).  Real time records of those radar observations are maintained by the Maritime Data Centre.  (Triay Decl. ¶ 6).  Also, another Danish-flagged vessel, the MAERSK QATAR, was at anchor in Gibraltarian waters at the relevant times and appears to have witnessed the collision.

As a result of the collision, the damaged TORM GERTRUD proceeded to Algeciras where the voyage had to be abandoned and the cargo transshipped on another vessel owned by Torm.  (Triay Decl. Exh. A).  The NEW FLAME partially sank in the territorial waters of Gibraltar and was abandoned by its crew, who were then taken to the Port of Gibraltar, where they were put ashore and medically examined.  (Triay Decl. Exh. A).  The Captain of the NEW FLAME was arrested in Gibraltar and charged with a violation of the Gibraltarian maritime law.  (Triay Decl. ¶ 7).  If convicted, he could face a fine of £2,000 and/or two years imprisonment.  (Triay Decl. ¶ 7).

The Gibraltar Port Authority immediately activated its Emergency Response Plan and dispatched all its available resources to the scene of the collision. (Triay Decl. Exh. A). The Gibraltar Port Authority deployed divers to the wreck of the NEW FLAME to inspect the damage to the submerged hull. (Triay Decl. Exh. A). A full on-board inspection was undertaken by the Gibraltar Port Authority Maritime Surveyors. (Triay Decl. Exh. A). The Gibraltar Maritime Administration commenced an investigation into the collision and into how the NEW FLAME had departed from the Port of Gibraltar without the necessary clearance. (Triay Decl. Exh. A).

The local Spanish maritime authorities also investigated the collision and deployed significant resources to the scene of the collision. Panamanian and Danish investigations are also underway. These latter two are being jointly conducted with the Gibraltarian investigation with the Gibraltar Maritime Administration leading the joint investigation. (Triay Decl. Exh. B). The report of the investigation is expected to be issued by March 2008. (Triay Decl. Exh. B).

Pursuant to the joint investigation, the crews from both the NEW FLAME and the TORM GERTRUD were questioned/interviewed by the Gibraltarian Maritime Administration. (Triay Decl. ¶ 9). In addition, various NEW FLAME officers and crew were also interviewed by The Royal Gibraltar Police. (Triay Decl. ¶ 9).

Salvage and recovery efforts were jointly conducted by Greek and Dutch marine salvage contractors. (Sweeney Decl. Exhs. A & B). The aim was to remove plaintiff's cargo from the wreck of the NEW FLAME and land it ashore in Gibraltar for ultimate transshipment to Turkey.

Two actions have been commenced in the Courts of Gibraltar. (Triay Decl. ¶ 4). One is between the owners of the vessels and the other is between Torm and the plaintiff herein as the

owners of the cargo aboard the NEW FLAME.  (Triay Decl. ¶ 4).  In Gibraltar, the trial of these cases can be held within twelve (12) months.  (Triay Decl. ¶ 11).

There is no known U.S. involvement or investigation into the collision.

## POINT I

### THE COURT LACKS PERSONAL JURISDICTION OVER TORM

The plaintiff has the burden of showing that the Court has personal jurisdiction over the defendant.  *See Bank Brussels Lambert v. Fiddler Gonzales & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999).  When deciding the motion, the Court may "consider affidavits and documents submitted by the parties without converting the motion into one for summary judgment."  *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 50 n.54 (S.D.N.Y. 1999); *see also ADP Investor Commc'n Servs., Inc. v. In House Attorney Servs., Inc.*, 390 F. Supp. 2d 212, 217-18 (E.D.N.Y. 2005).

In this admiralty action, the Court must look to the law of New York to determine if personal jurisdiction exists over Torm.  *See Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro In Amministrazione Straordinaria*, 937 F.2d 44, 50 (2d Cir. 1991).  If there is jurisdiction under New York law, the Court must then also decide if exercising jurisdiction comports with the constitutional requirements of due process.  Due process is satisfied if the defendant purposely availed itself of the benefits of the forum and had sufficient minimum contacts that it should reasonably expect to be haled into court to defend its actions there.  *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945); *Hanson v. Denkla*, 357 U.S. 235, 251, 78 S. Ct. 1228, 1238, 2 L. Ed. 2d 1283 (1958); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92, 100 S. Ct. 559, 564, 62 L. Ed. 2d 490 (1980).

A.     **General Jurisdiction**

Under N.Y. C.P.L.R. § 301 (McKinney 2001), a defendant is amenable to general jurisdiction in New York if it is "doing business" in New York.  *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990).  In response to a certification from the Second Circuit, the New York Court of Appeals has explained:

> A foreign corporation is amenable to suit in New York courts under CPLR 301 if it has engaged in such a continuous and systematic course of "doing business" here that a finding of its "presence" in this jurisdiction is warranted.  The test of "doing business" is a "simple [and] pragmatic one," which varies in its application depending on the particular facts of the case.  The court must be able to say from the facts that the corporation is "present" in the State "not occasionally or casually, but with a fair measure of permanence and continuity."

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 77 N.Y.2d 28, 33, 565 N.E.2d 488, 490, 563 N.Y.S.2d 739, 741 (1990) (internal citations omitted).

Torm is a corporation organized and existing under the laws of Denmark with its principal place of business at 18 Tuborg Havnevej, Hellerup, Denmark.  (Verified Complaint ¶ 5; Hansen Decl. ¶ 2).  It is not licensed to conduct business in the State of New York and has not appointed an agent for service of process in New York.  (Hansen Decl. ¶ 2).  Torm does not have an office or phone listing in New York and does not own any real or personal property or maintain a bank account in New York.  (Hansen Decl. ¶ 2).  Furthermore, Torm does not regularly advertise or solicit business in New York.[3]  (Hansen Decl. ¶ 2).

Torm owns, operates or manages 130 ships, comprised of two types of vessels, i.e. dry bulk carriers and product tankers.  (Hansen Decl. ¶ 3).  The M.T. TORM GERTRUD is a product tanker.  (Hansen Decl. ¶ 3).

---

[3]  At page five, paragraph "C" of the *ad damnum* clause of its Verified Complaint, plaintiff expressly admits Torm's lack of New York contacts and this Court's lack of personal jurisdiction, pleading that:  "the Defendants cannot be found within this District."

A number of the vessels in the Torm fleet are bareboat or time chartered to other companies.  Under those charters, the vessels sail under the exclusive direction of the charterers.  (Hansen Decl. ¶ 5).

The voyage-chartered vessels are operated by Torm, who maintains records of where the vessels call in order to comply with the directions of Torm's customers.  (Hansen Decl. ¶ 6).  During the last twelve months, nine of the voyage-chartered vessels (three of which are not actually owned by Torm) have been directed by Torm's clients to call in the "Port of New York"[4] a total of 21 times (7 of the calls were by the three vessels not owned by Torm).  (Hansen Decl. ¶ 6).  When Torm's voyage-chartered vessels have called in the Port of New York, they have loaded or discharged cargoes belonging to Torm's customers at the following terminals:[5]

·    Kinder Morgan Terminal in Carteret, New Jersey;

·    Motiva Terminal in Sewarin, New Jersey;

·    Conoco Phillips Refinery in Linden, New Jersey;

·    IMTT in Bayonne or Linden, New Jersey;

·    Amerada Hess in Bayonne or Port Reading, New Jersey;

·    NuStar Terminal in Linden, New Jersey; and

·    Valero-Citco Terminal in Linden, New Jersey.

---

[4]  The "Port of New York" is a commercial fiction and a misnomer.  The port, in large measure, consists of container terminals, bulk cargo terminals and tank farms located in New Jersey.  There is very little cargo (liquid, containerized, bulk or breakbulk) that is loaded or discharged in New York itself.  Indeed, and although the plaintiff alleges that the NEW FLAME had loaded the plaintiff's cargo in the "Port of New York" (Verified Complaint ¶¶ 8 & 9), the cargo was actually loaded at Claremont Terminal, Port Newark, New Jersey.  *See Int'l Terminal Operating Co. v. Skibs A/S Hidlefjord*, 63 F.R.D. 85, 86 (S.D.N.Y. 1973), wherein a stevedore sued a Norwegian ship-owner for services performed on the ship while in Port Elizabeth, New Jersey.  The stevedore contended that the work performed at Port Elizabeth was a transaction in New York and "base[d] this claim on the theory that Port Elizabeth is within the 'Port of New York.'"  *Id.* at 87.  The district court rejected the stevedore's argument based upon its straightforward reading of the treaty between New York and New Jersey, which provided New Jersey with exclusive jurisdiction over the wharves and docks on its side of the shore.  *See id.*

[5]  Some of the vessels may have performed lighterage to barges at Stapleton Anchorage before proceeding to the individual terminal.  (Hansen Decl. ¶ 6, n.1).

(Hansen Decl. ¶ 6). There are no records of any Torm vessel having called at any terminal in the State of New York in the past twelve months (Hansen Decl. ¶ 6), and the calls at terminals in New Jersey do not support the exercise of personal jurisdiction over Torm by this Court. *See Int'l Terminal Operating Co.*, 63 F.R.D. at 86-87.

Even if the calls had been made at terminals in New York, they would not be relevant to exercising jurisdiction over Torm. The ports called at by a vessel in compliance with the directions of the owner's customers are irrelevant to whether the vessel's owner has sufficient minimum contacts with the jurisdiction. *See, e.g.*, *Porina v. Marward Shipping Co.*, 2006 A.M.C. 2489, 2496-98 (S.D.N.Y. 2006) (holding owner of vessel had not purposefully availed itself of the benefits and protections of the laws of the United States because the trips made to the United States were at the direction of the charterer); *Mutualidad Seguros Del Institutuo Nacional De Industria v. M.V. Luber*, 1999 A.M.C. 824, 826 (S.D.N.Y. 1998) (holding "the relevant question is not [the owner's] awareness or control of the condition of the vessel, but its destination. Where the vessel's owner has ceded authority to the charterer, the choices of the latter cannot be imputed to the former").

The TORM GERTRUD was not one of the Torm vessels that called at the Port of New York during the last twelve months. (Hansen Decl. ¶ 8). The TORM GERTRUD has called in the Port of New York ten times. (Hansen Decl. ¶ 8). The last time was in February, 2005. (Hansen Decl. ¶ 8). To the best of Torm's knowledge, none of the calls by TORM GERTRUD were at a terminal within the State of New York. (Hansen Decl. ¶ 8).

At the time of the August 2007 collision off Gibraltar, the TORM GERTRUD was operating under a Contract of Affreightment. (Hansen Decl. ¶ 9). The vessel had loaded a full cargo of gasoline at Augusta, Italy and was nearing Algeciras, Spain in order to perform a crew

change.  (Hansen Decl. ¶ 9).  From there, she was to sail to the East Coast of the United States for final discharge orders, with the voyage charterer indicating that the port of discharge was to be Port Everglades, Florida.  (Hansen Decl. ¶ 9).

In summary, the few calls by Torm's voyage-chartered vessels at terminals in New Jersey in the last twelve months do not establish the "fair measure of permanence and continuity" required to find that Torm is doing business in the State of New York.  *Landoil Resources Corp.*, 77 N.Y.2d at 33, 565 N.E.2d at 490, 563 N.Y.S.2d at 741.

**B.    <u>Long Arm Jurisdiction</u>**

N.Y. C.P.L.R. § 302(a)(3) (McKinney 2001):  It is undisputed that the alleged tortious activity (i.e., Torm's "negligence, gross negligence . . ., willfull indifference, and of the unseaworthiness of the . . . TORM GERTRUD" (Verified Complaint ¶ 11)) did not take place in New York, but rather in the "vicinity of Gibraltar" (Verified Complaint ¶ 8).  Therefore, plaintiff cannot establish jurisdiction without proof of an injury suffered by it in New York.  As stated in *Keramchemie GmbH v. Keramchemie (Canada) Ltd.*, 771 F. Supp. 618, 621 (S.D.N.Y. 1991):

> injury in the state must be direct and not remote or consequential. In general, the situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff (citations omitted).

*Id.* (internal alterations and citations omitted); *see also GTFM, Inc. v. Int'l Basic Source, Inc.*, No. 01-CIV-6203, 2002 WL 31050840, at *6 (S.D.N.Y. Sept. 12, 2002) (stating "for long arm purposes an injury occurs at the location of the events that caused the injury, not the location where the damages are felt by the plaintiff").  Since plaintiff is an alien corporation with its principal place of business in Hatay, Turkey, its damages were felt in Gibraltar or Turkey, but not in New York.

Even if plaintiff can establish actual injury in New York, Torm is not subject to jurisdiction under N.Y. C.P.L.R. § 302(a)(3) unless plaintiff establishes that Torm either (i) "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state," N.Y. C.P.L.R. § 302(a)(3)(i),[6] or (ii) "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce," *id.* § 302(a)(3)(ii).   As shown above, Torm does not regularly solicit business (Hansen Decl. ¶ 2) or derive substantial revenues from services rendered in New York (Hansen Decl. ¶ 7), nor did it have any reason to believe that the navigation of the TORM GERTRUD off Gibraltar would have consequences in New York.

There is no basis for assuming personal jurisdiction over Torm under N.Y. C.P.L.R. § 302(a)(3), and thus the action should be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

## POINT II

## THE COURT LACKS *IN REM* <br> JURISDICTION OVER TORM GERTRUD

The TORM GERTRUD is not currently within the District.  (Hansen Decl. ¶ 4).  Indeed, she has not been in the Port of New York (in either New York or New Jersey) since February 2005.  (Hansen Decl. ¶ 8).  The vessel is not currently scheduled to call in New York.  (Hansen Decl. ¶ 4).  Therefore, the Court cannot exercise *in rem* jurisdiction over the vessel.  *See* Fed. R. Civ. P. Supp. Admiralty Rule E(3)(a) ("In admiralty and maritime proceedings process *in rem* or

---

[6]  The fact that business in the Port of New York (including the New Jersey terminals) is an insubstantial part of Torm's world-wide business is shown by the fact that Torm derives no income from customers in New York. Further, the payments to vendors/suppliers in all of the United States represents only 0.01% of Torm's expenditures and the bunkers, i.e., the fuel to operate the vessels' engines and machinery, purchased in the Port of New York is only 1.09% of the bunkers purchased by Torm.  (Hansen Decl. ¶ 7).

of maritime attachment and garnishment may be served only within the district."); *Dluhos v. Floating & Abandoned Vessel, Known as New York*, 162 F.3d 63, 69 (2d Cir. 1998) (dismissing action because district court did not arrest the vessel and, therefore, lacked jurisdiction over the vessel *in rem*); *Burns Bros. v. Long Island R. Co.*, 176 F.2d 950, 950 (2d Cir. 1949) (holding that without an arrest of the vessel, jurisdiction to enter a decree *in rem* is lacking).

**POINT III**

**THE ACTION AGAINST TORM SHOULD BE
DISMISSED FOR FORUM NON CONVENIENS**

Plaintiff, a Turkish corporation, has sued the defendants, Greek and Danish shipowning corporations for cargo damage stemming from a vessel collision that occurred in the territorial waters of Gibraltar in August 2007.  Neither the collision nor the resultant alleged cargo damage had anything to do with New York.  Not one, but two litigations relating to this collision (one action between the two shipowners and another between plaintiff and Torm) are now underway in the courts of Gibraltar.[7]   (Triay Decl. ¶ 4).  As such, and because this is an inconvenient forum, and because the public and private interest factors heavily outweigh New York in favor of Gibraltar, this action should be dismissed under the *forum non conveniens* doctrine.

In the early morning hours of August 12, 2007, the M/V NEW FLAME, a Greek-owned, Panamanian-flagged bulk carrier, sailed from Gibraltar (reportedly without clearance) en route to Turkey laden with the plaintiff's scrap metal cargo.  (Triay Decl. Exh. A).  Off Europa Point, in Gibraltarian waters, the Panamanian M/V NEW FLAME, which was then outbound from Gibraltar to Turkey collided with the Danish tanker M.T. TORM GERTRUD (Verified Complaint ¶ 8), which was then outbound from the Mediterranean and nearing the Spanish Port

---

[7]  The action between the shipowners may be referred to arbitration, pending an agreement now being negotiated between those parties.

of Algeciras to perform a crew change.[8]  (Hansen Decl. ¶ 9).  As a result of the collision, the

NEW FLAME partially sank in Gibraltarian waters and was abandoned by its crew, who were

then all taken to the Port of Gibraltar, where they were put ashore, medically examined and

questioned.  (Triay Decl. Exh. A).  The Captain of the NEW FLAME was arrested for violation

of Gibraltarian maritime law.  (Triay Decl. ¶ 7).

The Gibraltar Port Authority immediately activated its Emergency Response Plan and

dispatched all its available resources to the scene of the collision.  (Triay Decl. Exh. A).  The

Gibraltar Port Authority deployed its divers to the wreck of the NEW FLAME to inspect the

submerged hull damage.  (Triay Decl. Exh. A).  A full on-board inspection was undertaken by

the Gibraltar Maritime Surveyors.  (Triay Decl. Exh. A).  The Gibraltar Maritime Administration

commenced an investigation into the collision and into how the NEW FLAME had departed

from the Port of Gibraltar without the necessary clearance.  (Triay Decl. Exh. A).

The local Spanish maritime authorities also investigated the collision, and deployed

significant resources to the scene of the incident.  Panamanian and Danish investigations of the

incident are also underway.  (Triay Decl. Exh. B).  These Danish and Panamanian investigations

are being jointly conducted with the Gibraltarian investigation, with the Gibraltar Maritime

Administration leading the investigation.  (Triay Decl. Exh. B).

There is no known U.S. involvement or investigation.

Pursuant to the Gibraltarian investigation, the crews from both the NEW FLAME and the

TORM GERTRUD were questioned/interviewed by the local Gibraltarian maritime authorities.

(Triay Decl. ¶ 9).  The TORM GERTRUD's officers were Danish and its crew was Filipino.  The

NEW FLAME's master and chief engineer were Greek, the chief officer and the second engineer

---

[8]  The movements of the vessels were being tracked on radar by a UK Ministry of Defence Maritime Data Center signal station in Gibraltar.

were Ukrainian and the remaining crew was Filipino. Another Danish vessel, the MAERSK QATAR, which was at anchor in Gibraltarian waters at the relevant time, appears to have witnessed the collision.

The ensuing salvage and recovery efforts in Gibraltar were jointly conducted by Greek and Dutch marine salvage contractors. (Sweeney Decl. Exhs. A & B). During these salvage operations, the plaintiff's cargo was to be removed from the wreck of the NEW FLAME and landed in Gibraltar for ultimate trans-shipment to Turkey.

Obviously, this is an inconvenient forum. Gibraltar, where both the casualty and cargo damage occurred, and where the pertinent litigations, official investigations and salvage operations are now being conducted, and where several of the third-party witnesses and documents reside, is not inconvenient; rather it is the factual and jurisprudential fulcrum of this case. Given the availability of the much more convenient and suitable Gibraltarian forum with its ready access to all of the necessary proofs, combined with the pendency of the two litigations there, this action should be dismissed on *forum non conveniens* grounds.

In *Chubb Inc. Co. of Europe S.A. v. M/V HUMBOLDT EXPRESS*, No. 02-CV-1294, 2003 WL 22434092, at *3 (S.D.N.Y. Oct. 24, 2003) (Daniels, J.), this Court granted a *forum non conveniens* motion and dismissed an admiralty cargo damage action on facts remarkably similar to those at bar. In *Chubb*, as here, all parties were foreign corporations. *See id.* at *1. The alleged cargo damage also occurred on board a ship while it was exclusively in foreign waters. *See id.* The Court held:

> In the field of admiralty, federal courts have applied the doctrine of *forum non conveniens* most flexibly in part because of admiralty's equitable nature and in part from the absence of the usual venue requirements. *Alcoa Steamship Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147, 153-54 (2d Cir. 1980). The district court is vested with broad discretion in determining a motion to dismiss under the

doctrine of *forum non conveniens*.  *Scottish Air Int'l v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996).  In *Aguinda v. Texaco*, 303 F.3d 470 (2d Cir. 2002), the Second Circuit set forth the manner in which the district court should analyze such a motion.  The Second Circuit explained:

> After determining the degree of deference owed to a plaintiff's choice of forum, a district court engages in a two-step inquiry.  First, the court must consider whether an adequate alternative forum exists.  If so, it must then balance a series of factors involving the private interests of the parties in maintaining the litigation in the competing fora and any public interests at stake.  The defendant seeking dismissal bears the burden as to both questions. *Aguinda*, 303 F.3d at 476 (internal quotation marks and citations omitted).

*Chubb Inc. Co. of Europe S.A.*, 2003 WL 22434092, at *1-2.

Since the plaintiff is a foreign corporation and because the acts giving rise to this action have no relationship to this District, the plaintiff's choice of forum is entitled to only a minimal amount of deference.  *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001).  A foreign plaintiff's choice of forum is entitled to a lesser degree of deference given the "realistic doubt about the ultimate convenience of a foreign plaintiff's choice to litigate in the United States."  *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 72 (2d Cir. 2003) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56, 102 S. Ct. 252, 265-66, 70 L. Ed. 2d 419 (1981)); *see also Murray v. British Broad. Corp.*, 81 F.3d 287, 290 (2d Cir. 1996).  The weight to be given plaintiff's choice of forum is further diminished where the operative facts underlying the action have no material connection with the chosen forum.  *See S.E.C. v. KPMG, LLP*, No. 03-CIV-671, 2003 WL 1842871, at *3 (S.D.N.Y. Apr. 9, 2003); *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 96 (S.D.N.Y. 1995); *Carta Cartoni Cellulosa, S.P.A. v. M.V. Costa Atlantica*, No. 84-CIV-8673, 1986 WL 3521, at *2 (S.D.N.Y. Mar. 14, 1986).

The courts of Gibraltar, where the casualty occurred, where both defendants are already litigating this casualty, and where the plaintiff is litigating against Torm, provide an adequate and much more convenient forum.[9]

Having found the existence of an alternative forum, the focus shifts to a consideration of the applicable private and public factors. In *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09, 67 S. Ct. 839, 843, 91 L. Ed. 1055 (1988), *superseded by statute on other grounds as explained in American Dredging Co. v. Miller*, 510 U.S. 443, 449, n.2, 114 S. Ct. 981, 986 n.2, 127 L. Ed. 2d 285 n.2 (1994), the Supreme Court delineated a number of factors, of both a private and public nature, that a court should consider in determining whether to dismiss an action on *forum non conveniens* grounds. The factors associated with the private interests of the litigants are:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of the case easy, expeditious and inexpensive.

*Gilbert*, 330 U.S. at 508, 67 S. Ct. at 843, 91 L. Ed. 1055. The public interest factors concern court congestion, the burden of jury duty, whether the case touches upon the affairs of many persons and whether there exists a localized controversy. *See id.* at 508-09, 67 S. Ct. at 843, 91 L. Ed. 1055.

Application of the *Gilbert* factors (which govern when the court is sitting in admiralty, *see Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 153 (2d Cir. 1980)) here compels the

---

[9] The requirement that an alternative forum exist will generally be satisfied when the defendant is amenable to process in the other forum. *See Aguirda v. Texaco, Inc.*, 303 F.3d 470, 476-77 (2d Cir. 2002)(quoting *Piper Aircraft Co.*, 454 U.S. at 255 n.22, 102 S. Ct. at 265 n.22, 70 L. Ed. 2d 419 n.22).

conclusion that New York is not a convenient forum. This case should be dismissed in favor of the pending Gibraltar actions. We address the *Gilbert* factors *ad seriatim*:

A.    **Private Interest Factors**

1.    **Relative Ease of Access to Sources of Proof**

The collision did not happen in New York nor in American waters, but in Gibraltarian waters. (Verified Complaint ¶ 8). The collision itself was tracked in real time via radar by a UK Ministry of Defence signal station situated in Gibraltar. (Triay Decl. ¶ 6). The Gibraltar Port Authority responded to the casualty on an emergency basis. (Triay Decl. Exh. "A"). Divers were sent from Gibraltar to inspect the submerged hull of the NEW FLAME as it came to rest on an offshore reef in the territorial waters of Gibraltar. (*Id.*). A full on-board inspection was conducted by Gibraltarian Maritime Surveyors. (*Id.*). The Gibraltar Maritime Administration commenced an investigation into the collision. (*Id.*). The same body is also investigating how and why the NEW FLAME departed from the Port of Gibraltar without the necessary clearance. (*Id.*). The crews and officers from both the NEW FLAME and the TORM GERTRUD were questioned and interviewed about the collision by the Gibraltarian maritime authorities. (Triay Decl. ¶ 9). The Captain of the M/V NEW FLAME was arrested by the Royal Gibraltar Police and charged with violation of the Merchant Shipping Act of Gibraltar. (*Id.* ¶ 7). Salvage operations were to land the plaintiff's (allegedly damaged) cargo in Gibraltar. (Sweeney Decl. Exhs. A & B). The litigation between the colliding vessels is now pending in the courts of Gibraltar. (Triay Decl. ¶ 4). The litigation of this cargo loss is also pending in the courts of Gibraltar. (Triay Decl. ¶ 4).

No witnesses or physical evidence are located within the Southern District of New York. The plaintiff is an alien corporation located in Hatay, Turkey, while the defendants are residents

of Panama and Hellerup, Denmark, respectively. (Verified Complaint ¶¶ 2, 5, 6 & 7). The alleged tortious conduct of the defendants occurred in Gibraltar. The relevant witnesses, documents and evidence, indeed the cargo itself, is either in Gibraltar, where the legal proceedings are already underway or closer to Gibraltar than New York. Presumably, the condition of the cargo, post-casualty, will be ascertained by marine surveyors in Gibraltar. The local tides, currents, navigations channels and the local maritime traffic rules of Gibraltar (not New York) will also figure prominently at trial.

### 2. Availability of Compulsory Process for Attendance of Unwilling Witnesses

In accordance with the accompanying Declaration of Julian Richard Triay, a Gibraltarian solicitor, the courts of Gibraltar will apply Gibraltarian law and procedure (which closely follows English law and procedure) and compulsory process for attendance of unwilling witnesses, such as government-retained divers, investigators, surveyors, inspectors, salvors, Marine Data Center radar observers, etc. is available and commonly used in Gibraltar. (Triay Decl. ¶¶ 10 & 11).

All of these highly relevant fact witnesses are well beyond the subpoena power of this Court.

### 3. Cost of Obtaining Attendance of Willing Witnesses

The Triay Declaration confirms that the cost of obtaining the attendance of witnesses in Gibraltar (most of whom are located in Gibraltar) will be minimal. (Triay Decl. ¶ 10). Given that none of these witnesses are residents in New York, they cannot be subpoenaed or compelled to attend/testify in this Court and if they agreed to appear at trial voluntarily, the cost of their attendance would be considerable.

16

### 4.     Possibility of View of Premises, If View Would be Appropriate

Under this *Gilbert* factor, the scene of the incident was just off the coast of Gibraltar. The cargo is also there.  In contrast, there is nothing to be seen or observed in the Southern District of New York.

### 5.     All Other Practical Problems that Make Trial of The Case Easy, Expeditious, and Inexpensive

This final "catch-all" factor militates heavily in favor of the Gibraltarian forum, where all of the evidence is.  Marshalling, collating and compelling that evidence and then re-assembling it in New York would be burdensome to say the least.  All of that evidence would need to be brought to New York.  In Gibraltar, most of the evidence is already there.

If left in New York, the trial would be impractical (requiring importation of all witnesses and evidentiary proofs), difficult (the sheer logistics of bringing these proofs from Europe to North America without the benefit of compulsory process), protracted (all witnesses are foreigners, potentially requiring translators/interpreters, while extensive pre-trial discovery will also need to be taken abroad) and expensive (bringing all fact witnesses and proofs from Europe).  In the courts of Gibraltar, where this case rightfully belongs, these problems are non-existent.

### B.     Public Interest Factors

### 1.     Court Congestion

In Gibraltar, the matter will proceed to trial within twelve months.  (Triay Decl. ¶ 11). According to the most recent published statistics, it will take, on average, more than twice that long for this action to reach trial in this District.[10]

---

[10] *See* Judicial Caseload Profile for Southern District of New York, year 2006, *available at* http://www.uscourts.gov/c gi-bin/cmsd2006.pl (Sweeney Decl. Exh. D).

### 2.    The Burden of Jury Duty

This is a non-factor as the matter will proceed as a bench trial in either jurisdiction.

### 3.    Whether the Case Touches Upon the Affairs of Many Persons/ Whether There Exists a Localized Controversy

While it can be said that this case touches upon the affairs of many persons, none of them are in New York, while many of them are in Gibraltar.  As for a localized controversy, the only local nexus is Gibraltar, where the collision occurred.

### C.    Other Factors

### 1.    Avoidance of Unnecessary Problems in Conflict of Laws Or In Application of Foreign Law

This is another *Gilbert* factor to be considered.  *See Piper Aircraft Co.*, 454 U.S. 235, 241 n.6, 102 S. Ct. 252, 258 n.6, 70 L. Ed. 2d 419 (1981); *Lynch v. National Prescription Admin.*, No. 03-CIV-1303, 2004 WL 385156, at *2 n.2 (S.D.N.Y. Mar. 1, 2004) (Daniels, J.).

Here the Court will be required to determine whether to apply the 1910 Collision Convention, which would limit plaintiff's recovery from Torm and the TORM GERTRUD to only their proportionate share of the fault for the collision, or the "innocent cargo rule," which would allow plaintiff to recover 100% of its damages from Torm and the TORM GERTRUD if there is even the slightest fault on their parts.  Gibraltar, Turkey, Denmark, Panama, and England all apply the 1910 Collision Convention while only the United States applies the "innocent cargo rule."

Furthermore, the Court will have to decide whether to apply the 1976 Limitation of Liability Convention, which would limit the liability of Torm and the TORM GERTRUD to a little more than $8,000,000, or the U.S. Limitation of Liability Act, which would limit its liability to the value of the TORM GERTRUD at the conclusion of the voyage plus any pending

freight.  Gibraltar and Turkey apply the 1976 Limitation of Liability Convention and only the United States applies its Limitation of Liability Act.

Finally, while all of the interested countries are signatories to the International Regulations for Preventing Collisions at Sea ("COLREGS"), they are applied differently in European countries than they are in the United States.  Since the collision occurred within the territorial waters of Gibraltar, this Court will have to familiarize itself with how the navigation rules are applied in that country.

### 2.     Legal Standard for Choice of Law Analysis

In 1953, the Supreme Court stated that maritime law resolves substantive choice of law questions "by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved."  *Lauritzen v. Larson*, 345 U.S. 571, 582, 73 S. Ct. 921, 928, 97 L. Ed. 1254 (1953).  The Court then set forth seven points of contact to be considered:  (1) Place of the Wrongful Act; (2) Law of the Flag; (3) Allegiance or Domicile of the Injured; (4) Allegiance of the Defendant Shipowner; (5) Place of Contract; (6) Inaccessibility of Foreign Forum; and (7) The Law of the Forum.  *See id.* at 583-90, 73 S. Ct. at 928-32.  In a subsequent case, the Supreme Court added an eighth factor:  The Shipowner's Base of Operations.  *See Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 308-09, 90 S. Ct. 1731, 1734, 26 L. Ed. 2d 252 (1970).  Although both *Lauritzen* and *Hellenic Lines* were Jones Act claims for maritime personal injuries, *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 382, 79 S. Ct. 468, 485, 3 L. Ed. 2d 368 (1959), *superseded by statute on other grounds as explained in Miles v. Apex Marine Corp.*, 498 U.S. 19, 33, 111 S. Ct. 317, 326, 112 L. Ed. 2d 275 (1990), held that the choice of law principles set forth in *Lauritzen* governed choice of law problems in all maritime cases, with due regard for the differing interests advanced by the various aspects of

maritime law.  However, the test "is not a mechanical one. . . .  The significance of one or more factors must be considered in light of the national interest" involved in the dispute.  *Hellenic Lines*,  398 U.S. at 308-09,  90 S. Ct. at 1734.    Indeed,  the  Court  quoted  with  approval Judge Medina in the Second Circuit when he said:

> "[T]he decisional process of arriving at a conclusion . . . involves the ascertainment of the facts or groups of facts which constitute contacts between the transaction involved in the case and the United States, and then deciding whether or not they are substantial.  Thus each factor is to be 'weighed' and 'evaluated' only to the end that, after each factor has been given consideration, a rational and satisfactory conclusion may be arrived at on the question of whether all the factors present add up to the necessary substantiality.  Moreover, each factor or contact, or group of facts must be tested in the light of the underlying objective . . . .

*Id.* at 309 n.4 (quoting *Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437, 441 (2d Cir. 1959); second and final alterations added).

### 3.    1910 Collision Convention or Innocent Cargo Rule

The Second Circuit has held that the 1910 Collision Convention is applied instead of the innocent cargo rule when the collision occurs in the territorial waters of a country that is a signatory to the 1910 Collision Convention, particularly when the laws of the flags of the colliding vessels also applied the 1910 Collision Convention.  *See The MANDU*, 102 F.2d 459, 463 (2d Cir. 1939); *see also Man Ferrostaal, Inc. v. M/V VERTIGO*, 447 F. Supp. 2d 316 (S.D.N.Y. 2006), *reconsideration denied*, 2006 WL 2669315 (S.D.N.Y. Sept. 18, 2006).

Even applying the *Lauritzen* analysis, this Court will conclude that liability in this matter will be decided under the 1910 Collision Convention and the 1976 Limitation of Liability Convention.

(i)    Place of the Wrongful Act:  The collision occurred in the territorial waters of Gibraltar.

(ii)    <u>Law of the Flag</u>:  The TORM GERTRUD flies the Danish flag.

(iii)    <u>Allegiance or Domicile of the Injured</u>:  Plaintiff is a Turkish corporation with its principal place of business in Turkey.

(iv)    <u>Allegiance of the Defendant Ship-owner</u>:  Torm is a Danish corporation with its principal place of business in Denmark.

(v)    <u>Place of Contract</u>:  Plaintiff's claim against Torm and the TORM GERTRUD does not arise out of a contract, so this contact is not relevant to the analysis.

(vi)    <u>Inaccessibility of Foreign Forum</u>:    There is an alternative (and much more convenient) forum in Gibraltar, so this contact is not relevant to the analysis.

(vii)    <u>The Law of the Forum</u>:  As shown above, even the pre-*Lauritzen* law applied in this Circuit requires the application of the law of Gibraltar since the collision occurred in the territorial waters of Gibraltar.  *See The MANDU*, 102 F.2d at 463; *Man Ferrostaal, Inc.*, 447 F. Supp. 2d 316.

(viii)    <u>The Shipowner's Base of Operations</u>:  Torm's base of operations is in Denmark.

None of the relevant contacts point to the law of the United States.  Every single relevant contact points to the law of a country that is a signatory to the 1910 Collision Convention.  Therefore, this Court must apply the 1910 Collision Convention rather than the innocent cargo rule.

### 4.    <u>1976 Limitation Convention or the U.S. Limitation of Liability Act</u>

In *Black Diamond S.S. Corp. v. Robert Stewart & Sons (The NORWALK VICTORY)*, 336 U.S. 386, 69 S. Ct. 622, 93 L. Ed. 754 (1949), the Supreme Court opened the door for the application of foreign law to the issue of limitation if (1) the issue of liability would be determined by the foreign law and (2) under the applicable foreign law, limitation of liability was

substantive and not procedural.  The foreign limitation is substantive if it "attaches to the right" establishing the underlying liability.  *Id.* at 395, 69 S. Ct. at 627.

Since the above analysis establishes that the issue of the liability of Torm and the TORM GERTRUD to plaintiff will be decided under the law of Gibraltar, this Court will be required to evaluate expert evidence on the issue of whether limitation of liability is substantive or procedural under the law of Gibraltar.

### 5.    COLREGS

All of the interested countries, including the United States, are signatories to the COLREGS.  However, as the Second Circuit has recently acknowledged, the Convention is applied in European countries without the benefit of certain presumptions applied in the United States.  *See Otal Invs. Ltd. v. M/V CLARY*, 494 F.3d 40, 50-51 (2d Cir. 2007) (the presumption on causation established by the *The Pennsylvania*, 86 U.S. 125 (1873), did not apply to collision governed by the 1910 Collision Convention).  This Court would be required to decide this case without applying the usual evidentiary presumptions.

## **CONCLUSION**

Because this Court lacks personal jurisdiction over Torm and *in rem* jurisdiction over the

TORM GERTRUD and because this is an inconvenient forum while another more suitable

convenient forum exists, this Court should dismiss the action as against defendants Torm and the

TORM GERTRUD pursuant to Federal Rule of Civil Procedure 12(b)(2) and the doctrine of

*forum non conveniens*.

Dated: New York, New York
        December 10, 2007

Respectively submitted,

NICOLETTI HORNIG & SWEENEY
*Attorneys for Defendant*
A/S DAMPSKIBSSELSKABET TORM

By:_____s/ James F. Sweeney_____
        James F. Sweeney (JFS-7745)
        Wall Street Plaza
        88 Pine Street, 7th Floor
        New York, New York  10005-1801
        Telephone No.: (212) 220-3830
        Facsimile No.: (212) 220-3784
        E-mail: jsweeney@nicolettihornig.com
        (FILE NO.: 00000798 JFS)

**TO:**

Patrick F. Lennon, Esq.
Charles E. Murphy, Esq.
LENNON, MURPHY & LENNON, LLC
*Attorneys for Plaintiff*
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone No.: (212) 490-6050
Facsimile No.: (212) 490-6070
E-mail: pfl@lenmur.com; cem@ldnmur.com


Peter J. Gutowski, Esq.
Gina M. Venezia, Esq.
FREEHILL HOGAN AND MAHAR LLP
*Attorneys for Gladiator Navigation S.A.*
80 Pine Street
New York , N.Y. 10005-1759
Telephone No.: 212-425-1900
Facsimile No.: 212-425-1901
E-mail:  gutowski@freehill.com; venezia@freehill.com

E:\Shared\wfennell\Motion to Dismiss -- MOL (FINAL).doc