UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
NURSAN METALURJI ENDUSTRISI A.S.,                :         **ECF CASE**
                                                 :
                  Plaintiff,                     :         **Case No.: 07 CIV 7687 (GBD)**
                                                 :
          -against-                              :
                                                 :
M/V "TORM GERTRUD" her engines, tackle,          :
boilers, etc. *in rem*, M/V "NEW FLAME" her engines, :
tackle, boilers, etc. *in rem*,                  :
A/S DAMPSKIBSSELSKABET TORM, TRANSMAR            :
SHIPPING CO. S.A., GLADIATOR NAVIGATION S.A.,    :
*in personam*,                                   :
                                                 :
                  Defendants.                    :
------------------------------------------------------------------------X

**DEFENDANT A/S DAMPSKIBSSELSKABET TORM'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT
DECLARING THAT ITS LIABILITY, IF ANY, WILL BE
<u>DETERMINED UNDER THE 1910 COLLISION CONVENTION</u>**


NICOLETTI HORNIG & SWEENEY
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
Tel: (212) 220-3830
Fax: (212) 220-3780

*Attorneys for Defendant*
*A/S DAMPSKIBSSELSKABET TORM*


Of Counsel:

   James F. Sweeney (JS-7745)
   Terry L. Stoltz (TS-7650)

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

FACT STATEMENT............................................................................................................... 1

LEGAL ARGUMENT.............................................................................................................. 4

      THE COURT SHOULD RULE THAT TORM'S LIABILITY,
      IF ANY, WILL BE GOVERNED BY THE 1910 COLLISION CONVENTION..............4

          A.     Legal Standard for Choice of Law Analysis................................................ 4

          B.     1910 Collision Convention or Innocent Cargo Rule................................... 6

CONCLUSION........................................................................................................................ 10

# **TABLE OF AUTHORITIES**

**CASES**

*The ATLAS*, 93 U.S. 302 (1876) ...................................................................................................... 4

*Hellenic Lines Ltd. v. Rhoditis*,
   398 U.S. 306, 90 S. Ct. 1731, 26 L. Ed. 2d 252 (1970) ............................................................ 5, 6

*Lauritzen v. Larsen*,
   345 U.S. 571, 73 S. Ct. 921, 97 L. Ed. 1254 (1953). ................................................................ 4-5

*MAN Ferrostaal, Inc. v. M/V VERTIGO*,
   447 F. Supp. 2d 316 (S.D.N.Y. 2006), *reconsideration denied*,
   2006 WL 2669315 (S.D.N.Y. Sept. 18, 2006) ................................................................. 4, 6-7, 9

*The MANDU*, 102 F.2d 459 (2d Cir. 1939) ................................................................................ 6, 9

*Miles v. Apex Marine Corp.*,
   498 U.S. 19, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990) ................................................................ 5

*Romero v. International Terminal Operating Co.*,
   358 U.S. 354, 79 S. Ct. 468, 3 L. Ed. 2d 368 (1959) ................................................................... 5

*Schexnider v. McDermott Int'l Inc.*,
   817 F.2d 1159 (5th Cir. 1987) ...................................................................................................... 8

**TREATISES**

6 MICHAEL F. STURLEY, BENEDICT ON ADMIRALTY (7th ed., rev. 1993) ............................... 4, 8-10

## INTRODUCTION[1]

Nursan Metalurji Endustrisi A.S. is an alien corporation with a principal place of business in Hatay, Turkey. (Verified Complaint ¶ 2). It has brought suit in this Court against defendant A/S Dampskibsselskabet Torm ("Torm"), another alien corporation resident in Hellerup, Denmark. (Verified Complaint ¶ 5). The lawsuit arises out of a vessel collision in the territorial waters of Gibraltar between Danish- and Panamanian-flagged vessels. (Verified Complaint ¶¶ 3, 4 & 8). The foreign plaintiff, the foreign defendant and the subject matter of the action all have nothing to do with New York.

This plaintiff is forum shopping for one reason — to enhance its monetary recovery. Plaintiff hopes to have this Court apply the "innocent cargo rule" to its alleged loss. (Verified Complaint ¶ 12). But the "innocent cargo rule," which permits a cargo owner to fully recover its loss from the non-carrying ship in a collision situation, is legally inapplicable.

## FACT STATEMENT

On July 31, 2007, the M/V NEW FLAME, a Panamanian-flagged bulk carrier owned by Greek interests (Verified Complaint ¶¶ 4, 6 & 7), sailed from Claremont Terminal in Port Newark, New Jersey with a cargo of metal scrap bound for Turkey. (Sweeney Decl. Exh. C).[2] En route to Turkey, the vessel made a port call in Gibraltar. (Triay Decl. Exh. A). In the early morning hours of August 12, 2007, the NEW FLAME sailed from Gibraltar (reportedly

---

[1] Defendant A/S Dampskibsselskabet Torm has filed a motion to dismiss the complaint (i) on the grounds that the Court lacks *in personum* jurisdiction over it and lacks *in rem* jurisdiction over the M/V TORM GERTRUD and (ii) for *forum non conveniens*. (*See* Docket Nos. 5-9). This motion is brought without prejudice to the motion to dismiss which, if granted, will moot this motion.

[2] "Stoltz Decl." refers to the declaration of Terry L. Stoltz executed on January 4, 2008; "Sweeney Decl." refers to the declaration of James F. Sweeney executed on December 7, 2007 (*see* Docket No. 6); "Triay Decl." refers to the declaration of Julian Richard Triay executed on December 5, 2007 (*see* Docket No. 7); "Hansen Decl." refers to the declaration of Anne Mentz Hansen executed on December 6, 2007 (*see* Docket No. 8), and the exhibits annexed to the respective declarations.

without clearance).  (Triay Decl. Exh. A).  Just off Europa Point, in the territorial waters of Gibraltar, the NEW FLAME collided with the TORM GERTRUD.  (Verified Complaint ¶ 8).

The TORM GERTRUD, a Danish-flagged product tanker owned by Torm, a Danish shipowner, was outbound from Augusta, Italy with a full cargo of unleaded gasoline for delivery to the East Coast of the United States. (Hansen Decl. ¶ 9).  The TORM GERTRUD's voyage charterer had preliminarily indicated that the port of discharge was to be Port Everglades, Florida.  (Hansen Decl. ¶ 9).  At the time of the collision, the vessel was nearing Algeciras, Spain to perform a crew change.  (Hansen Decl. ¶ 9)

The movements of the NEW FLAME and the TORM GERTRUD were being tracked on radar by the UK Ministry of Defence Maritime Data Centre, Windmill Hill Signal Station located in Gibraltar.  (Triay Decl. ¶ 6).  Real time records of those radar observations are maintained by that Maritime Data Centre.  (Triay Decl. ¶ 6).

As a result of the collision, the damaged TORM GERTRUD proceeded to Algeciras where the voyage had to be abandoned and the cargo transshipped on another vessel owned by Torm.  (Triay Decl. Exh. A).  The NEW FLAME partially sank in the territorial waters of Gibraltar and was abandoned by her crew, who were then taken to the Port of Gibraltar, where they were put ashore and medically examined.  (Triay Decl. Exh. A).  The Captain of the NEW FLAME was arrested in Gibraltar and charged with a violation of the Gibraltarian maritime law.  (Triay Decl. ¶ 7).  If convicted, he could face a fine of £2,000 and/or two years imprisonment.  (Triay Decl. ¶ 7).

The Gibraltar Port Authority immediately activated its Emergency Response Plan and dispatched all its available resources to the scene of the collision.  (Triay Decl. Exh. A).  The Gibraltar Port Authority deployed divers to the wreck of the NEW FLAME to inspect the

2

damage to the submerged hull.  (Triay Decl. Exh. A).  A full on-board inspection was undertaken by the Gibraltar Port Authority Maritime Surveyors.  (Triay Decl. Exh. A).  The Gibraltar Maritime Administration commenced an investigation into the collision and into how the NEW FLAME had departed from the Port of Gibraltar without the necessary clearance.  (Triay Decl. Exh. A).

The local Spanish maritime authorities also investigated the collision and deployed significant resources to the scene of the collision.  Panamanian and Danish investigations are also underway.  These latter two are being jointly conducted with the Gibraltarian investigation with the Gibraltar Maritime Administration leading the joint investigation.  (Triay Decl. Exh. B).  The report of the investigation is expected to be issued by March 2008.  (Triay Decl. Exh. B).

Pursuant to the joint investigation, the crews from both the NEW FLAME and the TORM GERTRUD were questioned/interviewed by the Gibraltar Maritime Administration.  (Triay Decl. ¶ 9).  In addition, various NEW FLAME officers and crew were also interviewed by The Royal Gibraltar Police.  (Triay Decl. ¶ 9).

Salvage and recovery efforts were jointly conducted by Greek and Dutch marine salvage contractors.  (Sweeney Decl. Exhs. A & B).  The aim was to remove plaintiff's cargo from the wreck of the NEW FLAME and land it ashore in Gibraltar for ultimate transshipment to Turkey.  Recently, the wrecked vessel has broken in two, resulting in minor oil pollution in the territorial waters of Gibraltar.  (Stoltz Decl. Exh. D).

There is no known U.S. involvement or investigation into the collision.

**LEGAL ARGUMENT**

**THE COURT SHOULD RULE THAT TORM'S
LIABILITY, IF ANY, WILL BE GOVERNED BY
THE 1910 COLLISION CONVENTION**

Should this case not be dismissed for either (i) lack of personal jurisdiction over Torm and lack of *in rem* jurisdiction over the TORM GERTRUD and/or (ii) on the basis of *forum non conveniens*, the Court must determine whether to apply the Convention for the Unification of Certain Rules of Law with respect to Collisions between Vessels (the "1910 Collision Convention") or the "innocent cargo rule."  The 1910 Collision Convention would limit plaintiff's recovery from Torm and the TORM GERTRUD to their proportionate share of the fault for the collision, while the "innocent cargo rule," would allow plaintiff to recover 100% of its damages from Torm and the TORM GERTRUD if there is even the slightest fault on their parts. *See MAN Ferrostaal, Inc. v. M/V VERTIGO*, 447 F. Supp. 2d 316, 320-21 (S.D.N.Y. 2006), *reconsideration denied*, 2006 WL 2669315 (S.D.N.Y. Sept. 18, 2006).  Gibraltar, Turkey, Denmark, Greece, Spain, and England[3] all apply the 1910 Collision Convention, *see* 6 MICHAEL F. STURLEY, BENEDICT ON ADMIRALTY 3-15 to 3-17 (7th ed., rev. 1993), while the United States applies the "innocent cargo rule," *see The ATLAS*, 93 U.S. 302, 317 (1876).

**A.    Legal Standard for Choice of Law Analysis**

In 1953, the Supreme Court stated that maritime law resolves such substantive choice of law questions "by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved." *Lauritzen v. Larsen*, 345 U.S. 571, 582, 73 S. Ct. 921, 928, 97 L. Ed. 1254 (1953).  The Court then set forth seven points of contact

---

[3] In Torm's Memorandum of Law in Support of its Motion to Dismiss (*see* Docket No. 9), Torm mistakenly alleged that Panama, where the NEW FLAME is registered, applied the 1910 Collision Convention (*see id.* at p.18). Although Panama has not ratified the 1910 Collision Convention, the Panamanian law on collision would limit the recovery against TORM GERTRUD to its proportionate fault for the collision, the same as the 1910 Collision Convention. (Stoltz Decl. ¶ 7).  Panama does not apply the innocent cargo rule.

4

to be considered: (1) Place of the Wrongful Act; (2) Law of the Flag; (3) Allegiance or Domicile of the Injured; (4) Allegiance of the Defendant Shipowner; (5) Place of Contract; (6) Inaccessibility of Foreign Forum; and (7) The Law of the Forum. *See id.* at 583-91, 73 S. Ct. at 928-32. In a subsequent case, the Supreme Court added an eighth factor: The Shipowner's Base of Operations. *See Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 308-09, 90 S. Ct. 1731, 1734, 26 L. Ed. 2d 252 (1970). Although both *Lauritzen* and *Hellenic Lines* were Jones Act claims for maritime personal injuries, *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 382, 79 S. Ct. 468, 485, 3 L. Ed. 2d 368 (1959), *superseded by statute on other grounds as explained in Miles v. Apex Marine Corp.*, 498 U.S. 19, 33, 111 S. Ct. 317, 326, 112 L. Ed. 2d 275 (1990), held that the choice of law principles set forth in *Lauritzen* governed choice of law problems in all maritime cases, with due regard for the differing interests advanced by the various aspects of maritime law. However, the test "is not a mechanical one. . . . The significance of one or more factors must be considered in light of the national interest" involved in the dispute. *Hellenic Lines Ltd.*, 398 U.S. at 308-09, 90 S. Ct. at 1734. Indeed, the Court quoted with approval Judge Medina in the Second Circuit when he said:

> "[T]he decisional process of arriving at a conclusion . . . involves the ascertainment of the facts or groups of facts which constitute contacts between the transaction involved in the case and the United States, and then deciding whether or not they are substantial. Thus each factor is to be 'weighed' and 'evaluated' only to the end that, after each factor has been given consideration, a rational and satisfactory conclusion may be arrived at on the question of whether all the factors present add up to the necessary substantiality. Moreover, each factor or contact, or group of facts must be tested in the light of the underlying objective . . . ."

*Id.* at 309 n.4, 90 S. Ct. at 1734 n.4 (quoting *Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437, 441 (2d Cir. 1959)) (second and final alterations added).

5

In determining which law to apply, this Court must decide which national interests predominate, "with deference to the interest with the most substantial connection to the disputed action." *MAN Ferrostaal Inc.*, 447 F. Supp. 2d at 322. Furthermore, in making this choice of law determination, the courts require "a cold objective look at the actual operational contacts" rather than a mechanical application of factors. *Hellenic Lines, Ltd.*, 398 U.S. at 310, 90 S. Ct. at 1734.

### B.    1910 Collision Convention or Innocent Cargo Rule

(i)    <u>Place of the Wrongful Act</u>:  In a tort case, the place where the tortious act took place is of paramount concern, as that country has the strongest interest in regulating tortious acts in its jurisdiction. The collision occurred in the territorial waters of Gibraltar.

The Second Circuit held that the 1910 Collision Convention is applied instead of the "innocent cargo rule" when the collision occurs in the territorial waters of a country that is a signatory to the 1910 Collision Convention. *See The MANDU*, 102 F.2d 459, 463 (2d Cir. 1939). In a strikingly parallel situation to the case at bar, this Court followed *The MANDU*, and held that the 1910 Collision Convention, rather than the American "innocent cargo rule," applied to a vessel collision in foreign waters. *See MAN Ferrostaal Inc.*, 447 F. Supp. 2d at 320-25.

In *MAN Ferrostaal*, the owners of cargo carried on board the M/V ZIEMIA LODZKA sued that vessel and its owners and the M/V VERTIGO and its owners to recover for cargo damage arising out of a collision between those ships in Danish waters. *See* 447 F. Supp. 2d at 317. The court was then asked to determine whether the 1910 Collision Convention or the American "innocent cargo rule" governed the cargo owners' claims for damages. *See id.* After an exhaustive analysis of the facts and the competing law, Judge Hellerstein concluded that the

6

1910 Collision Convention was applicable to the cargo claim, to the exclusion of the so-called "innocent cargo rule." *See id.* at 320-25.

  The *MAN Ferrostaal* court specifically found that:

> the interest of Denmark, as the site of the accident, predominates. Denmark has a strong interest in regulating and overseeing the conduct of vessels within its waters . . . . Significantly, in seeking to regulate the conduct of ships within its territorial waters, Denmark has adopted the 1910 Convention which expressly provides that damages should be distributed in a manner proportionate to each vessel's independent degree of fault. 1910 Convention, Article 4. By adopting such a rule of proportionate liability, Denmark necessarily intended to regulate the conduct of ships within its waters, making clear that all vessels passing through its waters would bear responsibility for any damages sustained as a result of its own negligence or other fault.

*Id*. at 324.

  Judge Hellerstein went on to hold that the "innocent cargo rule" was inapplicable:

> In contrast, the so-called innocent cargo rule applied under U.S. law, granting immunity to the carrying vessel for damage resulting from "the navigation or . . . management of the ship," COGSA, § 1304(2)(a), but allowing injured cargo claimants to nevertheless pursue full damages as against the non-carrying vessel, is not conduct-regulating in nature. Instead, the true intent and purpose of COGSA may more properly be characterized as regulating the relationship between parties in privity, the cargo and the carrying vessel, requiring that cargo interests protect themselves from the possible grant of immunity through their contractual agreements with the carrying vessel or by procuring insurance coverage. Thus, U.S. law places limited value on the compensatory features of tort law and, by relegating parties to suits in tort against vessels not in privity, necessarily assumes the vagaries and varieties of different countries' tort laws. To apply such U.S. law and policy to the exclusion of Danish law which instead mandates that each vessel assume responsibility only for its own degree of fault, would work a manifest injustice and would ignore the more dominant interest of Denmark in regulating the conduct of ships within its territorial waters.

*Id.*

7

The strong interests of Gibraltar in the issues in this case are demonstrated by the facts that: (1) the Ministry of Defence monitors all vessel movements in the area where the collision occurred; (2) the Captain of the NEW FLAME was arrested and faces criminal penalties including possible imprisonment for violation of Gibraltarian maritime law; (3) the Gibraltar Port Authority activated its Emergency Response Plan and dispatched its available resources, including divers, to the scene of the collision; (4) the Gibraltar Maritime Surveyors performed a full on-board inspection; (5) the Gibraltar Maritime Administration, in cooperation with the appropriate Panamanian and Danish authorities, is leading an investigation into the collision; (6) the salvage operation of the NEW FLAME and her cargo was conducted in Gibraltar with an eye toward landing plaintiff's cargo in Gibraltar for transshipment to Turkey; and (7) the NEW FLAME has broken apart in Gibraltarian territorial waters resulting in minor oil pollution. On the other hand, there is no known United States involvement or interest in the collision.

Because Gibraltar applies the 1910 Collision Convention, *see* 6 BENEDICT ON ADMIRALTY 3-17 n.7, this contact calls for application of the 1910 Collision Convention.

(ii)  Law of the Flag: The "law of the flag is given *great* weight in determining the law to be applied in maritime cases." *Schexnider v. McDermott Int'l Inc.,* 817 F.2d 1159, 1162 (5th Cir. 1987) (emphasis in original). The TORM GERTRUD flies the Danish flag. Because Denmark applies the 1910 Collision Convention, *see* 6 BENEDICT ON ADMIRALTY 3-15, this contact calls for the application of the 1910 Collision Convention.[4]

---

[4] The claim at issue is plaintiff's claim against Torm and the TORM GERTRUD. It does not entail the claim by plaintiff against the NEW FLAME and her owners or the collision claim between the two vessels. Therefore, the flag of the NEW FLAME is irrelevant to this analysis. However, the NEW FLAME flies the flag of Panama. Although Panama has not adopted the 1910 Collision Convention, the domestic law of Panama would, like the 1910 Collision Convention, limit plaintiff's recovery against Torm and the TORM GERTRUD to only their proportionate fault. (Stoltz Decl. ¶ 7). Therefore, if it were relevant, the law of the flag of the NEW FLAME militates against application of the innocent cargo rule.

8

(iii)   Allegiance or Domicile of the Injured:  Plaintiff is a Turkish corporation with its principal place of business in Turkey.  Because Turkey applies the 1910 Collision Convention, *see* 6 BENEDICT ON ADMIRALTY 3-17, this contact calls for the application of the 1910 Collision Convention.

(iv)   Allegiance of the Defendant Shipowner:  Torm is a Danish corporation with its principal place of business in Denmark.  Because Denmark applies the 1910 Collision Convention, *see* 6 BENEDICT ON ADMIRALTY 3-15, this contact calls for the application of the 1910 Collision Convention.[5]

(v)   Place of Contract:  Plaintiff's claim against Torm and the TORM GERTRUD does not arise out of a contract, so this contact is not relevant to the analysis.

(vi)   Inaccessibility of Foreign Forum:  Torm has moved to dismiss the action on the basis of *forum non conveniens*, so this factor is relevant.  *See MAN Ferrostaal*, 447 F. Supp. 2d at 323.  There is an alternative (and much more convenient) forum in Gibraltar.  Because Gibraltar applies the 1910 Collision Convention, *see* 6 BENEDICT ON ADMIRALTY 3-17, this contact calls for the application of the 1910 Collision Convention.

(vii)   The Law of the Forum:  As shown above, the Second Circuit requires the application of the law of Gibraltar since the collision occurred in the territorial waters of Gibraltar.  *See The MANDU*, 102 F.2d at 463; *MAN Ferrostaal, Inc.*, 447 F. Supp. 2d at 324 (the "innocent cargo rule" is not a "conduct-regulating" rule).  Because Gibraltar applies the

---

[5] The allegiance of the owner of the NEW FLAME is again not relevant to plaintiff's claim against Torm and the TORM GERTRUD.  *See*, *supra*, n.4.  However, the NEW FLAME is owned by Greek interests (Verified Complaint ¶¶ 4, 6 & 7), thus their allegiance is to Greece.  Since Greece applies the 1910 Collision Convention, *see* 6 BENEDICT ON ADMIRALTY 3-15, this contact, if relevant, would call for the application of the 1910 Collision Convention.

1910 Collision Convention, *see* 6 BENEDICT ON ADMIRALTY 3-17 n.7, this contact calls for the application of the 1910 Collision Convention.

(viii)   The Shipowner's Base of Operations:  Torm's base of operations is in Denmark. Because Denmark applies the 1910 Collision Convention, *see* 6 BENEDICT ON ADMIRALTY 3-15, this contact calls for the application of the 1910 Collision Convention.[6]

None of the relevant contacts point to application of the law of the United States.  Every single relevant contact points to the law of a country that is a signatory to the 1910 Collision Convention.  Therefore, this Court must apply the 1910 Collision Convention rather than the "innocent cargo rule."

## CONCLUSION

This action brought by a Turkish cargo owner against the Danish owner of a Danish-flagged vessel arises out of a collision between two foreign flagged vessels in the territorial waters of Gibraltar.  There is no United States involvement in the action.  Therefore, the Court should declare that Torm's liability, if any, is governed by the 1910 Collision Convention and Torm's motion for partial summary judgment should be GRANTED.

---

[6] Again, the base of operations of the owner of the NEW FLAME is not relevant to plaintiff's claim against Torm and the TORM GERTRUD. *See*, *supra*, n.4. However, the base of operation of the NEW FLAME owner is Greece. (Verified Complaint ¶¶ 4, 6 & 7).  Since Greece applies the 1910 Collision Convention, *see* 6 BENEDICT ON ADMIRALTY 3-15, this contact, if relevant, would call for the application of the 1910 Collision Convention.

Dated: New York, New York
January 4, 2008

                                            Respectively submitted,

                                            NICOLETTI HORNIG & SWEENEY
                                            *Attorneys for Defendant*
                                            *A/S DAMPSKIBSSELSKABET TORM*

                                        By: *[signature]*
                                           Terry L. Stoltz (TS 7650)
                                           Wall Street Plaza
                                           88 Pine Street, 7th Floor
                                           New York, New York 10005-1801
                                           Telephone No.: (212) 220-3830
                                           Facsimile No.: (212) 220-3784
                                           E-mail: jsweeney@nicolettihornig.com
                                           (FILE NO.: 00000798 JFS)

**TO:**

Patrick F. Lennon, Esq.
Charles E. Murphy, Esq.
LENNON, MURPHY & LENNON, LLC
*Attorneys for Plaintiff*
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone No.: (212) 490-6050
Facsimile No.: (212) 490-6070
E-mail: pfl@lenmur.com; cem@lenmur.com

11

Peter J. Gutowski, Esq.
Gina M. Venezia, Esq.
FREEHILL HOGAN AND MAHAR LLP
*Attorneys for Gladiator Navigation S.A.*
80 Pine Street
New York , N.Y. 10005-1759
Telephone No.: 212-425-1900
Facsimile No.: 212-425-1901
E-mail:  gutowski@freehill.com; venezia@freehill.com