EXHIBIT "2"

**RECOMMENDED**

# CHARTER PARTY
Adopted by the Documentary Committee of the
General Shipping of the United Kingdom

CODE NAME: **Gencon.**

Issued to come into force for fixtures on and after 15th September 1922

The Documentary Council of The Baltic and White Sea Conference

## UNIFORM GENERAL CHARTER
AS REVISED 1922
(only to be used for trades for which no approval form is in force)

Pleasantville, New York, July 11th, ~~19~~ 2007

| | | |
|---|---|---|
| Owners. | 1. It is this Day mutually agreed between  E. D. & F. MAN SHIPPING LTD., | 1 |
| | London, as Disponent | 2 |
| | Owners of the ~~steamer or~~ motor-vessel "NEW FLAME", Panamanian Flag, Built 1994 | 3 |
| | Classed: Highest CCS | |
| | of 26,824 / 13,885 tons ~~gross~~/nett Register and carrying about _____ tons of deadweight cargo, | 4 |
| Position. | now _____ | 5 |
| | and expected ready to load under this Charter about _____ | 6 |
| Charterers. | and Messrs. SIMS GROUP GLOBAL TRADE CORP. | 7 |
| | of New York, New York _____ as Charterers. | 8 |
| Where to load. | That the said vessel shall proceed to one (1) safe berth NEW YORK, or in Charterers' | 9 |
| | option one (1) safe berth ALBANY + one (1) safe berth NEW YORK, | |
| | in this rotation _____ or so near thereto as she may safely get and lie | 10 |
| Cargo. | always afloat, and there load a full and complete cargo (~~if shipment of deck cargo~~ | 11 |
| | ~~agreed same to be at Charterers' risk~~) of see Clause 71 _____ | 12 |
| | _____ | 13 |
| | _____ | 14 |
| | _____ | 15 |
| | (Charterers to provide all mats and/or wood for dunnage and any separations required, | 16 |
| | the Owners allowing the use of any dunnage wood on board if required) which the | 17 |
| | Charterers bind themselves to ship, and being so loaded the vessel shall proceed to | 18 |
| | one (1) safe berth, one (1) safe port TURKEY, Sea of Marmara - Nemrut Bay Range; | 19 |
| Destination. | or in Charterers' option, _____ | 20 |
| | one (1) safe berth ISKENDERUN. Port in Charterers' option. | 21 |
| | Charterers to declare discharge port latest upon vessel's passing Gib. | 22 |
| | ~~as ordered on signing Bills of Lading~~ or so near thereto as she may safely get and | 23 |
| | lie always afloat and there deliver the cargo on being paid freight—on ~~delivery~~/intaken quantity—as | 24 |

Form 30-142   Printed and Sold by Unz & Co., 190 Baldwin Ave., Jersey City, New Jersey 07306   (201) 795-5400   (800) 631-2098

1/14

| | | |
|---|---|---|
| Owners' Responsibility Clause. | 2. Owners are responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods (unless stowage performed by shippers or their stevedores or servants) or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager.<br><br>And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this clause, be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever.<br><br>Damage caused by contact with or leakage, smell or evaporation from other goods or by the inflammable or explosive nature or insufficient package of other goods not to be considered as caused by improper or negligent stowage, even if in fact so caused. | 29<br>30<br>31<br>32<br>33<br>34<br>35<br>36<br>37<br>38<br>39<br>40<br>41<br>42<br>43<br>44 |
| Deviation Clause. | 3. The vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist vessels in all situations, and also to deviate for the purpose of saving life and/or property. | 45<br>46<br>47 |
| Payment of Freight. | 4. ~~The freight to be paid in cash without discount on delivery of the cargo at mean rate of exchange ruling on day or days of payment, the receivers of the cargo being bound to pay freight on account during delivery, if required by Captain or Owners.~~<br>~~Cash for vessel's ordinary disbursements at port of loading to be advanced by Charterers if required at highest current rate of exchange, subject to two per cent. to cover insurance and other expenses.~~ | 48<br>49<br>50<br>51<br>52<br>53<br>54 |
| Loading. | 5. ~~Cargo to be brought alongside in such a manner as to enable vessel to take the goods with her own tackle and to load the full cargo in _____ running working days. Charterers to procure and pay the necessary men on shore or onboard the lighters to do the work there, vessel only heaving the cargo onboard.~~<br>~~If the loading takes place by elevator cargo to be put free in vessel's holds, Owners only paying trimming expenses.~~<br>~~Any pieces and/or packages of cargo over two tons weight, shall be loaded, stowed and discharged by Charterers at their risk and expense.~~<br>~~Time to commence at 1 p.m. if notice of readiness to load is given before noon, and at 6 a.m. next working day if notice given during office hours after noon.~~<br>~~The notice to be given to the Shippers, Messrs. _____~~<br><br>~~Time lost in waiting for berth to count as loading time.~~ | 55<br>56<br>57<br>58<br>59<br>60<br>61<br>62<br>63<br>64<br>65<br>66<br>67 |
| Discharging. | 6. ~~Cargo to be received by Merchants at their risk and expense alongside the vessel not beyond the reach of her tackle and to be discharged in _____ _____ running working days. Time to commence at 1 p.m. if notice of readiness to discharge is given before noon, and at 6 a.m. next working day if notice given during office hours after noon.~~<br>~~Time lost in waiting for berth to count as discharging time.~~ | 68<br>69<br>70<br>71<br>72<br>73 |
| Demurrage | 7. ~~Ten running days on~~ Demurrage at the rate of USD 541,500.00 (FORTY ONE THOUSAND FIVE HUNDRED DOLLARS) (If incurred to be paid by Charterers) per day or pro rata for any part of a day, ~~payable day by day, to be allowed Merchants altogether at ports of loading and discharging.~~ | 74<br>75<br>76 |
| Lien Clause. | 8. Owners shall have a lien on the cargo for freight, dead-freight, demurrage ~~and damages for detention~~. Charterers shall remain responsible for dead-freight and demurrage (~~including damages for detention~~), incurred at port of loading. Charterers shall also remain responsible for freight and demurrage (~~including damages for detention~~) incurred at port of discharge, ~~but only to such extent as the Owners have been unable to obtain payment thereof by exercising the lien on the cargo.~~ | 77<br>78<br>79<br>80<br>81<br>82 |
| Bills of Lading. | 9. ~~The Captain to sign Bills of Lading at such rate of freight as presented without prejudice to this Charterparty, but should the freight by Bills of Lading amount to less than the total chartered freight the difference to be paid to the Captain in cash on signing Bills of Lading.~~ | 83<br>84<br>85<br>86 |
| Strike-, War- and Ice-Clauses | 10. Strike-Clause, War Clause and Ice-Clause as below. | 87 |

2/14

Laydays not to commence before July 21st, 2007.

Cancelling Clause    11. Should the vessel not be ready to load (whether in berth or not) on or before the 29th July 2007 Charterers have the option of cancelling this contract, such option to be declared, if demanded, at least 48 hours before vessel's expected arrival at port of loading. ~~Should the vessel be delayed on account of average or otherwise, Charterers to be informed as soon as possible, and if the vessel is delayed for more than 10 days after the day she is stated to be expected ready to load, Charterers have the option of cancelling this contract, unless a cancelling date has been agreed upon.~~    88 89 90 91 92 93 94 95

General Average.    12. General average to be settled ⟨in New York⟩ according to York—Antwerp rules, ⟨1974⟩ ~~Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see clause 2).~~    96 97 98

Indemnity.    13. Indemnity for non-performance of this Charter-party, proved damages, not exceeding estimated amount of Freight.    99 100

~~In case of non-execution at least ⅓ of the brokerage on the estimated amount of freight and dead-freight to be paid by the Owners to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be mutually agreed.~~    105 106 107 108

### GENERAL STRIKE CLAUSE.    109

Neither Charterers nor Owners shall be responsible for the consequences of any strikes or lock-outs preventing or delaying the fulfilment of any obligations under this contract.
If there is a strike or lock-out affecting the loading of the cargo, or any part of it, when vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, Captain or Owners may ask Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, Owners shall have the option of cancelling this contract. If part cargo has already been loaded, Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.
If there is a strike or lock-out affecting the discharge of the cargo on or after vessel's arrival at or off port of discharge and same has not been settled within 48 hours, Receivers shall have the option of keeping vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging, or of ordering the vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this charterparty and of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

### GENERAL WAR CLAUSE.    131

If the nation under whose flag the vessel sails should be engaged in war and the safe navigation of the vessel should thereby be endangered either party to have the option of cancelling this contract, and if so cancelled, cargo already shipped shall be discharged either at the port of loading or, if the vessel has commenced the voyage, at the nearest safe place at the risk and expense of the Charterers or Cargo-Owners.
If owing to outbreak of hostilities the goods loaded or to be loaded under this contract or part of them become contraband of war whether absolute or conditional or liable to confiscation or detention according to international law or the proclamation of any of the belligerent powers each party to have the option of cancelling this contract as far as such goods are concerned, and contraband goods already loaded to be then discharged either at the port of loading, or if the voyage

has already commenced, at the nearest safe place at the expense of the Cargo-Owners. Owners to have the right to fill up with other goods instead of the contraband.

Should any port where the vessel has to load under this Charter be blockaded the contract to be null and void with regard to the goods to be shipped at such port.

No Bills of Lading to be signed for any blockaded port, and if the port of destination be declared blockaded after Bills of Lading have been signed, Owners shall discharge the cargo either at the port of loading, against payment of the expenses of discharge, if the ship has not sailed thence, or, if sailed at any safe port on the way as ordered by Shippers or if no order is given at the nearest safe place against payment of full freight.

### GENERAL ICE CLAUSE.

#### PORT OF LOADING.

a) In the event of the loading port being inaccessible by reason of ice when vessel is ready to proceed from her last port or at any time during the voyage or on vessel's arrival or in case frost sets in after vessel's arrival, the Captain for fear of being frozen in is at liberty to leave without cargo, and this Charter shall be null and void.
b) If during loading the Captain, for fear of vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for Owner's benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter to be forwarded to destination at vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Receivers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per Charter.
c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Captain or Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section B or to declare the charter null and void unless Charterers agree to load full cargo at the open port.
d) This Ice Clause not to apply in the Spring.

#### PORT OF DISCHARGE.

a) Should ice (except in the Spring) prevent vessel from reaching port of discharge. Receivers shall have the option of keeping vessel waiting until the re-opening of navigation and paying demurrage, or of ordering the vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the impossibility of reaching port of destination.
b) If during discharging the Captain for fear of vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.
c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

Clause numbers 16 through 73 are attached hereto and are to be considered fully incorporated herein and form part of this Charter Party.

### RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

**Clause 16**
Charterers privilege to shift to other berths and/or anchorages each port both ends. Shifting expenses to be for the Charterers' account/shifting time to count as laytime, but all other port charges remain for Owners' account. Officers' and crew overtime and fuel consumed to be for Owners' account.

**Clause 17**
Cargo to be loaded, stowed, trimmed, and discharged by the Charterers free of expense to the vessel.

**Clause 18**
Cargo is to be loaded, stowed and trimmed at the average rate of 8000 MTS per weather working day of 24 consecutive hours, Saturday afternoons, Sundays and holidays excepted, even if used.

Cargo is to be discharged at the average rate of 7000 MTS per weather working day of 24 consecutive hours, Sundays and holidays included.

Laytime is reversible between load ports but non-reversible between load and discharging ports.

**Clause 19**
At load port time from noon Saturday until 0800 hours Mondays not to count, even if used. Time from midnight day preceding a holiday until 8:00 A.M., the day after a holiday not to count, even if used.
At discharge port time to count Sundays and holidays included.

**Clause 20**
At each port Notice of Readiness to be given in berth, in writing, within laydays during office hours, excepted that if berth is occupied, Notice of Readiness to be given in writing or by cable from designated anchorage or layberth within office hours. Time used to shift from anchorage or layberth to load or discharging berth not to count. At load port office hours are 0800-1700 hours Monday through Friday and 0800-1200 (noon) Saturday, excluding holidays. At discharging port office hours are 0800-1700 hours Sundays and holidays included.
Time to count 0800 hours next working day after proper Notice of Readiness duly tendered and accepted. It is understood the word "holidays" as it appears throughout this Charter Party includes local and/or national and/or public and/or stevedore holidays as stated in the BIMCO holiday calendar.
Time at second load port, if used, to count on arrival. See also Clause 72.

**Clause 21**
At loading port vessel to wireless Charterers or their agents giving 7 days, 96 hours and 48 hours notice of expected time of arrival. At discharge port, vessel to wireless Charterers or their agents, giving 7 days, 96 hours and 48 hours notice of expected time of arrival. Vessel to wireless Charterer's agents at both ends any change in E.T.A., exceeding 2 hours after 48 hour notice is given. Discharging port to be declared by Charterers latest upon vessel's passing Gib.

**Clause 22**
Vessel is a bulkcarrier, has one deck, five holds and five hatches and has 4 cranes at 25 tons, each in good working condition and serving all hatches. Charterers' privilege to work all hatches at all times and all gear shall be capable of being worked simultaneously at all hatches at the gear's maximum lifting capacity. Vessel is capable of deballasting fully within 24 hours. Ship to give free

-1-

## RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

use of power for gear and supply light for night work, if required, free of expense to Charterers.
Vessel has MacGregor type folding fore and aft hatch covers. Cranes work simultaneously and serve all hatches. Vessel's total deadweight is 43,815 MT on 11.221 M (summer) saltwater, length overall 189.98 M, beam 30.5 M. Hatch sizes: all) 18.92 X 16 M TPC: 51.9 Crane outreach: about 8.5 M
Bale cubic by hold: 1) 10192.5 2) 11310.4 3) 11207.1 4) 11341.7 5) 10879.4 cubic meters
Maximum 12.0 M from waterline to top of hatchcoaming or other obstruction preventing access to hatch opening in fully ballasted condition. Engine/bridge aft.
Head Owners' P + I Club: Swedish Club. Disponent Owners' P + I Club: North of England.
Vessels' ballast tanks to maintain the same ballast condition prior to commencement of loading and on completion of discharging. Maximum air draft 130 feet.
The vessel is classed 100A1 Lloyds, a registry being a member of the International Association of Classification Societies, with no subjects or conditions imposed by class and in every way fitted and suitable for the intended voyage with all certificates current and valid.

**Clause 23**
Owners do not have privilege of completing with other cargo.

**Clause 24**
Vessel to tender with holds clean, and dry and free of any residue and in all respects ready to load.
Vessel to tender clear of sweat battens and any obstacles that might be hindering the loading and discharging of scrap, including trimming hatch covers and ladders. Tanktops, tunnels exposed cables and pipes to be entirely and properly protected by the vessel against the hazards normally connected with scrap cargo. Broken or split boards, cargo battens, dunnage, and loose protection on tanktops not to be considered as proper protection. Charterers and stevedores are not to be responsible for damages to sweat battens, hatch covers and trimming hatch covers and any object if stored in such a way that they are exposed to contact with the cargo. Charterers and stevedores are not to be responsible for damages to ladder brackets and battenclips, removable or unremovable warranted wood bulkhead sheathing and landing pads on tank tops to be in good condition.

**Clause 25**
Vessel to furnish a certified calibration scale and trim correction tables for all ballast holds and tanks, including fore and after peak and double tanks and deeptanks. Plimsoll marks amidship and draft marks on port and starboard side, bows and sterns to be clearly cut and marked on shell plating.
Sounding pipes to be maintained free and clear without obstructions at all times. Vessel to furnish capacity plan, displacement scale, hydrostatic curves and deadweight scale, and same to be certified by Master as to the correctness at time of loading.

**Clause 26**
Stevedoring overtime to be for the account of party ordering same; however, officers' and crew overtime always to be for the Owners' account.

**Clause 27**
Any taxes/dues/wharfage on cargo to be for Charterers' account.
Any taxes/dues/wharfage/dockage on vessel and/or freight to be for Owners' account.

**Clause 28**
Charterers' privilege to load and discharge with magnets, grabs, boxes, conveyors and/or bulldozers.

## RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

**Clause 29**
Owners to appoint agents nominated by Charterers at load and discharging ports, Owners paying the customary agency fee.

**Clause 30**
Charterers' privilege to load and unload from or into lighters at berths and/or anchorages. Lighterage and lightening, if any, at either end, to be for the Charterers' expense, time counting.

**Clause 31**
Any extra insurance due to vessel's age/flag/class/ownership, to be for Charterers' account.

**Clause 32**
At loading and discharging ports, vessel to lie always safely afloat and berths always safely accessible.

**Clause 33**
The stevedores, although appointed by Charterers, shippers, receivers, or their agents to be under the direction and control of the Captain. Charterers, shippers, or receivers shall not be responsible for the acts and defaults of the stevedores at load/discharging port(s). A joint survey to be held prior to loading and after completion of discharging between Owners and stevedores appointed by Charterers, the expenses of which to be shared equally. Discharging port stevedores to have the option not to participate in the joint survey as they may elect to repair damage to the vessel caused at discharging port. All claims for damages allegedly caused by stevedores, to be settled directly between Owners and stevedores at load/discharging port(s). Master to notify stevedores of damage, if any, in writing within 24 hours after occurrence; otherwise, stevedores not to be held liable. However, Charterers agree to assist the Owners in recovering claims for proven damages in case the Owners have difficulties obtaining same.

**Clause 34**
Master to sign statement of facts concerning time used in loading and discharging submitted to him by Charterers' agents/receivers' representative, making his reservations if he believes this statement to be incorrect. Master to issue and sign the statement that available cargo space has been utilized and stowed to his satisfaction. Master to attend, issue and sign draft survey specifying quantity of cargo on board at loading and discharging port(s).

**Clause 35**
Charterers' privilege to sublet this charter, but original Charterers to remain responsible for its fulfillment.

**Clause 36**
Master is not to take on or pump ballast at loading or discharging ports without obtaining permission of Charterers, which not to be unreasonably withheld. Vessel to comply with Charterers and/or shippers instructions concerning ballast condition required on arrival load ports. Owners have the option to bunker vessel at/during load and discharging provided that same does not interfere with loading and discharging operation, but Charterers/Stevedores permission to be obtained prior to bunkering which not to be unreasonably withheld.

**Clause 37**
Any and all disputes of every description arising under this Charter which cannot be resolved by the

-3-

7/14

## RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

parties and which shall not by this agreement have been referred to arbitration shall be resolved by action brought in the U.S. District Court for the southern district of New York, to the admiralty jurisdiction of which court the parties submit themselves. Process in an action brought in such court may be served by either party upon the other by registered mail addressed to the individual or company signing this charter at the address appearing at the end hereof. The parties agree that this charter shall be deemed to have been made within the state of New York.

**Clause 38**
Charterers are not required to accept notice of readiness of the vessel at loading port if the ship has more than eight (8) feet drag by the stern.

**Clause 39**
Chamber of Shipping War Risk Clauses 1 and 2, New Jason Clause, New Both-to-Blame Collision Clause, P & I Bunkering Clause, U.S.A. Clause Paramount, as attached hereto, are to be considered fully incorporated in this Charter Party.

**Clause 40**
Owners guarantee that vessel is not intended for break-up upon the completion of the engagement entered into under this charter party. Should Owners contrary to the above guarantee, sell the vessel for break-up before she has been completely discharged and released by the receivers of the cargo, Owners then to pay whatever insurance penalty might be assessed against the Charterers forthwith.

**Clause 41**
If vessel calls at any U.S. port for purposes of loading and discharging cargo, vessel's cargo gear and all other equipment shall comply with regulations established by U.S. Public Law 85-742 Part 9 (Safety and Health Regulations for Longshoring). If longshoremen are not permitted to work due to failure of the Master and/or Owners, and/or Owners' agents to comply with the aforementioned regulations, any delay resulting therefrom shall be for Owners' account.

**Clause 42**
It is understood that Owners will endeavor to keep vessel on approximately even keel within three (3) feet on completion of discharge.

**Clause 43**
Master is to authorize Charterers' agents on arrival loading port to sign and issue and release bills of lading any time Charterers desire for any quantity loaded up to that time, but always in accordance with Mate's receipts and always without prejudice to the terms and conditions of this Charter Party.

**Clause 44**
Vessel has not traded Cuba in the last 180 days.
With regard to the Asian Gypsy Moth, Owners warrant the vessel has not traded Pacific Ports of Russia/C.I.S.or high risk Japanese ports within the last 24 months and all consequences resulting from violation of this clause to be for Owners' account.

**Clause 45**
Owners to comply with any law or regulations concerning oil pollution and Owners' financial responsibility therefore.

-4-

8/14

## RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

**Clause 46**
Should the delivery of cargo to the place of loading, or shipment or loading or discharging of cargo be prevented or interfered with by reason of war, blockade, revolutions, insurrections, mobilizations, strikes, lockouts of any class of workers, civil commotions, riots, acts of God, plague or other epidemics, the time by which loading/ discharging shall be prevented or interfered with by any such cause or causes, or by other cause or causes whatsoever, whether or not of a nature or kind as enumerated above, which shall be beyond the Charterers'/Receivers' control, shall not count, and demurrage shall not accrue. If the vessel is then on demurrage, all time lost by reason of the foregoing shall be included on any demurrage claim and calculation.

**Clause 47**
Crew is to operate ship's winches and windlasses to assist in moving the vessel up and down the berth at load port to accommodate stationary conveyor, provided local regulations permit. Owners/Master to cooperate with stevedore's requests accordingly. Shifting time used to count as laytime.

**Clause 48**
Ninety five percent (95%) freight to be paid to Owners' account in a bank in New York within five (5) banking days after signing/releasing Bills of Lading marked "Freight Payable as per Charter Party", discountless, non-returnable ship and/or cargo lost or not lost. Charterers' privilege to deduct undisputed despatch from balance freight. Charterers' privilege to deduct commissions from freight. Balance freight payable within 20 days after completion of discharge and receipt of Owners' laytime calculations and Statement of Facts.

Owners' Bank: JP Morgan Chase Bank, New York
Swift: CHASUS33
Account No.: 400 707 225
ABA: 021000021
In favour of: ED and F Man Treasury Management Ltd.
Ref: Man Shipping
VAT No.: 752203758

**Clause 49**
Scrap to be shredded and/or HMS 1 and 2, always excluding motor blocks and turnings. First layer of scrap in each hold not to be released until touching tank top. However, if loading process is such that "touching tank top" would be hazardous for the vessel, first layer to be loaded as close to the tanktop as is safe for vessel but always subject to Master's approval and satisfaction, which not to be unreasonable. Thereafter, sufficient loads of cargo to be lowered as close as possible to the bottom of each hold, so as to provide a proper flooring and cushion to Master's satisfaction, which not to be unreasonable.
Should electro-magnets be used during loading and discharging, then the time, risk and expenses for recalibrating vessel's compass (if necessary) to be for Charterers' account. Shredded scrap may be loaded by normal means without being loaded to the tanktop.

**Clause 50**
Owners guarantee minimum 35000 MT - maximum 38500 MT, quantity in Owners' option, deadweight cargo capacity;
or in Charterers' option;
Owners guarantee minimum 40000 MT - maximum 42200 MT, quantity in Owners' option,

### RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

deadweight cargo capacity on 11.3 M SW at load port/11.3 M SW at discharging port and Owners guarantee 54,931 cubic meter bale capacity in clear and unobstructed main holds available for cargo. Vessel has all clear space suitable for loading scrap excluding deeptanks and wingtanks. Vessel has no hindrances such as grain feeders, etc., in holds and has no centerline bulkhead or stanchions.

**Clause 51**
It is understood that if vessel is fitted with cardecks, pontoon racks and/or any other special fittings including hatch skirts not connected with the carriage of steel scrap in bulk, any extra expense incurred in loading and/or discharging as a result of the presence of such cardecks, pontoon racks and/or other special fittings are to be for the Owners' account. Time so lost shall not count as laytime or time on demurrage.

**Clause 52**
Owners to pay despatch at the rate of $20,750.00 U.S. Currency per day or pro rata for any part of a day on laytime saved.

**Clause 53**
Charterers' privilege to deduct commissions from freight.

**Clause 54**
Owners guarantee vessel's draft not to exceed 11.3 M SW at load port.
Owners guarantee vessel's draft not to exceed 11.3 M SW at discharging port.

**Clause 55**
Vessel will not drydock prior to reporting on this Charter Party except for Force Majeure.

**Clause 56**
Should the vessel be seized or detained by any authority or by legal process not initiated against the Charterers, laytime shall cease from the time of her seizure or detention until the time of her release. Any and all extra expenses thereby incurred due to the ships seizure or detention including stevedore standby time, up to the end of the shift, to be for Owners' account.

**Clause 57**
If vessel's cargo gear, hatch covers, mooring winches, etc., are found not to be in good working condition at either load or discharge port, Owners to be responsible for any and all expenses and delays incurred, including stevedore standby time up to the end of the shift, due to failure of same.

**Clause 58**
Vessel on arrival load port to have hatch covers in open position, ready to receive intended cargo. Crew to open/close hatches, if required, subject to local regulations.

**Clause 59**
The vessel to supply power free of expense to Charterers/stevedores for operation of magnets day and night per 24 hour period, if required simultaneously at all hatches. Charterers to supply necessary electric connections. The vessel can provide 380/440 volt, 3 phase min 90 ampere, 45 KWA per crane from the engine room.
Cables/Electrician if required to be for Charterers' account. Charterers confirm the total load picked up by each crane will not exceed the safe working load.

### RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

**Clause 60**
The vessel to be in possession of a valid certificate of entry class 3 P and I, Class 6 Fd and D.

**Clause 61**
The vessel to have in possession all necessary certificates for hull, machinery, equipment, class etc., for the duration of this voyage.

**Clause 62**
Owners warrant that at all times during the performance of this Charter, the vessel shall strictly adhere to and conform to the requirements of the ISM Code and shall be in possession of a valid Safety Management Certificate (SMC).
Owners further warrant that at all times during the performance of this charter, the Owner or the manager shall comply with the provisions of the ISM Code and be in possession of a Document of Compliance. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers, Agents and/or any authorities requiring same. The Owners/managers are to be responsible for any and all costs and consequences arising as a result of non-compliance with the foregoing.

**Clause 63**
Owners and/or Disponent Owners warrant that the vessel is not flagged, controlled or manned by Yugoslav Nationals. Owners to be responsible for any and all extra expenses incurred as a result of Owners' breach of the above. Prior to fixing Owners are to submit to Charterers a list of the Owners, Disponent Owners and crew noting the names and nationality of each.

**Clause 64**
BIMCO ISPS Voyage Clause as attached to apply and deemed incorporated in this Charter Party.

**Clause 65**
Owners warrant the vessel has a valid International Ship Security Certificate (ISSC) onboard. Any time lost/expenses incurred as a result of Owners' violation of this clause to be for Owners' account.

**Clause 66**
**Certificates for Letter of Credit Purposes**
Disponent Owners to provide following certificates for Letter of Credit purposes:

1) Original certificate issued by the Shipping Company or its agents attesting that the carrying vessel is registered at an International recognized P & I Club.

2) Original statement issued by the Shipping Company or its agents for the following information:
   Name, description and construction year of the carrying vessel.
   Name and detailed address of the vessel's Owners.

3) Original certificate issued by the Shipping Company or its agents that Master undertakes to ship the quantity under this L/C from port of loading to port of discharge directly and that no additional cargo shall be loaded along with the cargo under this L/C.

4) Original certificate issued by the Shipping Company or its agents attesting that the age of the vessel is not more than 30 years.

-7-

11/14.

## RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

5) Original certificate issued by the Shipping Company or its agents attesting that the capability of the vessel to load such goods.

**Clause 67**
Owners to issue a certificate stating that the carrying vessel is ISM Code certified and whose Owners or operators do hold a current ISM Code Document of Compliance as required under the Solas Convention 1974 as amended.

**Clause 68**
Receiver has the privilege to use electro-hydraulic grabs/magnets with ship's gear and to place in holds excavators or bulldozers or similar equipment (which not to exceed the gear's maximum lifting capacity) for use in discharging and to remove same upon completion of discharging by means of vessel's gear. Opening and closing of hatches shall be performed by vessel's crew.

**Clause 69**
The first opening and last closing of the hatches and the intermediate opening and closing of the hatches due to inclement weather shall be free of expense and the time used shall not be counted as laytime. Time used for draft surveys shall not count.

**Clause 70**
**USCG Clause**
Owners confirm that the vessel is not entered on the USCG List due to vessel, flag, ownership, classification, vessel's boarding history, outstanding items noted during previous USCG inspections, or due to any cause whatsoever arising from the terms/conditions of U.S. Homeland Security rules/regulations/legislation.
In case the vessel is detained by any competent US Authority due to the aforementioned causes or an new incidents involving competent U.S. Authorities, Owners are to be responsible for any/all expenses involved, and if the vessel is prevented from carrying out loading/discharging operations or from entering/leaving port(s) them time not to count.

**Clause 71**
**Cargo**
Minimum 35000 MTS - maximum 38500 MTS, quantity in Owners' option, iron and/or steel scrap excluding motor blocks and turnings. Average stowage of cargo not to exceed 45 cubic feet bale per MT. Approximate loadable quantity to be declared by Master latest upon vessel's arrival load port. Such amount to be subject to the amount of cargo it is possible to load owing to its stow factor,

or in Charterers' option,

minimum 40000 MTS - maximum 42200 MTS, quantity in Owners' option, iron and/or steel scrap excluding motor blocks and turnings. Average stowage of cargo not to exceed 45 cubic feet bale per MT. Approximate loadable quantity to be declared by Master latest upon vessel's arrival load port. Such amount to be subject to the amount of cargo it is possible to load owing to its stow factor.

The cargo consists of shredded and HMS 1 + 2 only.

**Clause 72**
If calling at Albany, time used in waiting for tide to allow the vessel to proceed up or down the Hudson River to count as laytime.

## ISPS Clause for Voyage Charter Parties

(A) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(D) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

13/14

(2) War Risks Clause.

(a) No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the ship has been ordered to discharge either on signing Bills of Lading or thereafter be one to which the ship is or shall be prohibited from going by the Government of the Nation under whose flag the ship sails or by any other Government, the owner shall discharge the cargo at any other port covered by this Charterparty as ordered by the Charterers (provided such other port is not a blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered.

(b) The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the Government of the Nation under whose flag the vessel sails or any department thereof, or any person acting or purporting to act with the authority of such Government or of any department thereof, or by any committee or person having, under the terms of the War Risks Insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or is not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfillment of the contract voyage and the freight shall be payable accordingly.

(3) Both To Blame Collision Clause.

If the liability for any collision in which the vessel is involved while performing this Bill of Lading falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:—

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

(4) New Jason Clause.
In event of accident, danger, damages or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owner or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

(5) U.S.A. Clause Paramount.
This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 15, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

(6) Protection & Indemnity Bunkering Clause.
The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take oil bunkers in any quantity in the discretion of owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

14/14

# CERTIFICATE OF ORIGIN
## ISSUED BY THE BENEFICIARY

| The undersigned | GLEB SOLONCOV LOGISTICS ADMINISTRATOR | |
|---|---|---|
| for | SIMS GROUP GLOBAL TRADE CORPORATION 110 FIFTH AVENUE, SUITE 700 NEW YORK, NY 10011-5614 USA | declares |
| that the following goods shipped on | M/V "NEW FLAME" FROM THE U.S.A. PORT OF NEW YORK | |
| on the date of | JULY 31, 2007 | Notify | NURSAN METALURJI ENDUSTRISI A.S. |
| ORGANIZE SANAYI BOLGESI 31900 PAYAS DORTYOL HATAY TURKEY | | | |
| | | are the products of U.S.A. origin. | |

| MARKS AND NUMBERS | NO. OF PKGS. BOXES OR CASES | WEIGHT GROSS | WEIGHT NET | DESCRIPTION OF GOODS |
|---|---|---|---|---|
| NO MARKS NO NUMBERS | IN BULK | 42,200.15 MT | 42,200.15 MT | AS PER SALES CONTRACT NO. SG-S-5054.07 1) 10,474.00 MT OF STEEL SCRAP AS PER HMS NO:1 AND HMS NO:2 IN RATIO OF 80/20 PCT. 2) 31,726.15 MT OF SHREDDED STEEL SCRAP AS PER ISRI SPECIFICATION /211. |
| FINANSBANK A.S. L/C CREDIT NUMBER 00016MC000105 | | | | |
| | | | | STATE OF NEW YORK |
| DEREK E. GRAF Notary Public, State of New York No. 01GR6132778 Qualified in New York County Commission Expires September 08, 20__ | | | | COUNTY OF NEW YORK |

| sworn to before me this 31ST day of JULY 20 07 | | Dated at NEW YORK, NY on the 31st Day of JULY in 20 07 |
|---|---|---|

MARITIME CHAMBER OF COMMERCE, INC.

| The | A RECOGNIZED CHAMBER OF COMMERCE | , a recognized Chamber of Commerce |
|---|---|---|
| under the laws of the State of | NEW YORK | , has examined the manufacturer's invoice |

or shipper's affidavit concerning the origin of the merchandise and, according to the best of its knowledge and belief, certify that goods to are of U.S.A. origin.

Secretary   *Hugh McGinn*



Inspectorate America Corporation Metals & Minerals Division   12000 Aerospace Ave., Suite 200   Houston, TX 77034
Tel: 713-944-2000   Fax: 713-941-5542
www.inspectorate.com

JULY 31, 2007

# DRAFT WEIGHT CERTIFICATE
(ISSUED BY INSPECTORATE AMERICA CORPORATION)

**SHIPPER:**   SIMS GROUP GLOBAL TRADE CORPORATION
110 FIFTH AVENUE, SUITE 700
NEW YORK, NY 10011-5614 U.S.A

**RECEIVER:**   NURSAN METALURJI ENDUSTRISI A.S.
ORGANIZE SANAYI BOLGESI
31900 PAYAS DORTYOL HATAY TURKEY

**VESSEL:**   M/V "NEW FLAME"

**LOAD PORT:**   U.S.A. PORT OF NEW YORK

**B/L NUMBER:**   ONE DATED JULY 31, 2007

**DESCRIPTION OF GOODS:**

42,200.15 MT AS PER SALES CONTRACT NO. SG-S-5054.07
1) 10,474.00 MT OF STEEL SCRAP AS PER HMS NO:1 AND HMS NO:2 IN RATIO OF 80/20 PCT. 2) 31,726.15 MT OF SHREDDED STEEL SCRAP AS PER ISRI SPECIFICATION /211.

Examination was made prior to and throughout the loading onboard the M/V "NEW FLAME" and it is certified and confirmed that we have attended the vessel at load port prior to during loading as well as onboard the vessel and after loading 10,474.00 MT STEEL SCRAP HMS NO:1 AND HMS NO:2 IN RATIO OF MIN 80 PCT/MAX 20, AND 31,726.15 MT OF SHREDDED STEEL SCRAP AS PER ISRI SPECIFICATION 211 was loaded onboard the vessel. TOTAL LOADED TONNAGE: 42,200.15 MT

AS PER ATTACHED DRAFT SURVEY REPORT.

COPY

For and on behalf of
Inspectorate America Corporation

INSPECTORATE AMERICA CORPORATION

FINANSBANK A.S. L/C CREDIT NUMBER 00016MC000105



Inspectorate America Corporation  Metals & Minerals Division  12000 Aerospace Ave., Suite 200  Houston, TX 77034
Tel: 713-944-2000   Fax: 713-941-5542
www.inspectorate.com

This is to certify that the undersigned surveyor did attend on board the vessel M/V "New Flame", while afloat at Port of New York, in order to ascertain the light and loaded displacements for the purpose of determining the quantity of SCRAP STEEL, loaded and has to report as follows: The vessel was surveyed in light condition on 07-26-07, and again when she was completed on 07-31-07 at 1800 Hours.

|  | LIGHT | LOADED |
|---|---|---|
| DRAFT FORWARD CORRECTED: | 4.695 | 11.219 |
| DRAFT AFT CORRECTED: | 5.99 | 11.346 |
| FORWARD AND AFT MEAN: | 5.3425 | 11.2825 |
| DRAFT MIDSHIP PORT: | 5.20 | 11.32 |
| DRAFT MIDSHIP STARBOARD: | 5.27 | 11.21 |
| DRAFT MIDSHIP MEAN: Corr. | 5.242 | 11.266 |
| MEAN OF MEANS: | 5.2925 | 11.27425 |
| DRAFT FOR HOG OR SAG: | 5.267125 | 11.270125 |
| DISPLACEMENT FOR DRAFT: | 23,103.50 | 52,805.85 |
| TRIM CORRECTION: | -247.18 | -0.05 |
| DISPLACEMENT CORRECTED FOR TRIM: | 22,856.32 | 52,805.80 |
| DENSITY: | 1.015 | 1.0165 |
| CORRECTION FOR DENSITY: | -222.99 | -437.90 |
| DISPLACEMENT AFTER DENSITY: | 22,633.33 | 52,367.90 |
| TOTAL LIQUIDS: | -13,711.50 | -1,245.92 |
| DISPLACEMENT AFTER LIQUIDS: | 8,921.83 | 51,121.98 |

LOADED: 51,121.98 MT
LIGHT: 8,921.83 MT

42,200.15 METRIC TONS
41,537.39 LONG TONS

REF. NO 07-60311-704

COPY

INSPECTORATE AMERICA CORPORATION



**NURSAN Metalurji**

Sn. Kaptan Murat IŞIKLI Dikkatine

Onaygır Keleş





**NURSAN METALURJİ ENDÜSTRİSİ A.Ş.**

Payas Organize Sanayi Bölgesi Sincan yolu üzeri - Payas / HATAY  
Tel.: 0.326.755 99 20 ( 10 Hat )   Fax : 0.326.755 99 31  
E-mail : metal@nursancelik.com.tr  
Web : http://www.nursancelik.com.tr

TOTAL P.22