UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

NURSAN METALURJI ENDUSTRISI, A.S.,

                              Plaintiff,

                                                    Case No.: 07 CIV 7687 (GBD)

            -against-

M/V "TORM GERTRUD" her engines, tackle,
boilers, etc. *in rem*, M/V "NEW FLAME" her engines,        **REPLY DECLARATION**
tackle, boilers, etc. *in rem,*                             **OF JULIAN RICHARD**
A/S DAMPSKIBSSELSKABET TORM, TRANSMAR                       **TRIAY, ESQ.  ____**
SHIPPING CO. S.A., GLADIATOR NAVIGATION S.A.,
*in personam,*

                              Defendants.

------------------------------------------------------------------------x

        Pursuant to 28 U.S.C. § 1746, JULIAN RICHARD TRIAY, declares as follows:

        1.      I make this Declaration in reply to the 18 January 2008 Affidavit of Keith

Azopardi.  In so doing, I expressly adopt and incorporate by reference my earlier Declaration

herein dated 5 December 2007.

        2.      At Paragraph 12 of his Affidavit, Mr. Azopardi states:

            The Honorable Judge also declined to hear the application for
            Permission to serve the *in personam* Claim Form on an inter
            parties basis.

            To clarify, normally an application for permission to serve out of the jurisdiction

is made by submitting the notice of application and witness statement in support. The Judge

considers the matter on the papers and only summons the party to Court if he needs to be

addressed on any issue. Once the claim form has been served, the defendant has a right to make

an application to strike out the claim form for lack of jurisdiction. Our attempt to have the

application for permission to serve heard on an "inter-parties" basis was motivated by our desire

to have the *forum non conveniens* issue dealt with at an early stage, instead of waiting until after

service of the claim form to have that argument.. Once Mr. Azopardi left the courtroom that day,

at our request that he hear us, the Honorable Judge granted our application in open court, when it

is normally done on submission of papers. A copy of the Order granting Permission is annexed

hereto as Exhibit "A." I also annex hereto as Exhibit "B," a copy of the transcript of the Hearing

For Submissions out of the Jurisdiction, held in the Supreme Court of Gibraltar on 8 January

2008.

3.    With respect to Nursan's cargo claim, it is noteworthy to quote the Honorable Mr.

Acting Chief Justice Dudley's ruling on that issue:

> ...the collision between the vessels having been occurred just off
> Gibraltar, I am of the view that the natural forum for the resolution
> of disputes arising from the collision is Gibraltar...I am persuaded
> at this stage that Gibraltar remains the most appropriate forum (Ex.
> "B" at p. 29).

4.    At Paragraph 19 of his Affidavit, Mr. Azopardi states:

> The cargo was loaded in New York and was bought by Nursan
> from US suppliers. If there are any issues as to the condition of the
> steel when it was loaded/shipped these would be matters in relation
> to which US evidence would be most pertinent.

Unless this scrap metal was inspected/surveyed in New York, the issue of cargo

condition is a "red herring." Even if true, the cargo's condition in New York entails only one

witness (on a minor issue at that) versus the numerous casualty surveyors (resident in Algeciras,

some 20 kilometers from Gibraltar), various Gibraltar surveyors, Royal Navy officers (residents

in Gibraltar or the U.K.), salvors, and the ships' officers from both the TORM GERTRUD and

the NEW FLAME (all residents in Europe). Thus, the domicile (and hence convenience) of witnesses tilts heavily in favor of Gibraltar.

5.     At Paragraphs 20 and 21 of his Affidavit, Mr. Azopardi states:

> The collision is being investigated in Gibraltar by the port authorities and these will produce a report. Evidence of that report and investigation can be given in any jurisdiction with relative ease. While it is accepted that it will be easier for Gibraltar Government officials to give evidence in Gibraltar these can also (if their expenses are underwritten) easily give evidence in another jurisdiction. It should be noted however that the Government have just published the report into the grounding of the Greek Tanker the *Samothraki* which occurred in a similar spot off Europa Point earlier in 2007 and that report carries clear rider on its fact that
>
> > "this report is not intended to be used for the purposes of litigation. It endeavours to identify the relevant safety issues pertaining to the accident and make recommendations aimed at preventing similar accidents in the future."
>
> That qualification would have to be absent from the expected New Flame report for this to be available for use in any proceedings.

It is much more likely (and obviously much more convenient) that the officers of the Gibraltar Government be able to give evidence in Gibraltar rather than New York. Mr. Azopardi seems to suggest that two members of the Gibraltar Maritime Administration be asked to travel to New York (in the process incurring expenses that would not be incurred in Gibraltar), leaving the department completely undermanned or unmanned. In any event, the Gibraltar Maritime Administration is likely to refuse to simply hand over the witnesses and/or the information and an application for disclosure and/or production would have to be made *in the Gibraltar court*. The convenience of that court thus becomes obvious.

I also note the disclaimer contained in the *Samothraki* Report. But contrary to Mr. Azopardi's insinuation, the disclaimer does not mean that such a report cannot be used in

evidence, rather, the disclaimer merely warns the finder of fact as to the weight to be attached to

the report. Of more importance is the information gathered in the preparation of that Gibraltar

Government report. An Order disclosing that information is much more likely to issue for cases

being heard in Gibraltar.

6.      At Paragraph 22 of his Affidavit, Mr. Azopardi states:

> As for the displacement of other witnesses given that none of the
> parties are local it matters little to which jurisdiction any party
> needs to send witnesses.

On the contrary, the divers who inspected the NEW FLAME are employed in

Gibraltar by a Gibraltar company. The surveyors who inspected both ships are resident in the

area of either Gibraltar or Algeciras. Moreover, the local Gibraltar maritime authorities will

undoubtedly be called to give evidence (and while I appreciate that the relevant Royal Navy

personnel may have now been rotated back to England, I am sure that it will be easier to enforce

a Gibraltar witness summons in England as opposed to an American subpoena in Gibraltar).

7.      At Paragraph 23 of his Affidavit, Mr. Azopardi states:

> Indeed in relation to the salvage operation itself it is worth
> mentioning that the Gibraltar Government recently announced that
> a United States company, Titan salvage, would carry out the wreck
> removal operation. Clearly any evidence in relation to the same is
> easily available to US Courts because this is a United States
> company.

Titan Salvage is a division of Crowley Marine, based in Fort Lauderdale, Florida

(not New York). Titan's website (a copy of which is annexed hereto as Exhibit "C1") states that

it is a worldwide marine salvage and ship wreck removal company operating from main bases in

the USA, UK and Southeast Asia." Titan's website lists a UK telephone number. With respect

to Titan's salvage/wreck removal of the NEW FLAME, Titan's website states that "the salvage

team presently consists of 20 people with logistics being supported from Titan's UK-based

4

equipment depot. Vessels on site include Crowley's Invader-class tug WARRIOR (US-flagged); URS's dive support vessel UNION BEAVER (Belgian-flagged); and ITC's tug MISTRAL (Dutch-flagged). (A copy of Titan's webpage regarding the NEW FLAME operations is annexed hereto as Exhibit "C2"). Finally, and according to the attached newspaper report taken from the Gibraltar Chronicle the spokesman for Titan's NEW FLAME operations in Gibraltar is one Mark Hoddinott, described as "Titan's UK-based European director" (A copy of said newspaper article, dated 29th December 2007 , is annexed hereto as Exhibit "C3")

In summary, Titan Salvage's NEW FLAME operations in Gibraltar readily appear to be directed through its UK base of operations, not through the United States and certainly not through New York.

8.     At Paragraph 24 of his Affidavit, Mr. Azopardi states, *inter alia*:

> ...The New Flame Owners are not seeking to litigate their dispute in Gibraltar. Indeed they have agreed to do so in the United States. Given that the US Action will definitely continue against the Owners of the New Flame (whatever happens between Nursan and Torm) it will merely duplicate and heavily increase costs if the Torm *in personam* action were to continue in Gibraltar or if the US Courts declined jurisdiction against Torm.

Mr. Azopardi is incorrect. In fact, the owners of the NEW FLAME and the owners of the TORM GERTRUD have agreed to litigate their dispute exclusively in Gibraltar (subject to an option by either party to refer the matter to arbitration). That fact alone tips the scales decidedly in favor of the Gibraltar forum.

9.     At Paragraph 25(1) of his Affidavit, Mr. Azopardi states:

> It should be noted that Torm have been slow in moving within the Gibraltar proceedings and have only done so as a reaction to the US proceedings launched by Nursan. The steps taken by Torm have all be <u>subsequent</u> to the action taken by Nursan namely.
>
> (1)     Nursan's US Action pre-dates the Gibraltar *in rem* and *in personam* actions issued by Torm;

5

Mr. Azopardi's suggestion that the *in rem* claim against cargo was issued only in response to the U.S. proceedings is not correct. The *in rem* claim in Gibraltar was issued on 31 August 2007, only two days after Nursan had filed the instant proceeding and long before Torm learned about the New York action. I can categorically state that the issuance of the *in rem* claim in Gibraltar was not done in response to, nor in reaction to, the commencement of proceedings in the U.S. court.

10.    At Paragraph 26 of his Affidavit, Mr. Azopardi states:

> In terms of timescale Torm's Gibraltar *in personam* action could not realistically proceed to Trial before early to mid 2009 with judgment expected a few months thereafter. That could only take place if no preliminary point on jurisdiction is taken by Nursan or if Torm succeed on any jurisdictional objection that is taken by Nursan. If a jurisdictional point is taken then under the procedural rules of Gibraltar the Court determines the jurisdiction points before requiring a Defendant to file its defence. This, in effect, halts the normal process of the action until the Court determines that point. For example the process of ordinary discovery does not take place. If Nursan were to decide to contest jurisdiction of the Torm *in personam* action (if and when they are served) then it is likely that such an objection would not be heard until May or June 2008 this year with a substantive determination possibly taking up to the few months thereafter (should the Court reserve judgement).

I disagree with Mr. Azopardi. Any challenge to the jurisdiction should cause no more than a month's delay in the Gibraltar proceedings. Indeed, as Mr. Azopardi correctly points out in Paragraphs 7 and 25(2) of his Affidavit, Nursan's original application to contest jurisdiction was filed on 5 November 2007 and was then set down for hearing 12 December 2007. Having had the opportunity of considering the law upon our previous application, I am confident that the Acting Chief Justice Judge will now be in a position to decide any forum or jurisdictional points relatively quickly. It is law that all of us in Gibraltar, including the Honorable Acting Chief Justice Dudley, are utterly familiar with.

6

11.    Furthermore and in connection with the limitation of liability proceeding that Torm has commenced in the Supreme Court of Gibraltar (see Azopardi Affid. ¶ 16(4)), I confirm that the limitation fund in the sum of special drawing rights 5,100,750 plus interest being £4,193,582.30  has now been duly posted by Torm.  This adds to the nexus with the Gibraltar court. (A copy of the ledger credit, dated  21st January 2008 , is annexed hereto as Exhibit "C4")

12.    Finally, and the Supreme Court having granted Torm permission to serve the *in personam* Claim Form (see ¶ 2 *supra* and Exhibit "B" annexed hereto), Torm is now undertaking to perfect service of that Claim Form upon Nursan in Turkey without delay.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 15th February, 2008
Irish Town, Gibraltar


_____
JULIAN RICHARD TRIAY

EXHIBIT A

## IN THE SUPREME COURT OF GIBRALTAR          Claim No. 2008 AJ 01
## ADMIRALTY JURISDICTION

### A/S DAMPSKIBSSELSKABET TORM

**Claimant**

-and-

### NURSAN METALURJI ENDUSTRISI A.S.

**Defendant**

Tuesday the 8ᵗʰ day of January 2008

Before the Honourable Mr Justice Dudley, Acting Chief Justice

IN PRIVATE

Upon reading the first and second Witness Statements of Julian Richard Triay both dated the 7ʰ January 2008 and upon hearing Richard Southern QC, one of Her Majesty's Counsel instructed by Messrs. Triay & Triay, solicitors for the Claimant IT IS ORDERED as follows:

1    That the Claimant is granted permission to serve the Claim Form herein out of the jurisdiction of the Court on Nursan Metalurji Endustrisis A.S. at Sanayi Bolgesi Sanayi Sokak No. 3 31900, Payas, Hatay, Turkey or elsewhere in Turkey.

2    That the time for acknowledgement of service of the Claim form herein be extended to 28 days from the date of service of the Claim Form.

Registrar

EXHIBIT B

# IN THE SUPREME COURT OF GIBRALTAR

### Case No. 200-AJ-No. 1

## A/S DAMPSKIBSSELSKABET TOCM
## NURSAN METALURIS

**<u>Claimant</u>**

v.

## ENDUSTRIS A/S

**<u>Defendant</u>**

---

## HEARING FOR SUBMISSIONS
## OUT OF THE JURISDICTION
### 8th January 2008

---

Transcribed by
Bishops
30 Rosbay Court
Naval Hospital Road
Gibraltar
Tel: 00 350 200 59741
Email: madge@gibtelecom.net

Mr Southen    .......Mr Azopardi and Mr Navas here – if nothing else we can dispose of it as an application in Chambers and nowadays you are entitled to remain.    I would not have objected.    My Lord I am very grateful to the Court for hearing me this morning.

It is my application for permission now to serve the inpersona risk against ... on Nursan in Turkey.  My Lord I can take this application at any speed convenient to the Court and skip over or dwell upon those points as requested.

There are essentially two stages to the application.    The first is to determine whether this Court has jurisdiction at all in respect of this claim and I will explain why that arises under, and effectively only under CPR 6.

Judge    I don't think you need to take me there.

Southen    Thank you. The second question is upon that basis whether the Court should exercise its jurisdiction which gives rise, essentially to the Spiniada questions.    The rules require that this be shown to be a proper case for service out and it will only be a proper case under the principles of Spiniada if the Courts are satisfied that Gibraltar is not just a, but the appropriate forum.    The fact that there may be another appropriate forum however is not an objection.  Now – my Lord are you familiar with the decision in Spiniada    I hesitate to...

Judge        Vaguely

Southen      Would it help if I remind you of it briefly…

Judge        Yes

Southen      … because it is one of those cases that is a mine of useful information.   In the bundle at tab 14

Judge        of the agreed bundle?

Southen      Yes.    The case arose out of alleged damage to a ship caused by a shipment of sulphur which was allegedly wet and of course of wet sulphur is sulphuric acid and did untold damage to the ships steel.   The shipment was from Nova Scotia to India and the question was whether England was the appropriate forum.   You can pick up the relevant part of the judgment at page 474.   Now Lord Gough begins by addressing the point of the fundamental principle by reference to cases where jurisdiction is found is as of right. I will go on to the relevant part in a moment.   The first paragraph down to 'd', 'b-d'.

             *Pause whilst document found*

Judge        Yes

Southen      That is the classic statement – and he goes on to explain that the word *'convenient'* is apt to mislead and *'appropriate'* is a better word to have in mind.

Then over the page at 475 we have got under sub-heading '6' addresses how the principle is applied in cases of stayed proceedings and the relevant part begins - again over the page at 476 – a letter 'b' and perhaps I could ask you to read at quite considerable length right the way down to 'e' on page 478.  I'm afraid that's two whole pages.

*A period whilst relevant part is read by Judge and others.*

Judge         Yes

Southen       So it is the search objectively for the relevant connecting factors, for the specific litigation that one is concerned with.   Now those principles are there stated where you serve as of right and the Defendant applies for a stay.   Lord Gough then went on to say that the principles as to how they differ in a case such as we are concerned with now – under the sub-heading '7' on page 478.   It isn't necessary to read the first part because he refers to an apparent disagreement in the earlier authorities but you can pick it up at page 480 at letter 'g' where Lord Gough begins the sentence *'...It seems to me inevitable...'*

It is not necessary to read on beyond about the middle of page 481.

*Pause whilst paragraph is read*

Judge         Yes

Southen    That the key statement of principle is that just right at the end at letter 'e' of page 481 *'that the effect is not merely that the burden of proof rests on the Plaintiff to persuade the Court thus (in this case Gibraltar) is the appropriate forum for the trial of the action but that he has to show that this is clear'* and then he just has a word of caution about exhorbitant which can..........

Can I just look also, and take it slightly more slowly at sub-section '8' at page 482 'the Treatment of a legitimate person [/////////]. I say this because one of the points that has been taken by Nursan is it is entitled to the advantages which it perceives it will obtain in New York.    Lord Gough said this *'..clearly the mere fact that the Plaintiff has such an advantage in proceedings in England cannot be decisive...'* as Lord Summers says *'...I cannot see how one can guide oneself profitably by endeavouring to conciliate and promote the interests of both these antagonists except in the ironical sense in which one says that it is in the interests of both that the case should be tried in the best way and in the best tribunal and the best man should win..'.*    Indeed as Lord Justice Oliver pointed out in his judgment in the present case *'...an advantage to the Plaintiff would ordinarily give rise to a comparable disadvantage to the Defendant and simply to give the Plaintiff his advantage at the expense of the Defendant is not consistent with the object of approach inherent in Lord Kinears 'Statement of Principle' in Simmon Robinay* And he says *'... The key to the solution of this problem lies in my judgment in the underlying fundamental principle...'.* He then goes on to examine *'...but it's the objectivity of the*

*identification of the appropriate forum that is the key. It is an objective thing not to be dictated by either parties personal best interests...'.*  And to give another example, he says just under letter 'e' –'...*typical examples are damages awarded on a higher scale. A more complete procedure of discovery how to award interest or a more generous limitation period. Now as a general rule I do not think the Court should be deterred from granting a stay of proceedings or from exercising its discretion against granting leave under Order 11 simply because the Plaintiff will be deprived of such an advantage provided the Court is satisfied that substantial justice will be done in the available appropriate forum.'*  Now there he is looking at the question of whether there will be substantial justice abroad.  What is suggested in this case is that substantial justice will not be done in Gibraltar, an even more ambitious argument that provided you are satisfied that substantial justice will be done in Gibraltar you should not hesitate to permit service of proceedings which will take place in Gibraltar purely from that perspective.

Judge        Clearly, clearly, I say clearly, on one possible interpretation that Claimants are seeking declaratory relief in this jurisdiction, on one possible interpretation because there may be a limitation on damages which may not happen in the US.

Southen      Yes.  Now that.....

Judge        Isn't that in a sense the Claimant who is not the one that has suffered the loss.    That the Claimant in a sense is

bringing protective proceedings in this jurisdiction as opposed to bringing substantive proceedings for a wrong done.

Southen    Yes, but of course a claim for damages on the one part is an obligation to pay damages on the other part and one has to look at justice for the Plaintiff to recover damages and justice for the Defendant not to have to pay more damages than are considered by the relevant law to be just.   So in this case one has the Gibraltar Law of Limitation which is accepted by many other, but not universally accepted, in a sense.   So one cannot look at justice from the Claimant's position of recovering damages without considering the Defendants liability.

Judge    Normally isn't it the Claimant's choice of forum a factor? Isn't the Claimant not entitled to say 'well I want to sue here if I can'?

Southen    He is indeed entitled to say that if he had but that's exactly the problem generated by that are dealt with by whole principle of forum non conveniums as explained by Lord Gough.   He returns to the theme in other cases.   He explains of course that because of Common Law... '....*does permit the Claimants quite often to sue in a variety of jurisdictions which may be connected with a claim or there may be a bound jurisdiction.   This whole principle is there to prevent claims being bought in an inappropriate jurisdiction where they can and should be tried in the appropriate jurisdiction*'.

Judge       I suppose the difficulty that I have is that this is, dare I describe it as 'a negative claim' as opposed to a 'positive' claim. Is that something that ought to concern me or not?

Southen      It shouldn't. Can I show you the decision in Bristow and Sakowski in just a moment. If I can just finish dealing with this.

Judge       Yes, yes absolutely.

Southen      Following on. Lord Gough dealt with an example of discovery in different jurisdictions and how that may be an advantage to one party in one jurisdiction. And at 'g' just below 'g' he says *'...no doubt each of these systems has its virtues and vices but generally speaking I cannot see that objectively injustice can be said to have been done if a party is in effect compelled to accept one of these well recognised systems applicable in the appropriate forum overseas or for that matter if it is suggested that it is inappropriate in the domestic forum here...'* but he says *'...that it is a recognised system of justice and has the collision convention and limitation convention are then you can hardly be found just...'* and he comes back to the theme just over the page at 483 letter 'b' he says *'...then take the scale on which damages are awarded. Suppose the two parties have been involved in a road accident in a foreign country where both were resident, and where damages are awarded on a scale lower than those awarded in this country, I do not think that an English Court would in ordinary circumstances hesitate to stay proceedings by one of them against the other in this country merely because he*

*would be deprived of a higher award of damages here...so even handed justice does not require you to focus on the Plaintiff's claim for damages, it requires you to focus on also the Defendant's liability and if the appropriate forum happens to award lower, or for that matter, higher damages so be it...'* . Of course Lord Gough here is talking about assuming that it is higher damages in England and lower damages abroad but exactly the same proposition applies in reverse.    The Claimant doesn't have a presumptional right to choose his forum which best suits him.    Now can I just look at Bristow and Sakowski?   You should have that in our supplementary bundle at tab 8. The decision of Mr Justice Morrison.

The claim arose out of the loss of a helicopter which was carrying two crew and several passengers, all were killed. There was an action between Bristow who operated the helicopter and Sakowski who manufactured it as well as the blades.    That doesn't matter because they were also joined to the action both the representatives of the deceased passengers and crew as defendants.    The defendants for negative declaratory relief.   I can show you that in the head note.   Beginning in the bottom paragraph in the left hand column in the present proceedings.    The Claimant's claimed damages from the first three Defendants for the loss of the helicopter and for sums payable to the dependents.    The Claimants also sought a declaration against the estate of the passengers that the Claimant's liability was limited under the Carriage by Air and so forth Act.   The details aren't important.   And then at the bottom of the page further the Claimants sought a declaration that

their liability to the employers of the passengers was so limited and finally the Claimant's asserted as against the dependents of the two deceased crew that any liability fell to be determined in accordance with English Law and asked for a declaration to this effect.    So just pausing there. There are a series of claims for declaratory relief which is either limited or governed by English Law depending whose looking at it and so forth.    The helicopter company had brought those proceedings for that declaratory relief. But Sakowski issued a Part 20 claim against the dependants of the crew and passengers and they too, if you read down that paragraph, ask for a declaration that they were not liable for the accident.

Judge       Yes

Southen     So Sakowski are asking for a declaration of non-liability as well.    In that context being a.. in a tort contest as it happened.    And the claims of all the passengers was settled but not of the representatives of the deceased crew.    Their representatives applied for a stay of the claim – that is to say the declaratory claims against them.    And I pick up the judgment at paragraph 25 at page 155 – the learned Judge refused to grant the stay asked for and this is what he said at 25 '...*it seems to me that the courts now recognise that there is little if any difference between a claim for a positive declaration and one that is negative in a court.    A positive declaration may well have a negative effect and vice versa.    Whether such a claim is proper or not proper is not to be determined by the all of the claim but by substance.    This seems to me to be effective of the decision*

*in Messia/Dought – one of the grounds where a negative declaration is appropriate is where a person against whom relief has been sought is temporised and he refers to the General's opinion in the Tantry.    Here, unlike the passengers on board the helicopter the applicants were not prepared to come forward and make their claims.*    That incidentally is true in Gibraltar but not globally in this case. Is what I think proper for Bristows and Sakowski to force the issue.    The use of such declaratory relief is both valuable and constructive because it seeks to ensure that the applicant's claims is determined at one trial.    It is also a legitimate tool to fix the timing and venue of litigation in a potential trans-national dispute.    It is intentionally legitimate.    He then goes on '...the attitude which the Court will take to a situation such as that between the applicants and Sakowski is to apply the well known principles anunciated in the Spiniada.    I reject the contention that the burden of proof is either diluted or transferred to the other party simply because the claim is for declaratory relief.    If the claim for a declaration serves a useful purpose and it is jurisdically sound then I can see no sensible reason why a different approach to the task should be taken.    Effectively the claim for declaratory relief is to force the applicant to seek damages in relation to the death of the two crew members.    That is the nature of the unjustified complaint about the form of the action.    The fact that as of yet no substantive claim has been formulated by them does not give them better rights to a stay.    And so on.

The representatives of the deceased's crew have argued that because it is a claim for negative declaratory relief Spiniada *should not be applied in its ordinary but in a modified form* and the Judge rejected that.    Now all of that rather pre-supposes however that the negative declaratory relief is useful, and, this is important, not a tool being used for inappropriate forum shopping.    So can I just come back to that in a second.    If you assume, for the sake of argument, that Gibraltar is clearly the appropriate forum you have this position, the cargo owners ought ordinarily to bring their claim for damages in that appropriate forum.    For whatever reason they don't do so.        There is absolutely, in my submission nothing at all wrong in the ship owners forcing the situation by issuing a claim for negative declaratory relief in which of course there would no doubt be ordinarily a counter-claim and so the determination will occur of that liability for damage to the cargo in the appropriate forum. But if Gibraltar is otherwise the appropriate forum there is nothing to be concerned about, to answer My Lord's question about the fact that this is a claim for negative declaratory relief.    Of course if Gibraltar, for the sake of argument, is quite inappropriate then there is everything wrong with it.        This takes me back to whether or not Gibraltar is appropriate.    The actual form of the relief need not trouble the Court.    I think that was the question.

Judge        Yes.

Southen        It should not trouble the Court at all.

Of course whatever the Court wishes I will make my proposition that Gibraltar is the appropriate forum. In a sense it is a short promise but this is the place of the collision and that dictates the governing law, the law governing the tort. The tort is connected with Gibraltar and not with any other place or the law of any other place. Now the significance of this point is in my submission not to be underestimated because it gives rise to all manner of relevant consequences.

First, there is the question of the applicable law. Within Gibraltar that is a matter which doesn't need to be proved it is a matter of which of course the court...

| | |
|---|---|
| Judge | The point would be in the US proceedings, evidence would have to be given as to Gibraltar Law. |
| Southen | It will but that is relatively inconvenient and we can be fairly confident that that will have to happen not only because we know that the cargo owners are revoking the law there but we know that this appears to be different from Gibraltar law. If the laws appear to be much the same then the problem doesn't arise but here it is different. |

So that is quite a significant point evidence of foreign law is always expensive and difficult and tends to give rise to disputes which are very awkward to resolve upon evidence. Bad enough on submissions.

The second major consequence is the involvement of enquiries about the authorities, the investigating authorities

in Gibraltar.   The detail of this has been set out in evidence by Mr Triay.  Perhaps in the most detail in his statement in the US proceedings which you have in the evidence bundle...

Judge        ... at tab 4?

Southen      I have it at tab 11.

Judge        Oh maybe I have the wrong bundle. You mean not the bundle for the purposes of this application, but the older bundle.

Southen      Yes of course, I am sorry the older bundle.   My Lord has the right reference, the appropriate reference and I have the inappropriate one.   If you have the statement at paragraph 5 onwards...

Judge        This is the statement of Mr Triay in the US Proceedings?

Southen      Yes

Judge        All right, fine.

Southen      If I could just ask you to read paragraphs 5 through to 12.

             *There is a pause whilst the court reads the paragraphs.*

Judge        Let me simply say that I think Mr Triay is exceedingly optimistic if he thinks that the matter could come to hearing

within 12 months – I am not quite so sure about that but anyway...

Southen     The same, may with great respect, could be the same in New York.

Judge     Oh yes absolutely...

Southen     We suggest speed as an entirely neutral factor here. Both courts are likely to get to the same destination at about the same time so far as one can peer into the future. But I follow that point.

One should not underestimate the significance of the materials available here. It is not so much the report of the enquiry that will matter, that can be emailed to New York at the flick of a switch.

Judge     Yes and the issue raised in Mr Azopardi's submission that it may well be framed in such a way that it cannot properly be relied upon for the purposes of proceedings.

Southen     Indeed, that is the actual report and of course even without that rubric within it it would still only be what one could strictly call hearsay opinion evidence. It is the underlying materials. Now so far as their documents, it is not necessarily too difficult to transport them to New York but it goes a little further than that. Can I give you one example. Take the movements of the ship tracked by the tracking station – the signal station. There will be available evidence, recorded evidence of what the ships did

|         | as recorded by the signal station, but the court may very well need to hear from somebody in charge at that signal station. |
|---------|---|
| Judge   | Yes, but the chances are that they will not be in Gibraltar then because that is manned by the Ministry of Defence and they shift their staff round every two years.    So they probably end up in Whitehall or somewhere else where a flight to New York or a flight to Gibraltar will I suppose be an added expense but in the context it is sometimes cheaper to fly to New York than to fly to Gibraltar. |
| Southen | It may be but that, if I may say so, is undoubtedly possible, but, how shall I put it, it  is somewhat speculative, one starts with the proposition that these people were in Gibraltar, and probably, there is a chance still will be.  One thing is for certain it is very unlikely that they will happen to be in New York.  So if you do need to hear evidence from people who can explain carefully, and in detail what the tracking records show Gibraltar is a much more likely venue for that to be convenient.    What with all of this it begins to add up.  There is the … obviously the salvage has taken place here, or has failed to take place here, the wreck removal is now taking place here and pollution is a considerations.    All of these may give rise to further actions here.    That too is slightly speculative but this jurisdiction is necessarily involved in many ways in this incident. |
| Judge   | I think the main point here I would like you to address me on is the proceedings in the US and how those must in a |

sense, if the... defendant's evidence is right those proceedings will necessarily have to continue if there is going to be any recovery.

Southen
Let me come to that.   Can I just conclude this just by observing that Gibraltar, we would say is a factual and a jurisprudential fulcrum of this case.  I have to establish that Gibraltar is so far, the natural forum than New York.

Now, the point of departure for the argument on New York jurisdiction is that Nursan is obliged to sue the owners of the New Flame in New York because of a jurisdiction clause which they are said to be bound.   Can I...would it help if I just elaborated on how that argument works.   We don't accept that they are bound by it, but even if they are we don't accept that it takes them very far because all that does is that it establishes the contractual jurisdiction between the New Flame cargo owners and the New Flame owners and nothing more.   It has nothing to do with us. Has that helped the argument?

Judge
Urm.  If that is right and if the P&I Club is saying '... *well we will pay whatever is awarded by the New York Court but not necessarily what is awarded by any other cour...*' insofar as that action is concerned - would it not make sense for all disputes related to the loss of cargo to be dealt with together?

Southen
It would but it doesn't make sense for all disputes to be exported to the inappropriate forum simply because one aspect of the case has, I will say in a moment, voluntarily

been agreed to be heard in New York by what I would describe as the tail of the dog, that is to say the action between Cargo and owners of New Flame. The real underlying issue here is what caused the collision, how did it happen, who is responsible because on the back of that the cargo claims ride.

Judge    I can see how there is merit in the argument that Gibraltar – the collision having taken place in Gibraltar - I can the merit saying why Gibraltar is a natural forum. I can see that. But leaving aside the technicalities of whether or not New York is the contractual forum between the New Flame and the cargo owners, if that be right and as against New Flame the cargo owners need to institute proceedings in New York and if their only prospects of recovery because the P&I Club are saying we will pay you if there is an award by that court but not necessarily if there is an award by another court. If the issue of damages as between Thor and New Flame falls to be determined, because at the end of the day, the cargo owners in terms of liability will have, dare I say it, relatively easy. It was either Thor's fault it was New Flame's fault or it was the fault of both, but it obviously was not the cargo owners fault. So one of the two is certainly to blame. If it is necessary for them to be in New York against New Flame does it make sense to have a parallel action running in Gibraltar at the same time in respect of the cargo?

Southen    In my submission, yes it does. Indeed it is almost necessary because… it is necessary to distinguish whether the tail is wagging the dog or the dog is wagging the tail

and you say is it necessary to have a parallel action in Gibraltar. I would with respect put it the other way. Is it necessary to have a parallel action in New York. Now I understand why My Lord puts the question the other way round because I am asking for permission to serve out but there is going to be a collision action in Gibraltar anyway, there are going to be potentially parallel actions unless we can do something about the New York one.

Now it does sometime happen in multi-party litigation that there is a jurisdiction clause which gets in the way and it sometimes happens that there are two real possibilities. One is that all proceedings should be commenced and fought out in the appropriate forum and if that means that one party wants to enforce his jurisdiction clause cannot … cannot get specific performance of his jurisdiction agreement, then from time to time the courts will say '*so be it, I refuse to enforce your jurisdiction clause because the appropriate form … there are special circumstances, namely that all should be decided in one forum, being the appropriate forum…*'.    And an example of that is a decision of the *House of Lords in Donaghue & Amco* which I won't take you to unless you wish me to. Complex, complex fraud litigation but Mr Donaghue was party to a contract which had English law and a jurisdiction clause, so he brought a claim for an injunction in England which was refused and the court refused to enforce his jurisdiction clause and said '*…no I'm afraid in the interests of justice everything must be determined in…*' – as it happens – New York. That is one possibility I think from recollection ///// Caspian which was a casualty of South

Africa was the same, there was an English jurisdiction clause which was effectively overwritten.    Because of course it is ... when one tries to enforce a jurisdiction, of course you are strictly asking the court for specific performance, it is an equitable remedy and is not as of right.    That's the first broad alternative, you don't enforce the jurisdiction clause.

The second broad alternative is that you have two actions. You have one that I call the main action in the appropriate forum and the satellite action in the contractual forum so far as that contract goes.    Where we part company with the other side in this case is on the building on the foundation of the contractual forum between cargo on the New Flame and the owners of the New Flame, they seek to import into New York all the other aspects of the litigation as well. Now if that is an inappropriate forum then we say that that just doesn't follow, if there must be two strands of litigation that is fair enough but there is no need to make the one the inappropriate forum any larger than it has to be. There is no question of the collision action being exported to New York, that is in Gibraltar, but that is the fulcrum of the whole case.    As My Lord said to me a moment ago, The cargo should have a pretty easy ride in this in one sense....

Judge        It is the recovery that everybody is fighting about...

Southen       One or other ships or both... where is the determination of which ship was liable to which extent going to be decided and the answer is here.    It may or may not be the case ...

| | |
|---|---|
| Judge | ...or in New York and you may end up with conflicting decisions. |
| Southen | It is unlikely that those two parties, one of whom is my client, would continue against each other in both jurisdictions without one of them saying to one or other court this is vexatious and oppressive because it is directly duplicate, normally one would have to relax ... |
| Judge | Yes |
| Southen | If I see somebody in two jurisdictions there.... |
| Judge | No, no you are absolutely right. |
| Southen | My Lord also made the point about P&I Insurers only agreeing to pay on a New York judgment.   Can I just suggest that that is entirely voluntary and  had been put in place in order to enable  them  to make the very argument that is troubling the court.  Can I just show you... |
| Judge | Yes |
| Southen | The starting point perhaps is the charter party which we have... |
| Judge | I wonder should we adjourn until 2.30 because I think it will take at least another 20 minutes or so... |

Southen        Well yes I am getting on well but I am not going to be five minutes...

Judge          Lets adjourns to 2.30pm

COURT ADJOURNS

Southen        My Lord I am about to begin a brief but I will keep it as brief as I can. Excerpts about a jurisdiction clause. The story begins with a charter party and the best place to find it is at page 40 of tab 3 of the previous application bundle. I'm sorry page 40 tab 4 the numbering in the top right hand corner. You should have a charter party on the .... On 4.

Between E&F Mann Shipping as disponent for time chartered owners and Sims Group of New York who were the sellers of the steel cargo. So that's the charter for the ship to carry the cargo of steel to Turkey. And at clause 37 which begins on page 46 there is a jurisdiction clause. ...'*Any disputes of any description arising under this charter..*' please note '*... which cannot be resolved by the parties and which shall not by this agreement have been referred to arbitration shall be resolved by action bought in the US District Courts...*' and so on. '*...processes in that action brought in such court may be served by either party upon the other by registered mail addressed to the individual company signing this charter...at the address appearing at the end hereof. The parties agree that this charter shall be deemed to have been made within the State of New York.*' There are three references to this charter. There is not much going to turn on the first and third but

the middle reference '...*the company signing this charter ... at the address appearing at the end hereof...*' is going to give some problem in a moment when we look at the Bill of Lading.   But that is the jurisdiction clause.   Obviously with which Nursan has nothing to do with it to start with.

The Bill of Lading is then at page 55 - now this Bill of Lading issued to Sims again as the shipper so they are an original party to it and it is issued, in the bottom right hand corner, by New England Shipping Co as agent for the Master.   The effect of that, at least in English Law, is that this is therefore a contract between the owner of the ship, Gladiator, and the shipper, Sims.   It is not a party to which ED&F Mann as the time chartered owners are a party.   So again Nursan is not an original party to the contract contained in or evidenced by this Bill of Lading.   They are named next as the notifying party.   It is again, as a matter of English Law, although the matter is governed by New York Law, it is of course entirely possible for Nursan to become a party to this Bill of Lading if it is endorsed to them.   That is English Law.   One would assume that New York Law will be not dissimilar.   As a matter of English Law that's either not possible or extremely difficult in the context of a non-negotiable Bill of Lading.   That can't be transferred.   It may be that this is just a non-negotiable copy.   I don't know.   The evidence doesn't explain that. In order to get a jurisdiction clause to which Nursan is bound Nursan would have to get over quite a number of hurdles.   First of all  they would have to become party to the contract contained or evidenced by this Bill of Lading. It is not obvious how, when or whether they did so.   The

second, you then have to have incorporated into this Bill of Lading the jurisdiction clause from the charter party. Now in the bottom left hand corner, or nearly the bottom left hand corner – there is a provision *for other terms and conditions and exceptions as per charter party dated 11th July*. Again the matter is governed by New York Law. As a matter of English Law that would not ordinarily include a jurisdiction clause. It would incorporate into the Bill of Lading all those terms which are germane to the shipment and carriage but not dispute resolution clauses. But one can assume for present purposes that it might have incorporated the jurisdiction clause in the New York Law. Even then you have got to look at the jurisdiction clause to see whether it makes sense so incorporated, and of course it reads '*the parties under this charter party*'. Those words can, as a matter of English Law be manipulated to read '*this bill of lading*' it is much more difficult where you have the sentence which says ... *talks about service on the parties, the charter party who signs it at the end.* Because that doesn't make sense.

One can perhaps summarise this by saying that there was probably something of a dispute about whether Nursan was truly bound by New York jurisdiction clause. It certainly appears to an English lawyer eminently debatable. There is really no evidence of New York Law before the Court which explains any of this, it is merely asserted without any explanation that Nursan has become party to the jurisdiction clause which had been incorporated into the Bill of Lading. That is by Mr Leonard...

So we come then, and perhaps this is what matters most to the letter of undertaking issued by the Swedish Club at page 66.    This is what gives rise to the submission that the cargo owners will only recover from the insurers if there is a judgment of the New York Court, a point which was troubling My Lord earlier.    It is the genesis of that submission.

Now within the letter of undertaking which has been disclosed and put into the bundle, I may co-ordinate, there is no objection at all  but I will say that it is not the subject of any evidence or explanation at all.    It is dated 19th December so it is recent and as with all of these letters of undertaking it begins '...*in consideration of your..*' and that is addressed of course to the cargo interests '... *consenting to the relief from arrest and/or refraining from taking any action resulting in the arrest detachment or other restraints of the New Flame or any other ship in the same management etc... we make the following promise...*' So what has happened, which is pretty normal, is that the cargo interests have given up their rights to seek security in return for this undertaking from the Swedish Club and what they obtained from the Swedish Club for giving up their rights to seek security is an undertaking in the second main paragraph  ' ... *that the Swedish Club will pay within 14 days of your written demands such sums as may be due pursuant to a final and unappealable judgment issued by a US Court or as may be agreed to be recoverable.*'    So to the extent that the cargo interest can only recover on the basis of a New York judgment that is a position in which they find themselves essentially out of choice.    They have

chosen to accept this limited undertaking in consideration of giving up their rights to seek security otherwise. One doesn't always see this form of wording, quite often one sees an undertaking to pay sums due pursuant to the final and unappealed judgment of a court of competent jurisdiction. It happens .... Negotiated, whether they could have done we do not know. Such a wording goes to the extent that they are tied in to New York jurisdiction by this letter of undertaking. I do submit that that appears to have been voluntarily. I really can't go any further than that because there is no evidence as how this came to be agreed.

Over the page on 67 there is an express agreement by Cargo interests and the Club on behalf of the owners of the New Flame that '...*the above claims of Cargo Interests shall be dealt with by US law and any claim shall be brought in the New York Court...*'.   So there is an agreement to the New York jurisdiction for the claims between New Flame Cargo and New Flame Shippers. No doubt one of the things which informed that agreement was the argument at any rate that the charter party jurisdiction clause was incorporated in the Bill of Lading and the Cargo interests were bound by it, but the only basis upon which one can say clearly that New Flame Cargo is bound by US jurisdiction is an agreement entered into on the 19th December last year.

|  |  |
|---|---|
| Judge | Then this letter of undertaking is subject to English Law and the jurisdiction of the English High Courts. |

Southen    I was going to point out that ultimately I can't say with any...

Judge    No, no it doesn't but it is just amusing.

Southen    It is. But that is not unusual in this context and it may well be itself important some of the detailed complexity of this agreement which I needn't trouble you with but there is a ////// which you can see if you read all this about the impact and effect of the boats displayed collision clause in the charter which is an English clause but to cut a long story short that has the effect of neutralising the New York Law on the innocent cargo ////.    There is a big row about that because this document itself is allied to an escrow agreement whereby any money that may be recovered by cargo from Thor Gertrude will be paid into escrow pending the resolution of the row about the collision clause.    We don't need to worry about that.

The significant point is that to the extent that the cargo interests are bound to New York jurisdiction for their claim against the owners of the New Flame.    One, we do not accept that that was always the position, it may and does appears to have been voluntary.    So too, thus more forcefully, we say the same about their limited security, their security being limited to a judgment of the New York Court.    They have got themselves into this position.

And so to come right back to the question that My Lord was asking me about whether the New York proceedings will continue should there be Gibraltar proceedings as well.

The solution in our submission is to minimise rather than maximise the New York proceedings which in terms of appropriate forum are an aberration driven by, at most, a quite fortuitous jurisdiction clause in the Bill of Lading to which Nursan was not an original party and which itself derives from the charter party.    Cargo interests need to build on that foundation a comprehensive action in New York but we say that is the tail end of the proceedings as I explained earlier.    The prospect, or should I say the possible prospect of there being two sets of proceedings should not deter the court from granting this application, if anything it is the New York action which should be stayed or at any rate kept to a minimum.    Can I just remind the court that the owners of the Thor Gertrude have in the New York proceedings issued an application there to stay those proceedings bought by the New Flame cargo interest.  So it doesn't at the moment, necessarily follow that there will be duplicate proceedings between cargo interests and Thor Gertrude.    That remains to be seen because there will no doubt be applications in both jurisdictions dealing with that prospect.    It is only a possibility.    But that is in outline what we say about how the New York proceedings lie they are a corner of the litigation, an important corner from the point of view of the cargo interests, but their claim depends fundamentally on what is established between the two ship owners.

Now I can address you further if you wish on the other bits and bobs which are said to connect the claim with New York – the shipment there and so on but..

| Judge | No I am not particularly concerned by those at this stage in any event. |
|---|---|

| Southen | Well, you will have gathered that we don't accept, as it were, the appearance which is created by the annex to my learned friend's skeleton argument at which it was thought to put into different columns the connecting factors with Gibraltar and with New York but unless there are any further matters I can assist you with that is all I wish to address you with My Lord with the sole exception of one small amendment to the terms of the draft Order which follows on this having been made ex-parte. |

*A break in proceedings.*

| Judge | ...right, the collision between the vessels having been occurred just off Gibraltar I am of the view that the natural forum for the resolution of disputes arising from the collision is Gibraltar.  The most significant matter which could support the contention that New York is a more appropriate forum is the jurisdiction clause in the charter party and possibly by incorporation into the Bill of Lading and the letter of undertaking from the Swedish Club. However given Mr Southen's submissions, so far as those are concerned, I am persuaded at this stage that Gibraltar remains the most appropriate forum.  So permission to serve out of the jurisdiction is granted.  Do you have a draft Order I can .....no doubt all this shall be gone into in far greater detail in a few weeks time – it will seem like it. Thank you very much indeed.- THE COURT CLOSES. |

EXHIBIT C

EXHIBIT C1




| Home | About Us | Services | Titan Pullers | Jack-Up Barges | Employment | Contact |

Titan Salvage's
Mauricio Garrido
Elected Vice
President of the
American Salvage
Association

## TITAN – WORLDWIDE MARINE SALVAGE, SHIP WRECK REMOVAL, MARINE FIREFIGHTING, VESSEL LIGHTERING, UNDERWATER FUEL REMOVAL, DAMAGE STABILITY AND RAPID MARINE EMERGENCY RESPONSE SERVICES FOR THE MARITIME INDUSTRY – 24 HOURS A DAY

Welcome. TITAN, a Crowley company, is a worldwide marine salvage and ship wreck removal company operating from main bases in the USA, UK and Southeast Asia. Since its founding in 1980, Titan has forged a solid reputation for total commitment to serving the maritime industry's emergency response needs. Within our website you will see how Titan has provided rapid response and results - solving problems worldwide for ship owners, underwriters and government agencies. In addition to marine salvage and wreck removal services, TITAN excels at marine firefighting, vessel/ship lightering, underwater fuel removal, damage stability and other rapid marine emergency response services for the maritime industry. All are offered 24 hours a day, 7 days a week, 365 days a year.

### SALVAGE & WRECK REMOVAL
### 24 HOURS A DAY

**USA +1-954-929-5200
UK +44-1273-515555
Singapore +65-62714277**

CLICK HERE TO VIEW A SLIDE SHOW OF PREVIOUS WORK



EXHIBIT C2



## NEWS

#### ⊞ TITAN Salvage Making Progress in Effort to Re-Float Sunken Ship – New Flame

TITAN Salvage, Crowley Maritime Corporation's salvage and wreck removal company, reported today that its salvage team on site in Gibraltar responding to the wreck of the bulk ship New Flame is preparing to begin cutting the stern section of the ship from the sunken bow so that the stern can be re-floated and towed away.

Titan Salvage's
Mauricio Garrido
Elected Vice
President of the
American Salvage
Association

The New Flame, which sank following a collision while exiting the port of Gibraltar in August of last year, now lies in the open ocean off Gibraltar's Europa Point with the forward four cargo holds of the ship lying on the ocean bottom, and cargo hold No.5 and the engine room still floating while being maintained by TITAN's salvage pumps. The ship is loaded with over 42,000 tons of scrap metal, which was being transported from New York Harbor to Turkey for recycling.

TITAN was contracted by vessel underwriters in mid-December after previous salvage / wreck removal efforts were terminated. The TITAN team first boarded the wreck on Dec. 24 and, because of pre-Christmas storms, was forced to work very quickly to prevent the stern section of the ship from sinking - performing damage control measures to stop the flooding in the engine room and cargo hold No. 5.

The salvage team presently consists of 20 people with logistics being supported from Titan's UK-based equipment depot. Vessels on site include Crowley's Invader-class tug Warrior, which is serving as the primary salvage tug on site; URS's dive support vessel Union Beaver; ITC's Shoal Buster-class tug Mistral, which is on her maiden voyage; and Crowley's 400' x 100' deck barge 408. Salvage equipment on site includes six TITAN Pullers – two of which are currently on the wreck's stern fixed with heavy chain to two 10,000-kilo anchors. The chains are set by the pullers at 135 tons each.

With buoyancy in the after section now stabilized by the salvage team, efforts are underway to cut the ship in to two sections separating the ships floating after section - comprised of the engine room, accommodation block and No. 5 cargo hold – from the sunken forward section of the ship. Completing this cut will enable salvors to "float away" the after part of the ship for onward transportation to an approved scrapping facility.

Prior to completing the cut, the team must first moor the barge 408 at the forward end of the wreck and cut away deck structures such as cranes, masts and deck houses to enable the barge to float freely over the wreck as it is moved further aft along the wreck until reaching the cut line at the after end of the No. 4 cargo hold. To complete this cut, TITAN will use heavy anchor chain operated by two TITAN Pullers positioned aboard the barge 408. As cutting will take place in way of the No. 4 double bottom fuel tanks, all efforts at this time are being focused on removing fuel oil residue from these tanks.

Barge 408 was moored at the wreck site Monday. Depending on weather conditions, deck clearing operations should last about 7 working days and the actual cutting of the ship and stabilization of the stern section should take about another 5 days. Complete removal of the sunken forward section of the ship and cargo is estimated to take an additional 90-120 working days.

Home | About Us | Contact | Copyright
© TITAN Maritime, LLC 2006. All Rights Reserved

EXHIBIT C3

The Gibraltar Chronicle - The Independent Daily First Published 1801

# GIBRALTAR CHRONICLE

*The Independent Daily - First Published 1801*



... click here

| | |
|---|---|
| **Headlines** | **Archive for December 2007** |
| **Comment** | 29-12-2007 | SALVAGE TEAM SET ABOUT |
| **UK News** | | **Read Story** |
| **Features** | 29-12-2007 | 'IRRATIONAL' RUST BUCKET SINKING IN PORT |
| **Bicentenary** | | **Read Story** |
| | 29-12-2007 | SEE IN THE NEW YEAR AT CASEMATES |
| **Links** | | **Read Story** |
| **Opinion** | 29-12-2007 | BISHOP HEADS NEW YEARS HONOURS |
| **Contact Us** | | **Read Story** |
| | 28-12-2007 | NEW ROUND OF MINISTERIAL TALKS AGREED AS CARUANA COOLS SPAT OVER NEW FLAME |
| **Weather** | | **Read Story** |
| **ARCHIVE** | 28-12-2007 | JUNTA THREATENS FINANCIAL CLAIM OVER NEW FLAME |
| | | **Read Story** |
| | 28-12-2007 | MILITARY SPOOKS WATCH OUT FOR CHINA'S STRAIT TRAFFIC |
| | | **Read Story** |
| | 28-12-2007 | MAN ARRESTED AFTER STABBING INCIDENT |
| | | **Read Story** |
| | 27-12-2007 | SISARELLO SPELLS OUT TGWU OBJECTIVES FOR 2008 |
| | | **Read Story** |
| | 27-12-2007 | ODA CRITICISES TONE OF "INOPPORTUNE" TIEMPO ARTICLE |
| | | **Read Story** |
| | 27-12-2007 | ESG URGE PUBLIC TO CONSIDER EASTSIDE IMPLICATIONS |
| | | **Read Story** |
| | 27-12-2007 | RLSS AND GOVERNOR AWARD LOCAL LIFESAVERS |
| | | **Read Story** |
| | 27-12-2007 | LAUNCHING OF MEMORIES |
| | | **Read Story** |

## SALVAGE TEAM SET ABOUT

*By Brian Reyes*

A 14-man team is already in Gibraltar making preparations to remove the wreck of the New Flame.

The team works for Titan Salvage, a US-based company that specialises in wreck removals of this type and won the contract to tackle the sunken cargo ship off Europa Point.

The operation will involve refloating the stern section, which broke from the bow of the ship last weekend and settled on the seabed in 27m of water.

"We think there is still sufficient buoyancy to refloat the stern section," said Mark Hoddinott, Titan's UK-based European director.

Once refloated, the condition of the stern section will be assessed at anchorage before being brought into port for dismantling.

The bow section of the New Flame is lodged on Europa Reef and will be cut into sections at the site and removed.

The operation is expected to start in January but Mr Hoddinott said the timescale for completion was largely dependent on weather conditions.

"If we have a decent weather window, it's a job that can be done very quickly," he said.

Titan has two vessels currently operating out of Gibraltar, the salvage ship Union Beaver and the tug Mistral. A third tug and a very large barge are expected to arrive in the New Year.

Greek salvage company Tsavliris will keep its tug Fotiy Krylov at the site until the wreck is formally handed to Titan.

Tsavliris had previously tried to save the stern section but the project was abandoned due to costs and technical factors. The bill so far is in excess of $20m.

The operation is now to remove the entire wreck and its cargo, which according to Mr Hoddinott consists of "a jumble of scrap".

The Gibraltar Government and Titan expect to make a formal presentation of the project early in the New Year.

"The Government is entirely satisfied with the conduct of this complex and difficult operation to date," a Government spokesman said.

"In terms of the exposure of its location, it is certainly one of the most complex anywhere in the world today."

The spokesman said that environmental and navigational safety remained the Government's main priorities.

"Accordingly, we will continue to keep the Spanish authorities well informed, so that they can assess and take whatever steps they deem necessary to protect their environment."

"That said, the Government is advised that the operation does not represent a material risk to the environment."

Titan has handled wreck removals around the globe and is not stranger to this part of the world.

In 2003 the Spanish Government awarded Titan the contract to recover the wreck of the bunker barge Spabunker Cuatro, which sank in rough weather in deep water off the refinery.

EXHIBIT C4

## SUPREME COURT FUND RULES

## PAYING IN STATEMENT

Rule 3.

**Title of cause or matter:**

**Claim No. 2007 – AJ - 11**

### IN THE SUPREME COURT OF GIBRALTAR

**BETWEEN: -**

### A/S DAMPESKIBSSELSKABET TORM

**CLAIMANTS**

**-AND-**

### NURSAM METALURJI ENDUSTRISI A/S Turkey

**-AND-**

### GLADIATOR NAVIGATION SA Panama

**DEFENDANTS**

**LEDGER CREDIT:**

*To the Admiralty Marshal

Please receive the undermentioned moneys and credit them to the Supreme Court Fund for the above ledger account

Particulars of payment: **CPR Rule 61.11**

**SUPREME COURT FUND RULE**

Full name of payer:        **TRIAY & TRIAY**

Amount:   **£4,193,582.30**

Amount in words:   **Four million One Hundred and Ninety Three Thousand and Five hundred and Eighty Two Pounds and Thirty Pence Sterling**

Date:   **21ˢᵗ January 2008**

Signature:

Address:        **28 Irish Town, Gibraltar**

Solicitor for:        :   **A/S DAMPESKIBSSELSKABET TORM**

The Admiralty Marshal

Please note that account is designated

      (a) trust account
      (b) interlocutory payment
      (c) deposit by way of security
      (d) miscellaneous

Date 28ᵗʰ January 2008

Registrar