EXHIBIT 5

**IN THE SUPREME COURT OF GIBRALTAR**

2007 – AJ – No. 3

**BETWEEN**

**A/S DAMPSKIBSSELSKABET TORM**

**Claimant**

-and-

**THE OWNERS OF
THE CARGO ON BOARD
THE MV NEW FLAME**

**Defendants**

---

**WITNESS STATEMENT**

---

I, **JAI KUMAR SHARMA** of Dolphin House, 16 The Broadway, Stanmore, Middlesex, HA7 4DW, England, Director, Casualty & GA Department, **SAY AS FOLLOWS**

1. I am the Director of the Casualty and GA Department of Dolphin Maritime & Aviation Services Limited ("Dolphin").

2. Nursan Metarulji Endustrisi AS ("Nursan") are the receivers and Owners of the cargo aboard the MV New Flame namely approximately 42,000 metric tonnes of steel. Nursan have agreed with Dolphin that the latter will, on commercial terms agreed with Nursan, assist and act for Nursan in the recovery and prosecution of its claim.

3. Now produced and shown to me marked JKS1 is a true copy of a letter of authorisation from the Owners of the Cargo which allow Dolphin to act on their behalf in relation to any matters arising from the Claim in respect of the cargo aboard the vessel, the MV New Flame. This includes ability to compromise such a claim or to litigate in any Courts in respect of the same. This gives us authority to enter into declarations, witness statements or affidavits as part of any action.



4. I make this Witness Statement from matters within my own knowledge which matters are true or from matters within my own knowledge, information and belief which matters are true to the best of my knowledge, information and belief and set out the sources for the said knowledge, information and belief herein.

5. I am duly authorised to make this Witness Statement in support of an application to challenge and contest the jurisdiction of the Gibraltar Courts to determine the Action issued by the Claimants against the Defendants on the grounds that the Gibraltar Court:

    (1) has no jurisdiction in this case; or

    (2) should not exercise its jurisdiction in this case given that there are already extant proceedings in the United States Courts between the Owners of the Cargo and the Owners of the New Flame and the Torm Gertrud and for the reasons set out herein.

6. The legal basis of the applications will be set out in the Skeleton Arguments to be filed by our counsel in advance of the hearing of this matter. This Witness Statement addresses the second limb of the Defendants application. The submissions in respect of paragraph 5(1) will be in the said Skeleton Arguments.

## BACKGROUND AND LOSS SUFFERED

7. On the 12th August 2007 the vessels Torm Gertrud and MV New Flame collided off Europa Point.

8. The vessel MV New Flame had about 42,000 tons of steel aboard. The cargo has a value of $13,672,849 (thirteen million six hundred and seventy two thousand, eight hundred and forty nine) US Dollars. The shippers of the cargo were paid on the 9th August 2007.

9. The cargo currently lies aboard the vessel and salvage operations in respect of the same have been well publicised in Gibraltar. However recently the Lloyds Open Form salvage contract, after incurring SCOPIC costs of more than $14million (US Dollars), has been terminated by salvors. Now produced

and shown to me marked **JKS2** is a true copy note on the salvage costs to the end of October.

10. There is currently no immediate prospect of obtaining the retrieval of the said cargo or minimising the damage suffered by Nursan. The said cargo has, in effect, been lost or substantially damaged and not been delivered to Nursan or its clients as originally contracted or planned.

11. The loss and damage suffered by the Owners of the cargo is significant in that they have not been able to take delivery of the valuable cargo and put it to use as planned. The loss to cargo owners (not including interest or costs of recovery of the loss) is estimated at $13,672,849 US Dollars as stated above.

12. Even if a replacement salvor is found, cargo owners will have to pay a very large sum in salvage, expected to be the vast majority of the value of the cargo, because of the high cost of salvaging the cargo.

## US LITIGATION AND JURISDICTIONAL FEATURES

13. On the 29th August 2007 the Owners of the Cargo issued proceedings against both ships in the United States as a result of the loss or damage sustained in respect of the cargo.

14. The principal reason for issuing proceedings in the United States is that we consider that it is the most convenient forum for litigating this matter because we consider that Nursan have a better chance of recovering the maximum of its loss in that jurisdiction and because of a number of other features present which connect the dispute to the United States.

(a) **General**

15. The cargo was loaded onto the New Flame in the Port of New York and was bought by the owners of the cargo from United States suppliers.

16. The owners of the cargo are Turkish. They have no connection with Gibraltar.

17. The Claimants are Danish but have offices in New York at 1 Station Place, Stamford, Conneticut, 06902, USA. Conneticut is 25 miles from New York. Equally they have no connection with Gibraltar.

18. In any event the Cargo owners issued proceedings in the US before the Gibraltar proceedings were issued.

19. The Claimants are not seeking an Order to prevent our US proceedings from continuing. Given the nature of declaratory relief sought by the Claimants if our application is not granted there would be a risk of irreconcilable and inconsistent judgments between the United States and Gibraltar Courts. If the Claimants were to seek anti-suit relief in Gibraltar and attempt to force us to litigate in Gibraltar it would risk an unfair and unjust result because of the limitation provisions of Gibraltar – as set out below.

(b) **Jurisdiction Clause**

20. The cargo was loaded and being shipped under a Charterparty which contained a clause applying US law and jurisdiction to any dispute. Clause 37 is quite specific in that regard and is binding in all its respects.

21. The charterparty requires litigation on loss to the cargo and claims made under it to be brought in the New York Courts and US law applies to any dispute.

22. Additionally the cargo was shipped under a Bill of Lading issued on 31st July 2007 in New York.

23. The Bill of Lading incorporates the Charter party jurisdiction clause which is, as mentioned, contractually binding on Nursan. The affidavit of Nursan's US attorneys exhibits the Charterparty and Bill of Lading.

(c) **Limitation**

24. We are advised that Gibraltar applies the 1976 International Convention on Limitation of Liability for Maritime Claims ("LLMC") but has not applied the 1996 Protocol extending the scope of that convention.

25. The effect of that would be that a Limitation fund could be constituted in Gibraltar but that this would be insufficient to cover all losses suffered as a result of the collision and the subsequent salvage operation. The financial limitation placed on the recovery of claims would prejudice parties suffering losses.

26. The Torm Gertrud Limitation Fund that could be constituted under Gibraltar law would have a value of $7,651,125 US Dollars. The vessel has a GRT of 30,058.

27. Conversely total claims against the Torm Gertrud would be expected to be around $50 million US dollars as follows:

    (1) Nursan's cargo loss of $13.67 million US Dollars as above;

    (2) The loss of the New Flame – valued at about $25-30 million US Dollars before the collision;

    (3) Claims by salvors - $14 Million US dollars;

    (4) The cost of the wreck removal is unknown at this stage but is expected to be at least $10m US Dollars.

28. As such any claimant would probably only recover a small proportion of their loss. If the total losses are as above we would expect Nursan to be able to recover only about $2 million US Dollars.

29. I am advised by Anthony English of English White Shipping Limited of London, Ship Brokers, and verily believe that the Torm Gertrud is estimated to be worth $50 Million US Dollars.

30. Accordingly any action in Gibraltar claiming loss or damage stemming from the collision will be limited in value and will cause the owners of the cargo unreasonable loss or damage which cannot be recovered.

31. We are concerned that if Nursan is forced to litigate its claim in this jurisdiction it would suffer significant irrecoverable loss.

32. This is not the case in the United States as set out in the Affidavit of Patrick Lennon the US Attorney acting for the owners of the cargo filed herein.

33. In those circumstances we consider more justice would be done if the litigation were to continue in the United States.

34. The United States Courts are already seized of the matter and I refer to the Affidavit sworn in these proceedings by Patrick Lennon.

### (d) Interests of Justice

35. The Claimants must be aware of the limitation regime applicable in Gibraltar and must simply be seeking to reverse the normal structure of the potential litigation by cargo claimants as a device to minimise their liability. That can and will produce an injust outcome as the Cargo owners have no wish to litigate in Gibraltar and we would ask the Court to exercise special caution in considering the relief requested by the Claimant.

36. Nursan is not aware how the collision occurred. But at least one thing must be certain namely that the Cargo Owners did not cause or contribute to it. In those circumstances to adjudicate on these matters in Gibraltar because of the favourable legal regime which will result in a partial recovery of losses is unfair and not in the interests of justice.

### SERVICE OF THE GIBRALTAR CLAIM FORM ON NURSAN

37. While I am advised by my solicitors, Attias & Levy and verily believe that service of the Claim Form on the Captain of the Port is technically possible under Gibraltar procedural rules I should say that we were not advised and Nursan did not become aware of the existence of this Claim Form until Monday 15th October. Neither we nor Nursan had actual notice until then and as such we reserve the Defendants position to argue that such service on the Captain of the Port should be set aside given that the Owners of the Torm Gertrud were perfectly aware (for the reasons set out below) that they could have given us or Nursan actual notice in a different way and that we would not necessarily receive notice of the service of the Claim Form by sending it to the Captain of the Port.

38. We became aware of the Claim Form during a general discussion about the claim as a whole with the Torm Gertrud's Danish lawyers Kromann Reumert when we were informed by Mr Jakob Rosing that proceedings had been issued against cargo by the Torm Gertrud interests, and he subsequently sent us a copy of the writ later that same day.

39. This was notwithstanding the fact that it would have been easy for the Claimants to have advised our Gibraltar solicitors that

they were taking these steps as they were aware we had instructed Gibraltar lawyers in late August (and had also been aware of Dolphins' involvement since at least the 30th August).

40. On receiving notice in mid October we immediately asked our solicitors to advise on the matter and move towards filing these applications.

## CONCLUSION

41. I therefore crave that this Honourable Court do grant an order in the terms of the draft submitted by Counsel on behalf of the Defendants and that it determine that it has no jurisdiction or alternatively should not exercise jurisdiction in this case for the variety of factors mentioned as well as the reason that if the Defendants are forced to litigate in this jurisdiction they will be deprived of recovery of the majority of the loss and damage suffered by them through no fault of their own and accordingly that this action should be stayed in favour of the United States Courts.

..............................................
**JAI KUMAR SHARMA**

9th day of November 2007

## STATEMENT OF TRUTH

I confirm the contents of this Statement are true as detailed therein.

..............................................
**JAI KUMAR SHARMA**

This Witness Statement is filed by Attias & Levy of First Floor Suites, 39 Irish Town, Gibraltar, Solicitors for the Defendants.

## IN THE SUPREME COURT OF GIBRALTAR

2007 – AJ – No. 3

**BETWEEN**

A/S DAMPSKIBSSELSKABET TORM

**Claimant**

-and-

THE OWNERS OF
THE CARGO ON BOARD
THE MV NEW FLAME

**Defendants**

---

**EXHIBIT "JKS1"**

---

This is the paper writing marked **"JKS1"** in the Witness Statement of Jai Kumar Shamar.

17-AUG-2007 10:35   FROM NURSAN CELIK          TO  02123500349        P.02



### LETTER OF AUTHORISATION AND ASSIGNMENT

To:   Whom it may concern

**Vessel: MV NEW FLAME**
**Voyage:**
**B/L / Air Waybill / CMR Note:**
**Cargo: 42,200.15 TONS STEEL SCRAP**
**Claim:**

We, NURSAN METALURJI ENDUSTRISI A.S. confirm that Dolphin Maritime & Aviation Services Ltd (DMAS) (and/or their agents or representatives) are fully authorised by us to act on our behalf in accordance with their standard terms and conditions in any and all matters relating to the above claim, including but not limited to dealing with investigating, negotiating and settling any and all aspects of the said claim, but our prior written approval must be taken for all the matters that will cause disadvantage consequences against of our company NURSAN METALURJI ENDUSTRISI A.S.

Further, DMAS are authorised at their discretion to commence legal proceedings and/or arbitration in our name in respect of the said claim, and to receive on our behalf any payment made in connection with the said claim by any third party(s) and to execute in their own name on our behalf any documents, releases or receipts which may be necessary for the prosecution and/or settlement of the said claim.

Yours faithfully

SIGNED ........................................
For and on behalf of

Company Stamp/Seal

## IN THE SUPREME COURT OF GIBRALTAR

2007 – AJ – No. 3

**BETWEEN**

           **A/S DAMPSKIBSSELSKABET TORM**

**Claimant**

-and-

           **THE OWNERS OF**
           **THE CARGO ON BOARD**
           **THE MV NEW FLAME**

**Defendants**

---

**EXHIBIT "JKS2"**

---

This is the paper writing marked **"JKS2"** in the Witness Statement of Jai Kumar Shamar.

**TMC (MARINE CONSULTANTS) LTD**
NAVAL ARCHITECTS
SHIP & CARGO SURVEYORS
MARINE ENGINEERS

Lloyds Wharf, 2 Mill Street, London SE1 2BD
Telephone: 020 7237 2617
Fax: 020 7231 8069
E-mail: info@tmcmarine.co.uk

A. BOWMAN   01256 764130
W. FINNIE   01245 466726
R. SNEDDON   01474 352024
S. TIERNEY   01732 460369

# FAX TRANSMISSION



| | | |
|---|---|---|
| To | : | The Swedish Club |
| Attn. | : | James Greene |
| Fax No. | : | by e-mail |
| Subject | : | "New Flame" |
| From | : | Richard Sneddon |
| Date | : | 5th November 2007 |
| Our Ref. | : | RES/7765 |
| Your Ref. | : | Unknown |

Total number of pages (including this one): 1

Please be advised that the SCOPIC costs until midnight on 2nd November 2007 were US$14,733,738.78.

Best Regards,
For **TMC (Marine Consultants) Ltd.**

*Richard Sneddon*

**Richard Sneddon**



Reg. in London No. 1414292
Regd. Office as above

Website:- http://www.tmcmarine.co.uk

Directors:
A. Bowman, BSC (Hons) CEng MRINA MNECI
W. Finnie, AMRINA AMIESS
R. Sneddon, CEng MIMarE
S. Tierney, Extra Master MNI Minst Pet
A. T. Radcliffe, MA PhD CEng MICE FRINA
C. T. H. Hewitt