EXHIBIT 6

<u>IN THE SUPREME COURT OF GIBRALTAR</u>

2007 – AJ – No. 3

BETWEEN

A/S DAMPSKIBSSELSKABET TORM

<u>Claimant</u>

-and-

THE OWNERS OF
THE CARGO ON BOARD
THE MV NEW FLAME

<u>Defendants</u>

---

## AFFIDAVIT

---

I, **PATRICK F. LENNON**, Attorney at Law of 875 Mill Hill Road, Southport, Connecticut, United States of America, **MAKE OATH** and **SAY AS FOLLOWS:**

1. I am an Attorney at Law admitted to the Bar of the State of New York in March, 1993 and practice as a partner of Lennon, Murphy & Lennon LLC from the Gray Bar Building, 420 Lexington Avenue, Suite 300, New York, New York, 10170, United States.

2. I have been an Attorney for fifteen years and have particular expertise in admiralty and maritime law.

3. I am also an adjunct Professor of Admiralty and Maritime Law at the Quinnipiac University School of Law in Hamden, Connecticut, and have held that position since 1998.

4. I represent the Owners of the Cargo aboard the M/V New Flame, namely Nursan Metalurji Endustrisi AS ("Nursan").

5. I make this Affidavit from matters within my own knowledge which matters are true or from matters within my own knowledge, information and belief which are true to the best of my knowledge, information and

1

belief. If the latter I set out the sources for that knowledge, information and belief herein.

6.     I am authorized to make this Affidavit of law in support of the application being filed by the Defendants in the Gibraltar action.

## THE U.S. ACTION

7.     On the 29th August 2007 and on instructions from Nursan I filed proceedings in the United States District Court for the Southern District of New York in New York City (the "U.S. Action") in relation to the damage to the Cargo owned by Nursan and suffered by it as a result of the collision between the M/V Torm Gertrud and the M/V New Flame in Gibraltar. Now produced and shown to me marked **PL1** is a true copy of the proceedings (Summons and Complaint) filed by Nursan as Plaintiff and against the M/V Torm Gertrud, the M/V New Flame and their respective owners as Defendants.

8.     In those proceedings Nursan as Plaintiff claims that Judgment be entered against the Defendants inter alia in the sum of not less than $13,672,849 US dollars, plus interest, costs and fees.

9.     Nursan was the intended receiver of a cargo of 42,200 metric tonnes of scrap steel aboard the M/V New Flame, which it is alleged has been damaged as a result of the collision between the M/V New Flame and the M/V Torm Gertrud.

10.     Now produced and shown to me marked **PL2** is a copy of the charter party by which the steel was being carried on board the M/V New Flame. The Honourable Court will note that this has a jurisdiction clause providing for United States law and jurisdiction (Clause 37).

11.     Now produced and shown to me marked **PL3** is a copy of the bill of lading covering the carriage of the steel on board the M/V New Flame, which bill of lading incorporates by reference the charter party marked as **PL2**. Under U.S. law, the bill of lading is subject to the U.S. Carriage of Goods by Sea Act ("COGSA") and, accordingly, Nursan is contractually required to bring claims arising out of the carriage of the steel and the loss or damage to the cargo in the United States.

12.     Now produced and shown to me marked **PL4** is a copy of the Sales Contract No. SG-S-5054.07 between Nursan and the buyer of the steel, Sims Group Global Trade Corporation ("Sims") of New York.

2

## THE PRINCIPLES ON DAMAGE
## THAT THE U.S. COURTS WOULD APPLY

13.   In the U.S. Action the Nursan invokes its rights and privileges under the "innocent cargo rule" as has been developed as part of the U.S. general maritime law. The basis, extent and meaning of that rule is as follows:

14.   Under the Innocent Cargo Rule a cargo owner may recover from the non-carrying ship the whole of its loss provided only that there is some degree of blame however slight from the non-carrying ship. While the damages due to a collision, when both vessels are at fault, are divided as between themselves, under U.S. general maritime law the innocent cargo owner may recover his full damages from the non-carrying vessel. *The Atlas*, 93 U.S. 302, 315; *The New York*, 175 U.S. 187, 209, 210; *Canada Malting Co.* v. *Paterson Steamships*, 285 U.S. 413, 418. This is so although the carrying vessel may be free from liability to the cargo owners. On a division of the entire damages between the two vessels, the non-carrying vessel may then recoup from the carrying vessel damages paid to the cargo owners, in an amount based on the proportionate fault of each vessel in causing the collision. *The Chattahooche*, 173 U.S. 540, 554, 555.

15.   In the United States, no limitation of liability convention has been adopted. Rather, in 1851 the United States Congress enacted the Shipowners Limitation of Liability Act, 46 United States Code section 183 *et seq.*, which is unique to the United States. The Act provides that a ship-owner facing claims from third parties for any tort or breach of contract is entitled to commence court proceedings for exoneration or limitation from liability. The Act further provides that once a limitation proceeding is commenced, under the Act's "concursus" provisions the prosecution of claims against the owner in other proceedings relating to the incident giving rise to such claims, e.g. a collision, will be enjoined and such claimants are then required to file their claims in the limitation proceeding, together with all other claimants so that all matters are dealt with promptly and economically.

16.   Upon commencing the limitation proceeding, the ship-owner must establish a "limitation fund" for payment of third party claims upon any eventual liability finding. The limitation fund is calculated based on the vessel's fair market value at the end of the voyage, or what is left of her, and also includes the value of any pending earned freight and any claims the owner may have against any third party for damages for loss or damage to the vessel arising out of the voyage. In the case of a collision that results in the sinking of the vessel the value of the limitation fund of the sunken vessel is often zero and as such, the shipowner is not required to create a limitation fund. In this latter scenario, if the shipowner proves it is entitled to limit its liability and the limitation fund

3

has a value of zero, the claimants are not entitled to any recovery against the shipowner.

17. Under the Act, generally, limitation of liability is only available upon proof that the loss occurred without the privity and knowledge of the vessel owner. This essentially means that whatever caused the collision must not be a matter of which the ship-owner was directly involved, or aware of. For example, an unseaworthy condition on the vessel at or before the commencement of the voyage of which the ship-owner was aware will be considered a cause "within the ship-owner's privity and knowledge," thus depriving the ship-owner of the right to exonerate or limit liability under the Act. Another example would be if the ship-owner hired an incompetent crew and the casualty was caused by crew incompetence. These are but two examples of the type of matter that would be sufficiently within the shipowner's privity and knowledge" so as to deprive the ship-owner of the right to exoneration or limitation.

18. Under the foregoing principles, if for hypothetical example, in the U.S. Action liability for the collision is apportioned 100% against the Owner of the M/V New Flame, but the Owner of the M/V New Flame proves that it is entitled to limitation under the Act and the limitation fund has a value of zero, Nursan would recover nothing. This is so because under the "innocent cargo" rule, Nursan can only recover against the non-carrying vessel, *i.e.* M/V Torm Gertrud, if some percentage of proportionate fault for the collision is attributed to her. Put another way, the "innocent cargo" rule does not provide recovery as against the non-carrying vessel if the non-carrying vessel bears no fault whatsoever for the collision.

19. Conversely, even if the Owner of the M/V New Flame is entitled to limitation under the Act and the limitation fund has a value of zero, under the innocent cargo rule Nursan would still recover 100% of its damages from the M/V Torm Gertrud as long as at least 1% fault was attributed to her in causing the collision.

## SERVICE OF PROCESS/JURISDICTION

20. The Action having been commenced I confirm that the Summons and Complaint have been provided to each Defendant on September 25, 2007 by sending this by FedEx courier to the Defendants at their registered places of business namely Transmar Shipping AA, 131 Praxitelous Street, Piraeus, Greece, 18532, in respect of the New Flame and A/S Dampskibsselskabet Torm, 18 Tuborg Havnevej, Hellerup, 2900 Denmark in respect of the Torm Gertrud , together with a request that they voluntarily waive the requirement that process be formally served upon them.

4

21. Now produced and shown to me marked **PL5** is the executed Waiver of Service of Summons form we received today from New York counsel for the owners of the M/V New Flame. We have not received any response from the owners of the M/V Torm Gertrud. Accordingly, we are in the process of carrying out formal service of process on the owners of the M/V Torm Gertrud.

22. I confirm that under U.S. law the U.S. courts have original subject matter jurisdiction over admiralty and maritime claims such as the ones alleged by Nursan in the U.S. Action. The U.S. court becomes seized of personal jurisdiction over the defendants once they are served with formal service of process (i.e. the Summons and Complaint) or they agree to waive the requirement.

23. It is also noteworthy in respect of the jurisdictional inquiry that by virtue of the U.S. law and jurisdiction clause in the charter party between New Flame and E,D&F Man Shipping Ltd. (see **PL2**), which was incorporated by reference in the bill of lading (see **PL3**), the United States District Court for the Southern District of New York has jurisdiction over claims by the owners of the cargo in respect of loss/damage to the cargo.

24. It is also relevant to the U.S. Court's jurisdiction that the Sales Contract between Nursan and Sims (see **PL4**) provides for New York law and jurisdiction in any competent court – see Clause 13.

25. The next step in the U.S. Action would be for the defendants to enter an appearance and file a pleading responsive to the allegations in Nursan's Verified Complaint and to put forth any defenses. It is possible under the circumstances of this case that the U.S. Action could proceed to trial within 12 months.

Patrick F. Lennon

Subscribed and sworn to before me
This 13th day of November 2007

Notary Public Commission Expires Nov 2011

Being a person duly authorised by United States Law to Administer Oaths.

5

This Affidavit is filed by Attias & Levy of First Floor Suites, 39 Irish Town, Gibraltar, Solicitors for the Defendant.

<u>IN THE SUPREME COURT OF GIBRALTAR</u>                    <u>2007 – AJ – No. 3</u>

**BETWEEN**

### A/S DAMPSKIBSSELSKABET TORM

<u>Claimant</u>

-and-

### THE OWNERS OF
### THE CARGO ON BOARD
### THE MV NEW FLAME

<u>Defendants</u>

---

### EXHIBIT "PL1"

---

This is the paper writing marked **"PL1"** in the Affidavit of Patrick Lennon.

**SWORN** by the above-named          )
Deponent at *Southport, CT*          )
                                      )
                                      )
This 13th day of November 2007 )

Before me

*[signature]*
Commissioner for Oaths
*Commission Expires Nov 2011*

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |

NURSAN METALURJI ENDUSTRISI A.S.,

V.

M/V "TORM GERTRUD" in rem, M/V "NEW
FLAME" in rem, et. al.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

## 07 CIV 7687

## JUDGE DANIELS

TO: (Name and address of Defendant)

GLADIATOR NAVIGATION S.A.
c/o TRANSMAR SHIPPING CO. S.A
131 Praxitelous Street, Piraeus, Greece.

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Patrick F. Lennon (PL 2162)
Charles E. Murphy (CM 2125)
Lennon, Murphy & Lennon, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
phone 212-490-6050
fax 212-490-6070

an answer to the complaint which is served on you with this summons, within _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON                    AUG 2 9 2007

CLERK                                 DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |

NURSAN METALURJI ENDUSTRISI A.S.,

V.

M/V "TORM GERTRUD" in rem,  M/V "NEW
FLAME" in rem, et. al.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

## 07 CIV 7687

## JUDGE DANIELS

TO: (Name and address of Defendant)

M/V "NEW FLAME" her engines,
tackle, boilers, etc. in rem.

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Patrick F. Lennon (PL 2162)
Charles E. Murphy (CM 2125)
Lennon, Murphy & Lennon, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
phone 212-490-6050
fax 212-490-6070

an answer to the complaint which is served on you with this summons, within _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

AUG 2 9 2007

J. MICHAEL McMAHON

CLERK

(By) DEPUTY CLERK                    DATE

AO 440 (Rev. 2/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |
| --- | --- | --- |

NURSAN METALURJI ENDUSTRISI A.S.,

**SUMMONS IN A CIVIL ACTION**

V.

M/V "TORM GERTRUD" in rem,  M/V "NEW FLAME" in rem, et. al.

CASE NUMBER:

**07 CIV 7687**

**JUDGE DANIELS**

TO: (Name and address of Defendant)

M/V "TORM GERTRUD" her engines, tackle, boilers, etc. in rem.

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Patrick F. Lennon (PL 2162)
Charles E. Murphy (CM 2125)
Lennon, Murphy & Lennon, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
phone 212-490-6050
fax 212-490-6070

an answer to the complaint which is served on you with this summons, within _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

AUG 2 9 2007

CLERK                                                                 DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Southern                    District of                    New York

NURSAN METALURJI ENDUSTRISI A.S.,

V.                                      **SUMMONS IN A CIVIL ACTION**

M/V "TORM GERTRUD" in rem, M/V "NEW
FLAME" in rem, et. al.

CASE NUMBER:
## 07 CIV 7687

## JUDGE DANIELS

TO: (Name and address of Defendant)

TRANSMAR SHIPPING CO. S.A
131 Praxitelous Street, Piraeus, Greece.

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Patrick F. Lennon (PL 2162)
Charles E. Murphy (CM 2125)
Lennon, Murphy & Lennon, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
phone 212-490-6050
fax 212-490-6070

an answer to the complaint which is served on you with this summons, within _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

AUG 2 9 2007

J. MICHAEL McMAHON

CLERK                                              DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |
|---|---|---|

NURSAN METALURJI ENDUSTRISI A.S.,

**v.**

M/V "TORM GERTRUD" in rem, M/V "NEW FLAME" in rem, et. al.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

**07 CIV 7687**

**JUDGE DANIELS**

TO: (Name and address of Defendant)

A/S DAMPSKIBSSELSKABET TORM
18, Tuborg Havnevej, Hellerup, Denmark

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Patrick F. Lennon (PL 2162)
Charles E. Murphy (CM 2125)
Lennon, Murphy & Lennon, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
phone 212-490-6050
fax 212-490-6070

an answer to the complaint which is served on you with this summons, within _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON                                    AUG 2 9 2007

CLERK                                                         DATE

(By) DEPUTY CLERK

LENNON, MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, NY 10170
(212) 490-6050 – Ph.
(212) 490-6070 – Fax

Attorneys for Plaintiff
NURSAN METALURJI ENDUSTRISI A.S.

**07 CIV 7687**

**JUDGE DANIELS**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------------------X

NURSAN METALURJI ENDUSTRISI A.S.,    :

                Plaintiff,    :

   - against -    :

                            ECF CASE

M/V "TORM GERTRUD" her engines, tackle,    :
boilers, etc. *in rem*, M/V "NEW FLAME" her engines,    :
tackle, boilers, etc. *in rem*,    :
A/S DAMPSKIBSSELSKABET TORM, TRANSMAR    :
SHIPPING CO. S.A., GLADIATOR NAVIGATION S.A.,    :
*in personam,*    :
               Defendants.    :

------------------------------------------------X

### <u>VERIFIED COMPLAINT</u>

    Plaintiffs, NURSAN METALURJI ENDUSTRISI A.S. (hereinafter referred to as

"Plaintiff") by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its

Verified Complaint against the Defendants, M/V "TORM GERTRUD" her engines, tackle,

boilers, etc. *in rem*, M/V "NEW FLAME" her engines, tackle, boilers, etc. *in rem*, A/S

DAMPSKIBSSELSKABET TORM, TRANSMAR SHIPPING CO. S.A., and GLADIATOR

NAVIGATION S.A. *in personam* alleges, upon information and belief, as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.

2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity organized and existing under foreign law with a principal place of business at Organize Sanayi Bolgesi, 31900 Payas Dortyol, Hatay, Turkey and was the intended receiver of a cargo of 42,200.15 metric tons of scrap steel carried on board the M/V NEW FLAME and therefore the party in interest to assert this claim.

3.    *In rem* defendant M/V "TORM GERTRUD," IMO number 9240885 is a Denmark flagged, 2002 steel built ocean going chemical/oil products tanker that at all material times was owned, operated, chartered, hired, managed and/or otherwise controlled by *in personam* defendant A/S Dampskibsselskabet Torm. Upon information and belief, said Vessel will be within the jurisdiction of this Honorable Court during the pendency of this action, or is otherwise subject to jurisdiction pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure.

4.    *In rem* defendant M/V "NEW FLAME," IMO number 9077393 is a Panamanian flagged, 1994 steel built ocean going bulk carrier that at all material times was owned, operated, chartered, hired, managed and/or otherwise controlled by *in personam* defendants Transmar Shipping Co. S.A. and/or Gladiator Navigation S.A. Upon information and belief, said Vessel will be within the jurisdiction of this Honorable Court during the pendency of this action, or is otherwise subject to jurisdiction pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure.

5.    *In personam* defendant A/S Dampskibsselskabet Torm was, and still is, a foreign corporation, or other business entity, organized and existing under foreign law with a principal place of business at 18, Tuborg Havnevej, Hellerup Denmark, and was the owner, operator, charterer and/or manager of the M/V "TORM GERTRUD."

6.    *In personam* defendant Transmar Shipping Co. S.A. was, and still is, a foreign corporation, or other business entity, organized and existing under foreign law with a principal

2

place of business at 131 Praxitelous Street, Piraeus, Greece, and was the owner, operator, charterer and/or manager of the M/V "NEW FLAME."

7.    *In personam* defendant Gladiator Navigation S.A. was, and still is, a foreign corporation, or other business entity, organized and existing under foreign law with a principal place of business in Panama, and an office c/o Defendant Transmar, and was the owner, operator, charterer and/or manager of the M/V "NEW FLAME."

8.    This action involves Plaintiff's claims for loss and/or damage to its cargo of 42,200.15 metric tons of scrap steel carried on board the M/V NEW FLAME and/or for indemnity in respect of any amounts Plaintiff is liable to pay in salvage of the cargo. The cargo was either lost or damaged while being carried on board the M/V NEW FLAME, which was steaming eastbound *en route* from the Port of New York to Turkey. Said cargo, which the Plaintiff delivered to M/V NEW FLAME in good order and condition, was lost and/or damaged when the M/V NEW FLAME and M/V TORM GERTRUD collided in the vicinity of Gibraltar on or about August 13, 2007. At the time of the collision, M/V TORM GERTRUD was steaming westbound *en route* from Europe to Port Everglades, Florida. As a result of the collision, the four of the five holds of the M/V NEW FLAME were flooded such that Plaintiff's scrap steel cargo contained therein was lost or damaged. Under the foregoing circumstances, Plaintiff invokes its rights and privileges under the U.S. "Innocent Cargo Rule."

9.    Plaintiff is the owner or duly authorized representative of the owner or underwriter or subrogated underwriter of the 42,200.15 metric ton scrap steel cargo shipped on board the M/V NEW FLAME, for which a "clean on board" Bill of Lading No. One dated July 31, 2007 was issued at the Port of New York.

10.    Defendants were vessel owners, suppliers, sellers, shippers, managers, operators, charterers, freight forwarders, common carriers by water, bailees for hire with respect to the cargo as described above that was sold, shipped, inspected, carried, kept, on board the M/V NEW FLAME by defendants.

11.    Said collision between the M/V TORM GERTRUD and M/V NEW FLAME resulted in the sinking and/or stranding of the M/V NEW FLAME such that M/V NEW FLAME abandoned her voyage on or about August 22, 2007. As a result of the collision, Plaintiff's cargo that was carried within the five cargo holds of M/V NEW FLAME was damaged and has not been delivered to date, and notwithstanding whether the cargo may be delivered Plaintiff will be obliged to pay amounts in salvage for recovery of the cargo by salvors. Said collision was caused by and contributed by the fault of the defendants and was the direct and proximate result of defendants' negligence, gross negligence, recklessness, willful indifference, and of the unseaworthiness of the vessels TORM GERTRUD and NEW FLAME. Plaintiff further alleges that the defendants' actions with respect to the navigation management and operation of the vessels violated the International Navigation Rules, 33 USC §2001 *et seq.*, the International Regulations for Preventing Collisions at Sea, 33 USC §1601 *et seq.* and applicable rules under the General Maritime Law of the United States and/or the law of the flag applicable to each vessel.

12.    In addition to the allegations aforesaid, Plaintiff invokes the protections of the U.S. "Innocent Cargo Rule" that applies to the instant case where Plaintiff's cargo was lost and damaged as a result of a collision between the carrying vessel and a non-carrying vessel. Under the "Innocent Cargo Rule" a cargo owner may recover from the non-carrying ship the whole of

4

its loss, provided only that there is some degree of blame, however slight, on the non-carrying ship.

13.    Plaintiff's cargo was lost and/or damaged by defendants due to the fault, neglect, deviation, unseaworthiness, maritime tort, tortuous interference with contract, breach of warranty, breach of contract, sinking, stranding, salvage expenses, general average and conversion of defendants, their agents and servants.

14.    Plaintiff has sustained damages as described aforesaid and sues on its own behalf and as agents and trustees on behalf of any other party who may have or hereinafter acquire an interest in this action.

15.    Plaintiff's damages as a result of the collision, which include *inter alia*, losses resulting from cargo non-delivery/damage and salvage expenses, are in excess of $13,672,849.

WHEREFORE, Plaintiff prays:

A.    That process in due form of law issue against the *in personam* defendants and against the M/V "TORM GERTRUD" and M/V "NEW FLAME", *in rem*, citing them to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That judgment be entered against the captioned *in personam* defendants and the captioned Vessels *in rem*, jointly and severally in the amount of not less than $13,672,849, plus prejudgment interest at the rate of 9% per annum from August 13, 2007 and the costs and reasonable attorneys' fees incurred in the prosecution of this action;

C.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims,

attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies,

tangible or intangible, or any other funds held by any garnishee within the District which are due

and owing to the Defendants, in an amount sufficient to secure the Plaintiff's claims, and that all

persons claiming any interest in the same be cited to appear and pursuant to Supplemental

Admiralty Rule B answer the matters alleged in the Complaint;

      D.     That this Court retain jurisdiction over this matter through the entry of any

judgment, including any appeals thereof;

      E.     That this Court award Plaintiff its attorneys' fees and costs of this action; and

      F.     That Plaintiff be afforded such other, further and/or different relief as warranted

by justice.

Dated: August 29, 2007
      New York, NY

                The Plaintiff,
                NURSAN METALURJI ENDUSTRISI A.S.,

                By: _____
                Patrick F. Lennon (PL 2162)
                Charles E. Murphy (CM 2125)
                LENNON, MURPHY & LENNON, LLC
                The GrayBar Building
                420 Lexington Ave., Suite 300
                New York, NY 10170
                (212) 490-6050 – phone
                (212) 490-6070 – fax
                pfl@lenmur.com
                cem@lenmur.com

## ATTORNEY'S VERIFICATION

State of Connecticut )
                     )    ss.:    Southport
County of Fairfield  )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    August 29, 2007
          Southport, CT

_____
Charles E. Murphy

7

<u>IN THE SUPREME COURT OF GIBRALTAR</u>

<u>2007 – AJ – No. 3</u>

BETWEEN

A/S DAMPSKIBSSELSKABET TORM

<u>Claimant</u>

-and-

THE OWNERS OF
THE CARGO ON BOARD
THE MV NEW FLAME

<u>Defendants</u>

EXHIBIT "PL2"

This is the paper writing marked **"PL2"** in the Affidavit of Patrick Lennon.

SWORN by the above-named          )
Deponent at *Southport, CT*        )
                                   )
                                   )
This 13th day of November 2007 )

Before me

*Mary E. Hedorchak*

**Commissioner for Oaths**

*Commission Expires Nov 2011*

RECOMMENDED

# CHARTER PARTY

CODE NAME: **Gencon.**

Issued to come into force for fixtures on and after 15th September 1922

## The Documentary Council of The Baltic and White Sea Conference

## UNIFORM GENERAL CHARTER

### AS REVISED 1922
(only to be used for trades for which no approval form is in force)

Pleasantville, New York, July 11th, 19 2007

| | | |
|---|---|---|
| Owners. | 1. It is this **Day** mutually agreed between __E D & F MAN SHIPPING LTD.__ | 1 |
| | London, as Disponent | 2 |
| | Owners of the steamer or motor vessel **"MEN FLAME"**, Panamanian Flag, Built 1994 | 3 |
| | Classed: Highest CCS | |
| | of 26,824 tons Net Register and carrying about _____ tons of deadweight cargo, | 4 |
| Position. | now _____ | 5 |
| | and expected ready to load under this Charter about _____ | 6 |
| Charterers. | and Messrs. SIMS GROUP GLOBAL TRADE CORP. _____ | 7 |
| | of __New York, New York__ as Charterers. | 8 |
| Where to load. | That the said vessel shall proceed to one (1) safe berth NEW YORK, or in Charterers' | |
| | option one (1) safe berth ALBANY + one (1) safe berth NEW YORK, | |
| | in this rotation. or so near thereto as she may safely get and lie | 10 |
| Cargo. | always afloat, and there load a full and complete cargo (if shipment of deck cargo | 11 |
| | agreed same to be at Charterers' risk) of __see Clause 71__ | 12 |
| | | 13 |
| | | 14 |
| | | 15 |
| | (Charterers to provide all mats and/or wood for dunnage and any separations required, | 16 |
| | the Owners allowing the use of any dunnage wood on board if required) which the | 17 |
| | Charterers bind themselves to ship, and being so loaded the vessel shall proceed to | 18 |
| | one (1) safe berth, one (1) safe port TURKEY, Sea of Marmara - Nemrut Bay Range; | 19 |
| Destination. | or in Charterers' option, | 20 |
| | one (1) safe berth ISKENDERUN, Port in Charterers' option. | 21 |
| | Charterers to declare discharge port latest upon vessel's passing Gib. | 22 |
| | as ordered on signing Bills of Lading or so near thereto as she may safely get and | 23 |
| | lie always afloat and there deliver the cargo on being paid freight—on intake quantity—as | 24 |

Form 20-140    Printed and Sold by Unz & Co., 190 Baldwin Ave., Jersey City, New Jersey 07306    (201) 795-5400    (800) 631-3098

1/14

**2.** Owners are ~~responsible for loss of or~~ damage to the goods or for delay in delivery of the goods only ~~in case the~~ loss, damage or delay has been caused by the improper or negligent ~~stowage~~ of the goods (unless stowage performed by shippers or their stevedores or ~~servants~~) or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager.

And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this clause, be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever.

Damage caused by contact with or leakage, smell or evaporation from other goods or by the inflammable or explosive nature or insufficient package of other goods not to be considered as caused by improper or negligent stowage, even if in fact so caused.

**3.** The vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist vessels in all situations, and also to deviate for the purpose of saving life and/or property.

**4.** ~~The freight to be paid in cash without discount on delivery of the cargo at mean rate of exchange ruling on day or days of payment, the receivers of the cargo being bound to pay freight on account during delivery, if required by Captain or Owners.~~

~~Cash for vessel's ordinary disbursements at port of loading to be advanced by Charterers if required at highest current rate of exchange, subject to two per cent. to cover insurance and other expenses.~~

**5.** ~~Cargo to be brought alongside in such a manner as to enable vessel to take the goods with her own tackle and to load the full cargo in _____ running working days. Charterers to procure and pay the necessary men on shore or onboard the lighters to do the work there, vessel only heaving the cargo onboard.~~

~~If the loading takes place by elevator cargo to be put free in vessel's holds, Owners only paying trimming expenses.~~

~~Any cases and/or packages of cargo over two tons weight, shall be loaded, stowed and discharged by Charterers at their risk and expense.~~

~~Time to commence at 1 p.m. if notice of readiness to load is given before noon and at 6 a.m. next working day if notice given during office hours after noon.~~

~~The notice to be given to the Shippers, Messrs. _____~~

~~Time lost in waiting for berth to count as loading time.~~

**6.** ~~Cargo to be received by Merchants at their risk and expense alongside the vessel not beyond the reach of her tackle and to be discharged in _____ running working days. Time to commence at 1 p.m. if notice of readiness to discharge is given before noon, and at 6 a.m. next working day if notice given during office hours after noon.~~

~~Time lost in waiting for berth to count as discharging time.~~

**7.** [If incurred to be paid by Charterers] ~~Ten running days on~~ Demurrage at the rate of USD [FORTY ONE THOUSAND FIVE] $41,500.00 [HUNDRED DOLLARS] per day or pro rata for any part of a day, payable day by day to be allowed Merchants altogether at ports of loading and discharging.

**8.** Owners shall have a lien on the cargo for freight, dead-freight, demurrage ~~and damages for detention~~. Charterers shall remain responsible for dead-freight and demurrage (including ~~damages for detention~~), incurred at port of loading. Charterers shall also remain responsible for freight and demurrage (including ~~damages for detention~~) incurred at port of discharge, ~~but only to such extent as the Owners have been unable to obtain payment thereof by exercising the lien on the cargo.~~

**9.** ~~The Captain to sign Bills of Lading at such rate of freight as presented without prejudice to this Charterparty, but should the freight by Bills of Lading amount to less than the total chartered freight the difference to be paid to the Captain in cash on signing Bills of Lading.~~

**10.** Strike-Clause, War Clause and Ice-Clause as below.

2/14

Laydays not to commence before July 11st., 2007.

Cancelling Clause.
11. Should the vessel not be ready to load (whether in berth or not) on or before the ~~12th July 2007~~. Charterers have the option of cancelling this contract, such option to be declared, if demanded, at least 48 hours before vessel's expected arrival at port of loading. ~~Should the vessel be delayed on account of average or otherwise, Charterers to be informed as soon as possible, and if the vessel is delayed for more than 10 days after the day she is stated to be expected ready to load, Charterers have the option of cancelling this contract, unless a cancelling date has been agreed upon.~~

| In New York |
General Average.
12. General average to be settled according to York—Antwerp rules, ~~1950.~~ | 1974 | ~~Provision of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see clause 2).~~

Indemnity.
13. Indemnity for non-performance of this Charter-party, proved damages, not exceeding estimated amount of Freight.

~~In case of non-execution at least ½ of the brokerage on the estimated amount of freight and dead freight to be paid by the Owners to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be mutually agreed.~~

GENERAL STRIKE CLAUSE.

Neither Charterers nor Owners shall be responsible for the consequences of any strikes or lock-outs preventing or delaying the fulfilment of any obligations under this contract.

If there is a strike or lock-out affecting the loading of the cargo, or any part of it, when vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, Captain or Owners may ask Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, Owners shall have the option of cancelling this contract. If part cargo has already been loaded, Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.

If there is a strike or lock-out affecting the discharge of the cargo on or after vessel's arrival at or off port of discharge and same has not been settled within 48 hours, Receivers shall have the option of keeping vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging, or of ordering the vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this charterparty and of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

GENERAL WAR CLAUSE.

If the nation under whose flag the vessel sails should be engaged in war and the safe navigation of the vessel should thereby be endangered either party to have the option of cancelling this contract, and if so cancelled, cargo already shipped shall be discharged either at the port of loading or, if the vessel has commenced the voyage, at the nearest safe place at the risk and expense of the Charterers or Cargo-Owners.

If owing to outbreak of hostilities the goods loaded or to be loaded under this contract or part of them become contraband of war whether absolute or conditional or liable to confiscation or detention according to international law or the proclamation of any of the belligerent powers each party to have the option of cancelling this contract as far as such goods are concerned, and contraband goods already loaded to be then discharged either at the port of loading, or if the voyage

3/14

has already commenced, at the nearest safe place at the expense of the Cargo-Owners. Owners to     142
have the right to fill up with other goods instead of the contraband.     143

    Should any port where the vessel has to load under this Charter be blockaded the con-     144
tract to be null and void with regard to the goods to be shipped at such port.     145

    No Bills of Lading to be signed for any blockaded port, and if the port of destination     146
be declared blockaded after Bills of Lading have been signed, Owners shall discharge the cargo     147
either at the port of loading, against payment of the expenses of discharge, if the ship has not sailed     148
thence, or, if sailed at any safe port on the way as ordered by Shippers or if no order is given at     149
the nearest safe place against payment of full freight.     150

### GENERAL ICE CLAUSE,     151

#### PORT OF LOADING.     152

a) In the event of the loading port being inaccessible by reason of ice when vessel is ready to     153
proceed from her last port or at any time during the voyage or on vessel's arrival or in case     154
frost sets in after vessel's arrival, the Captain for fear of being frozen in is at liberty to leave     155
without cargo, and this Charter shall be null and void.     156

b) If during loading the Captain, for fear of vessel being frozen in, deems it advisable to     157
leave, he has liberty to do so with what cargo he has on board and to proceed to any other     158
port or ports with option of completing cargo for Owner's benefit for any port or ports in-     159
cluding port of discharge. Any part cargo thus loaded under this Charter to be forwarded to     160
destination at vessel's expense but against payment of freight, provided that no extra expenses     161
be thereby caused to the Receivers, freight being paid on quantity delivered (in proportion if     162
lumpsum), all other conditions as per Charter,     163

c) In case of more than one loading port, and if one or more of the ports are closed by ice,     164
the Captain or Owners to be at liberty either to load the part cargo at the open port and     165
fill up elsewhere for their own account as under section B or to declare the charter null and     166
void unless Charterers agree to load full cargo at the open port.     167

d) This Ice Clause not to apply in the Spring.     168

#### PORT OF DISCHARGE,     169

a) Should ice (except in the Spring) prevent vessel from reaching port of discharge, Receivers shall     170
have the option of keeping vessel waiting until the re-opening of navigation and paying     171
demurrage, or of ordering the vessel to a safe and immediately accessible port where she can     172
safely discharge without risk of detention by ice. Such orders to be given within 48 hours     173
after Captain or Owners have given notice to Charterers of the impossibility of reaching     174
port of destination.     175

b) If during discharging the Captain for fear of vessel being frozen in deems it advisable to leave,     176
he has liberty to do so with what cargo he has on board and to proceed to the nearest ac-     177
cessible port where she can safely discharge.     178

c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and     179
vessel shall receive the same freight as if she had discharged at the original port of destination,     180
except that if the distance of the substituted port exceeds 100 nautical miles, the freight     181
on the cargo delivered at the substituted port to be increased in proportion.     182

Clause numbers 16 through 73 are attached hereto and are to be considered fully incorporated
herein and form part of this Charter Party.

4/14

RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

**Clause 16**
Charterers privilege to shift to other berths and/or anchorages each port both ends. Shifting expenses to be for the Charterers' account/shifting time to count as laytime, but all other port charges remain for Owners' account. Officers' and crew overtime and fuel consumed to be for Owners' account.

**Clause 17**
Cargo to be loaded, stowed, trimmed, and discharged by the Charterers free of expense to the vessel.

**Clause 18**
Cargo is to be loaded, stowed and trimmed at the average rate of 8000 MTS per weather working day of 24 consecutive hours, Saturday afternoons, Sundays and holidays excepted, even if used.

Cargo is to be discharged at the average rate of 7000 MTS per weather working day of 24 consecutive hours, Sundays and holidays included.

Laytime is reversible between load ports but non-reversible between load and discharging ports.

**Clause 19**
At load port time from noon Saturday until 0800 hours Mondays not to count, even if used. Time from midnight day preceding a holiday until 8:00 A.M., the day after a holiday not to count, even if used. At discharge port time to count Sundays and holidays included.

**Clause 20**
At each port Notice of Readiness to be given in berth, in writing, within laydays during office hours, excepted that if berth is occupied, Notice of Readiness to be given in writing or by cable from designated anchorage or layberth within office hours. Time used to shift from anchorage or layberth to load or discharging berth not to count. At load port office hours are 0800-1700 hours Monday through Friday and 0800-1200 (noon) Saturday, excluding holidays. At discharging port office hours are 0800-1700 hours Sundays and holidays included.
Time to count 0800 hours next working day after proper Notice of Readiness duly tendered and accepted. It is understood the word "holidays" as it appears throughout this Charter Party includes local and/or national and/or public and/or stevedore holidays as stated in the BIMCO holiday calendar.
Time at second load port, if used, to count on arrival. See also Clause 72.

**Clause 21**
At loading port vessel to wireless Charterers or their agents giving 7 days, 96 hours and 48 hours notice of expected time of arrival. At discharge port, vessel to wireless Charterers or their agents, giving 7 days, 96 hours and 48 hours notice of expected time of arrival. Vessel to wireless Charterer's agents at both ends any change in E.T.A., exceeding 2 hours after 48 hour notice is given. Discharging port to be declared by Charterers latest upon vessel's passing Gib.

**Clause 22**
Vessel is a bulkcarrier, has one deck, five holds and five hatches and has 4 cranes at 25 tons, each in good working condition and serving all hatches. Charterers' privilege to work all hatches at all times and all gear shall be capable of being worked simultaneously at all hatches at the gear's maximum lifting capacity. Vessel is capable of deballasting fully within 24 hours. Ship to give free

-1-

5/14

<u>RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007</u>

use of power for gear and supply light for night work, if required, free of expense to Charterers.
Vessel has MacGregor type folding fore and aft hatch covers. Cranes work simultaneously and serve
all hatches. Vessel's total deadweight is 43,815 MT on 11.221 M (summer) saltwater, length overall
189.98 M, beam 30.5 M. Hatch sizes: all) 18.92 X 18 M TPC: 51.9 Crane outreach: about 8.5 M
Bale cubic by hold: 1) 10192.5 2) 11310.4 3) 11207.1 4) 11341.7 5) 10879.4 cubic meters
Maximum 12.0 M from waterline to top of hatchcoaming or other obstruction preventing access to
hatch opening in fully ballasted condition. Engine/bridge aft.
Head Owners' P + I Club: Swedish Club. Disponent Owners' P + I Club: North of England.
Vessels' ballast tanks to maintain the same ballast condition prior to commencement of loading and
on completion of discharging. Maximum air draft 130 feet.
The vessel is classed 100A1 Lloyds, a registry being a member of the International Association of
Classification Societies, with no subjects or conditions imposed by class and in every way fitted and
suitable for the intended voyage with all certificates current and valid.

**Clause 23**
Owners do not have privilege of completing with other cargo.

**Clause 24**
Vessel to tender with holds clean, and dry and free of any residue and in all respects ready to load.
Vessel to tender clear of sweat battens and any obstacles that might be hindering the loading and
discharging of scrap, including trimming hatch covers and ladders. Tanktops, tunnels exposed ·
cables and pipes to be entirely and properly protected by the vessel against the hazards normally
connected with scrap cargo. Broken or split boards, cargo battens, dunnage, and loose protection on
tanktops not to be considered as proper protection. Charterers and stevedores are not to be
responsible for damages to sweat battens, hatch covers and trimming hatch covers and any object if
stored in such a way that they are exposed to contact with the cargo. Charterers and stevedores are
not to be responsible for damages to ladder brackets and battenclips, removable or unremovable
warranted wood bulkhead sheathing and landing pads on tank tops to be in good condition.

**Clause 25**
Vessel to furnish a certified calibration scale and trim correction tables for all ballast holds and tanks,
including fore and after peak and double tanks and deeptanks. Plimsoll marks amidship and draft
marks on port and starboard side, bows and sterns to be clearly cut and marked on shell plating.
Sounding pipes to be maintained free and clear without obstructions at all times. Vessel to furnish
capacity plan, displacement scale, hydrostatic curves and deadweight scale, and same to be
certified by Master as to the correctness at time of loading.

**Clause 26**
Stevedoring overtime to be for the account of party ordering same; however, officers' and crew
overtime always to be for the Owners' account.

**Clause 27**
Any taxes/dues/wharfage on cargo to be for Charterers' account.
Any taxes/dues/wharfage/dockage on vessel and/or freight to be for Owners' account.

**Clause 28**
Charterers' privilege to load and discharge with magnets, grabs, boxes, conveyors and/or bulldozers.

6/14

RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

**Clause 29**
Owners to appoint agents nominated by Charterers at load and discharging ports, Owners paying the customary agency fee.

**Clause 30**
Charterers' privilege to load and unload from or into lighters at berths and/or anchorages. Lighterage and lightening, if any, at either end, to be for the Charterers' expense, time counting.

**Clause 31**
Any extra insurance due to vessel's age/flag/class/ownership, to be for Charterers' account.

**Clause 32**
At loading and discharging ports, vessel to lie always safely afloat and berths always safely accessible.

**Clause 33**
The stevedores, although appointed by Charterers, shippers, receivers, or their agents to be under the direction and control of the Captain. Charterers, shippers, or receivers shall not be responsible for the acts and defaults of the stevedores at load/discharging port(s). A joint survey to be held prior to loading and after completion of discharging between Owners and stevedores appointed by Charterers, the expenses of which to be shared equally. Discharging port stevedores to have the option not to participate in the joint survey as they may elect to repair damage to the vessel caused at discharging port. All claims for damages allegedly caused by stevedores, to be settled directly between Owners and stevedores at load/discharging port(s). Master to notify stevedores of damage, if any, in writing within 24 hours after occurrence; otherwise, stevedores not to be held liable. However, Charterers agree to assist the Owners in recovering claims for proven damages in case the Owners have difficulties obtaining same.

**Clause 34**
Master to sign statement of facts concerning time used in loading and discharging submitted to him by Charterers' agents/receivers' representative, making his reservations if he believes this statement to be incorrect. Master to issue and sign the statement that available cargo space has been utilized and stowed to his satisfaction. Master to attend, issue and sign draft survey specifying quantity of cargo on board at loading and discharging port(s).

**Clause 35**
Charterers' privilege to sublet this charter, but original Charterers to remain responsible for its fulfillment.

**Clause 36**
Master is not to take on or pump ballast at loading or discharging ports without obtaining permission of Charterers, which not to be unreasonably withheld. Vessel to comply with Charterers and/or shippers instructions concerning ballast condition required on arrival load ports. Owners have the option to bunker vessel at/during load and discharging provided that same does not interfere with loading and discharging operation, but Charterers/Stevedores permission to be obtained prior to bunkering which not to be unreasonably withheld.

**Clause 37**
Any and all disputes of every description arising under this Charter which cannot be resolved by the

-3-

7/14

## RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

parties and which shall not by this agreement have been referred to arbitration shall be resolved by action brought in the U.S. District Court for the southern district of New York, to the admiralty jurisdiction of which court the parties submit themselves. Process in an action brought in such court may be served by either party upon the other by registered mail addressed to the individual or company signing this charter at the address appearing at the end hereof. The parties agree that this charter shall be deemed to have been made within the state of New York.

**Clause 38**
Charterers are not required to accept notice of readiness of the vessel at loading port if the ship has more than eight (8) feet drag by the stern.

**Clause 39**
Chamber of Shipping War Risk Clauses 1 and 2, New Jason Clause, New Both-to-Blame Collision Clause, P & I Bunkering Clause, U.S.A. Clause Paramount, as attached hereto, are to be considered fully incorporated in this Charter Party.

**Clause 40**
Owners guarantee that vessel is not intended for break-up upon the completion of the engagement entered into under this charter party. Should Owners contrary to the above guarantee, sell the vessel for break-up before she has been completely discharged and released by the receivers of the cargo, Owners then to pay whatever insurance penalty might be assessed against the Charterers forthwith.

**Clause 41**
If vessel calls at any U.S. port for purposes of loading and discharging cargo, vessel's cargo gear and all other equipment shall comply with regulations established by U.S. Public Law 85-742 Part 9 (Safety and Health Regulations for Longshoring). If longshoremen are not permitted to work due to failure of the Master and/or Owners, and/or Owners' agents to comply with the aforementioned regulations, any delay resulting therefrom shall be for Owners' account.

**Clause 42**
It is understood that Owners will endeavor to keep vessel on approximately even keel within three (3) feet on completion of discharge.

**Clause 43**
Master is to authorize Charterers' agents on arrival loading port to sign and issue and release bills of lading any time Charterers desire for any quantity loaded up to that time, but always in accordance with Mate's receipts and always without prejudice to the terms and conditions of this Charter Party.

**Clause 44**
Vessel has not traded Cuba in the last 180 days.
With regard to the Asian Gypsy Moth, Owners warrant the vessel has not traded Pacific Ports of Russia/C.I.S.or high risk Japanese ports within the last 24 months and all consequences resulting from violation of this clause to be for Owners' account.

**Clause 45**
Owners to comply with any law or regulations concerning oil pollution and Owners' financial responsibility therefore.

-4-

8/14

**RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007**

**Clause 46**
Should the delivery of cargo to the place of loading, or shipment or loading or discharging of cargo be prevented or interfered with by reason of war, blockade, revolutions, insurrections, mobilizations, strikes, lockouts of any class of workers, civil commotions, riots, acts of God, plague or other epidemics, the time by which loading/ discharging shall be prevented or interfered with by any such cause or causes, or by other cause or causes whatsoever, whether or not of a nature or kind as enumerated above, which shall be beyond the Charterers'/Receivers' control, shall not count, and demurrage shall not accrue. If the vessel is then on demurrage, all time lost by reason of the foregoing shall be included on any demurrage claim and calculation.

**Clause 47**
Crew is to operate ship's winches and windlasses to assist in moving the vessel up and down the berth at load port to accommodate stationary conveyor, provided local regulations permit. Owners/Master to cooperate with stevedore's requests accordingly. Shifting time used to count as laytime.

**Clause 48**
Ninety five percent (95%) freight to be paid to Owners' account in a bank in New York within five (5) banking days after signing/releasing Bills of Lading marked "Freight Payable as per Charter Party", discountless, non-returnable ship and/or cargo lost or not lost. Charterers' privilege to deduct undisputed despatch from balance freight. Charterers' privilege to deduct commissions from freight. Balance freight payable within 20 days after completion of discharge and receipt of Owners' laytime calculations and Statement of Facts.

Owners' Bank: JP Morgan Chase Bank, New York
Swift: CHASUS33
Account No.: 400 707 225
ABA: 021000021
In favour of: ED and F Man Treasury Management Ltd.
Ref: Man Shipping
VAT No.: 752203758

**Clause 49**
Scrap to be shredded and/or HMS 1 and 2, always excluding motor blocks and turnings. First layer of scrap in each hold not to be released until touching tank top. However, if loading process is such that "touching tank top" would be hazardous for the vessel, first layer to be loaded as close to the tanktop as is safe for vessel but always subject to Master's approval and satisfaction, which not to be unreasonable. Thereafter, sufficient loads of cargo to be lowered as close as possible to the bottom of each hold, so as to provide a proper flooring and cushion to Master's satisfaction, which not to be unreasonable.
Should electro-magnets be used during loading and discharging, then the time, risk and expenses for recalibrating vessel's compass (if necessary) to be for Charterers' account. Shredded scrap may be loaded by normal means without being loaded to the tanktop.

**Clause 50**
Owners guarantee minimum 35000 MT - maximum 38500 MT, quantity in Owners' option, deadweight cargo capacity;
or in Charterers' option;
Owners guarantee minimum 40000 MT - maximum 42200 MT, quantity in Owners' option,

-5-

9/14

## RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

deadweight cargo capacity on 11.3 M SW at load port/11.3 M SW at discharging port and Owners guarantee 54,931 cubic meter bale capacity in clear and unobstructed main holds available for cargo. Vessel has all clear space suitable for loading scrap excluding deeptanks and wingtanks. Vessel has no hindrances such as grain feeders, etc., in holds and has no centerline bulkhead or stanchions.

**Clause 51**
It is understood that if vessel is fitted with cardecks, pontoon racks and/or any other special fittings including hatch skirts not connected with the carriage of steel scrap in bulk, any extra expense incurred in loading and/or discharging as a result of the presence of such cardecks, pontoon racks and/or other special fittings are to be for the Owners' account. Time so lost shall not count as laytime or time on demurrage.

**Clause 52**
Owners to pay despatch at the rate of $20,750.00 U.S. Currency per day or pro rata for any part of a day on laytime saved.

**Clause 53**
Charterers' privilege to deduct commissions from freight.

**Clause 54**
Owners guarantee vessel's draft not to exceed 11.3 M SW at load port.
Owners guarantee vessel's draft not to exceed 11.3 M SW at discharging port.

**Clause 55**
Vessel will not drydock prior to reporting on this Charter Party except for Force Majeure.

**Clause 56**
Should the vessel be seized or detained by any authority or by legal process not initiated against the Charterers, laytime shall cease from the time of her seizure or detention until the time of her release. Any and all extra expenses thereby incurred due to the ships seizure or detention including stevedore standby time, up to the end of the shift, to be for Owners' account.

**Clause 57**
If vessel's cargo gear, hatch covers, mooring winches, etc., are found not to be in good working condition at either load or discharge port, Owners to be responsible for any and all expenses and delays incurred, including stevedore standby time up to the end of the shift, due to failure of same.

**Clause 58**
Vessel on arrival load port to have hatch covers in open position, ready to receive intended cargo. Crew to open/close hatches, if required, subject to local regulations.

**Clause 59**
The vessel to supply power free of expense to Charterers/stevedores for operation of magnets day and night per 24 hour period, if required simultaneously at all hatches. Charterers to supply necessary electric connections. The vessel can provide 380/440 volt, 3 phase min 90 ampere, 45 KWA per crane from the engine room.
Cables/Electrician if required to be for Charterers' account. Charterers confirm the total load picked up by each crane will not exceed the safe working load.

10/14

## RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

**Clause 60**
The vessel to be in possession of a valid certificate of entry class 3 P and I, Class 6 Fd and D.

**Clause 61**
The vessel to have in possession all necessary certificates for hull, machinery, equipment, class etc., for the duration of this voyage.

**Clause 62**
Owners warrant that at all times during the performance of this Charter, the vessel shall strictly adhere to and conform to the requirements of the ISM Code and shall be in possession of a valid Safety Management Certificate (SMC).
Owners further warrant that at all times during the performance of this charter, the Owner or the manager shall comply with the provisions of the ISM Code and be in possession of a Document of Compliance. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers, Agents and/or any authorities requiring same. The Owners/managers are to be responsible for any and all costs and consequences arising as a result of non-compliance with the foregoing.

**Clause 63**
Owners and/or Disponent Owners warrant that the vessel is not flagged, controlled or manned by Yugoslav Nationals. Owners to be responsible for any and all extra expenses incurred as a result of Owners' breach of the above. Prior to fixing Owners are to submit to Charterers a list of the Owners, Disponent Owners and crew noting the names and nationality of each.

**Clause 64**
BIMCO ISPS Voyage Clause as attached to apply and deemed incorporated in this Charter Party.

**Clause 65**
Owners warrant the vessel has a valid International Ship Security Certificate (ISSC) onboard. Any time lost/expenses incurred as a result of Owners' violation of this clause to be for Owners' account.

**Clause 66**
**Certificates for Letter of Credit Purposes**
Disponent Owners to provide following certificates for Letter of Credit purposes:

1) Original certificate issued by the Shipping Company or its agents attesting that the carrying vessel is registered at an International recognized P & I Club.

2) Original statement issued by the Shipping Company or its agents for the following information:
   Name, description and construction year of the carrying vessel.
   Name and detailed address of the vessel's Owners.

3) Original certificate issued by the Shipping Company or its agents that Master undertakes to ship the quantity under this L/C from port of loading to port of discharge directly and that no additional cargo shall be loaded along with the cargo under this L/C.

4) Original certificate issued by the Shipping Company or its agents attesting that the age of the vessel is not more than 30 years.

11/14

## RIDER TO THE M/V "NEW FLAME" CHARTER PARTY DATED JULY 11TH, 2007

5) Original certificates issued by the Shipping Company or its agents attesting that the capability of the vessel to load such goods.

**Clause 67**
Owners to issue a certificate stating that the carrying vessel is ISM Code certified and whose Owners or operators do hold a current ISM Code Document of Compliance as required under the Solas Convention 1974 as amended.

**Clause 68**
Receiver has the privilege to use electro-hydraulic grabs/magnets with ship's gear and to place in holds excavators or bulldozers or similar equipment (which not to exceed the gear's maximum lifting capacity) for use in discharging and to remove same upon completion of discharging by means of vessel's gear. Opening and closing of hatches shall be performed by vessel's crew.

**Clause 69**
The first opening and last closing of the hatches and the intermediate opening and closing of the hatches due to inclement weather shall be free of expense and the time used shall not be counted as laytime. Time used for draft surveys shall not count.

**Clause 70**
**USCG Clause**
Owners confirm that the vessel is not entered on the USCG List due to vessel, flag, ownership, classification, vessel's boarding history, outstanding items noted during previous USCG inspections, or due to any cause whatsoever arising from the terms/conditions of U.S. Homeland Security rules/regulations/legislation.
In case the vessel is detained by any competent US Authority due to the aforementioned causes or an new incidents involving competent U.S. Authorities, Owners are to be responsible for any/all expenses involved, and if the vessel is prevented from carrying out loading/discharging operations or from entering/leaving port(s) them time not to count.

**Clause 71**
**Cargo**
Minimum 35000 MTS - maximum 38500 MTS, quantity in Owners' option, iron and/or steel scrap excluding motor blocks and turnings. Average stowage of cargo not to exceed 45 cubic feet bale per MT. Approximate loadable quantity to be declared by Master latest upon vessel's arrival load port. Such amount to be subject to the amount of cargo it is possible to load owing to its stow factor,

or in Charterers' option,

minimum 40000 MTS - maximum 42200 MTS, quantity in Owners' option, iron and/or steel scrap excluding motor blocks and turnings. Average stowage of cargo not to exceed 45 cubic feet bale per MT. Approximate loadable quantity to be declared by Master latest upon vessel's arrival load port. Such amount to be subject to the amount of cargo it is possible to load owing to its stow factor.

The cargo consists of shredded and HMS 1 + 2 only.

**Clause 72**
If calling at Albany, time used in waiting for tide to allow the vessel to proceed up or down the Hudson River to count as laytime.

-8-

12/14

## ISPS Clause for Voyage Charter Parties

(A) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(B) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(D) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment which is for the other party's account according to this Clause, the other party shall, indemnify the paying party.

13/14

(2) War Risks Clause.

(a) No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the ship has been ordered to discharge either on signing Bills of Lading or thereafter be one to which the ship is or shall be prohibited from going by the Government of the Nation under whose flag the ship sails or by any other Government, the owner shall discharge the cargo at any other port covered by this Charterparty as ordered by the Charterers (provided such other port is not a blockaded or prohibited port as above mentioned and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered.

(b) The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the Government of the Nation under whose flag the vessel sails or any department thereof, or any person acting or purporting to act with the authority of such Government or of any department thereof, or by any committee or person having, under the terms of the War Risks Insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or is not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfilment of the contract voyage and the freight shall be payable accordingly.

(3) Both To Blame Collision Clause.

If the liability for any collision in which the vessel is involved while performing this Bill of Lading falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:—

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

(4) New Jason Clause.

In event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

(5) U.S.A. Clause Paramount.

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

(6) Protection & Indemnity Bunkering Clause.

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter and there take in bunkers in any quantity in the discretion of owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

14/14

<u>**IN THE SUPREME COURT OF GIBRALTAR**</u>

<u>2007 – AJ – No. 3</u>

BETWEEN

**A/S DAMPSKIBSSELSKABET TORM**

<u>**Claimant**</u>

-and-

**THE OWNERS OF
THE CARGO ON BOARD
THE MV NEW FLAME**

<u>**Defendants**</u>

---

**EXHIBIT "PL3"**

---

This is the paper writing marked **"PL3"** in the Affidavit of Patrick Lennon.

**SWORN** by the above-named )
Deponent at *Southport, CT* )
)
)
This 13th day of November 2007 )

Before me

*Mary E. Lederbach*
**Commissioner for Oaths**
*Commission Expires Jan. 2011*

14-AUG-2007  15:24   FROM  NURSAN CELIK           TO  02165674844          P.09

CODE NAME: "CONGENBILL EDITION 1994

Shipper:
SIMS GROUP GLOBAL TRADE CORPORATION
110 FIFTH AVENUE, SUITE 700
NEW YORK, NY 10011-5514 U.S.A

Consigned To the Order of

FINANSBANK AS-CUKUROVA BRANCH

Notify:

NURSAN METALURJI ENDUSTRISI A.S.
ORGANIZE SANAYI BOLGESI
31300 PAYAS DORTYOL
HATAY TURKEY

Vessel                                    Port of loading
M/V "NEW FLAME"                           U.S.A. PORT OF NEW YORK

Port of Discharge

ISKENDERUN/TURKEY

Shipper's description of goods            Gross weight

                                          42,300.16 MT

10,474.00 MT HMS NO: 1 AND HMS NO: 2
31,726.16 MT SHREDDED SCRAP

FREIGHT PAYABLE AS PER CHARTER PARTY

FINANSBANK A.S. L/C CREDIT NUMBER 00019NC000105

SHIPPED CLEAN ON BOARD AND UNDER DECK ON JULY 31, 2007

THESE COMMODITIES ARE LICENSED BY THE U.S. FOR
ULTIMATE DESTINATION TURKEY. DIVERSION CONTRARY
TO U.S. LAW PROHIBITED.

B/L No ONE
BILL OF LADING
TO BE USED WITH CHARTER-PARTIES

# NON-NEGOTIABLE

(of which  NA    on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

| | |
|---|---|
| Freight payable as per Charter Party dated JULY 11, 2007 | SHIPPED at the Port of Loading in apparent good order and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above. |
| All other terms, conditions and exceptions as per Charter Party dated JULY 11, 2007 | Weight, measure, quality, quantity, condition, contents and value unknown. |
| This being a full and complete cargo, to be discharged at the port of delivery by buyer. | IN WITNESS whereof the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void. |
| Flag: PANAMA | |
| | Place and date of issue<br>U.S.A. PORT OF NEW YORK<br>JULY 31, 2007 |
| | 3 (THREE)<br>NEW ENGLAND SHIPPING CO.<br>AS AGENT FOR MASTER<br>MASTER KONSTANTINOS DIMITRIOU |

<u>IN THE SUPREME COURT OF GIBRALTAR</u>

<u>2007 – AJ – No. 3</u>

BETWEEN

### A/S DAMPSKIBSSELSKABET TORM

<u>Claimant</u>

-and-

### THE OWNERS OF
### THE CARGO ON BOARD
### THE MV NEW FLAME

<u>Defendants</u>

---

### EXHIBIT "PL4"

---

This is the paper writing marked **"PL4"** in the Affidavit of Patrick Lennon.

SWORN by the above-named )
Deponent at *Southport, CT* )
)
)
This 13th day of November 2007 )

Before me

Commissioner for Oaths



SIMS GROUP
GLOBAL TRADE CORPORATION

110 Fifth Avenue, Suite 700
New York, NY 10011-5614 USA
Phone 212-504-0710
Facsimile 212-504-0722
www.sims-group.com

**SALES CONTRACT**
**NO. SG-S-5054.07**    NURSAN METALURJI
                       ENDUSTRISI A.S.

It is mutually agreed that ~~NURSAN CELIK~~ of Iskenderun, Turkey, as Buyers, herewith confirm having purchased and SIMS GROUP GLOBAL TRADE CORPORATION, New York, U.S.A., as Sellers, herewith confirm having sold one steel scrap cargo as described below in accordance with the following terms and conditions.

**1) TOTAL QUANTITY :**

   35,000 MT +/- 10% in Seller's Option.

**2) COMPOSITION:**

   A. Minimum 75% Shredded Scrap as per ISRI 211

   B. Maximum 25% HMS No. 1 and HMS No. 2 in ratio of 80/20 percent.

   Note: In Seller's option to substitute all or part of HMS No. 1 and 2 for Bonus scrap.

**3) COMPOSITE PRICE :**

   USD $324.00 MT CFR FO Iskenderun, Turkey. (berth to be nominated by Buyer upon shipment date).  ISDEMIR PORT / ISKENDERUN

**4) SHIPMENT:**

   From USA East Coast, USA Florida West Coast and / or Canadian port(s) during July 15 to August 15, 2007.

**5) ORIGIN :**

   USA and / or Canada

SG-S-5054.07                           1

6)  **PAYMENT:**

100 pct sight payment per an irrevocable Letter of Credit (L/C) advised through, confirmed by and negotiated at the counters of a Prime New York bank acceptable to Seller (ie Bank of New York, JP Morgan Chase Bank, HSBC Banking Corporation Standard Chartered Bank, American Express or other Prime New York bank acceptable to Seller).

Said L/C is to be opened and received by Seller in New York, in full satisfactory order to Seller, by latest July/9, 2007 and is to be payable 100 pct sight in New York against the following shipping documents:

a)  Seller's commercial invoice in triplicate.
b)  Full set 3/3 "on board" Charter Party Bills of Lading marked Freight Payable as per Charter Party.
c)  Certificate of Origin issued by the Seller and certified by a Chamber of Commerce.
d)  Draft Survey Certificate issued by an independent surveyor for survey preformed at loading port.
e)  Non-radioactive Certificate issued an independent surveyor for survey preformed at loading port.
f)  Quality Certificate issued by an independent surveyor.

All L/C charges in Turkey, as well as New York bank's confirmation charges, are for Buyer's / L/C opener's account; Seller to pay for the New York bank's advising and negotiation charges. However, in case of usance L/C, Buyer is to make their own arrangements for same, and Seller is to be paid at sight, with all relevant charges pertaining to usance L/C, i.e. acceptance/deferred payment costs, interest and discount charges, to be fix Buyer's / L/C opener's account.

7)  **DETERMINATION OF WEIGHT:**

The final weight shall be the average of the Draft Survey at loading port and the Draft Survey at discharging port.



The Draft Survey at loading port shall be performed by a mutually agreed independent inspection company, (i.e. Marine Inspection and Logistics International, Inspectorate America Corporation or Alex Stewart (Assayers) Inc). The nomination and costs of this inspection taken are for the account of the Sellers.

Discharge port draft survey shall be preformed by a mutually agreed independent inspection company (i.e. Marine Inspection and Logistics International, Inspectorate America Corporation or Alex Stewart (Assayers) Inc). The cost of the inspection taken at discharge is for the account of the Buyer.

SG-S-S054.07                                  2

**8) DETERMINATION OF QUALITY :**

Final at loading port determined by a mutually agreed independent inspection company, (i.e. Marine Inspection and Logistics International, Inspectorate America Corporation or SGS Alex Stewart (Assayers) Inc). The costs of this inspection taken are for the account of the Sellers.

Buyer has the right to witness loading operation and has the right to reject any pile or any part of a pile which impurity is over 1.5%. However, the same is to be at the ultimate discretion of the independent surveyor who will be sole and final arbiter on this matter.

**9) IMPURITIES:**

There shall be a tolerance of 0.75% for impurities for overall cargo composition.  Total dust/dirt material over 0.75% found in the cargo as per independent inspector at load port will be deducted from Seller's invoice.

Total dust/dirt material over1.5% found in the cargo will be subject for rejection (on the average of the cargo).

Allowed percentage of the oversize material shall be maximum 1.5%.  Oversize material Between 1.5% and 5.0% shall be subject to penalty of USD 5.00 per MT.  Any percentage over 5.0% shall be subject to rejection.

**10) DISCHARGE TERMS AND CONDITIONS :**

Vessel is to be no older than 25 years and must have minimum 4 x 25 MTS cranes in good working order as per vessel's books. In case of any crane breakdown, the hiring of shore gear is subject to vessel owner's approval and if vessel owner pays for shore gear then laytime is not to be prorated.

Buyer is to provide on (1) safe berth upon vessel arrival, with no LOA or beam restrictions and minimum guaranteed arrival draft at the port/berth of discharge of 12 meters SW. Vessel to supply free of charge electricity./power for magnets/ Grapples of 380/440 volt , three phase , min. 30 Ampere ,45 kVA per crane from engine room .
**Discharge Rate:**
Buyer agrees to discharge at Buyer's risk and expense at the rate of 6,000 MT per WWD SHINC. All other terms and conditions, including demurrage and despatch, as per governing Charter Party. Despatch to be half the demurrage rate.

**Laytime:**
Notice of Readiness (NOR) is to be tendered on a SHINC basis, during office hours of 08.00-17.00 hours Monday through Sunday including normal holidays/excluding official national and religious holidays.  Laytime will commence at 08.00 a.m. on the next working day.  Time used before commencement of laytime shall not count.

SG-S-5054.07                          3

**11) ARBITRATION :**

Any disputes, controversies and/or claims arising out of or relating to this Agreement or any modification thereto, or any alleged breach or cancellation thereof, which cannot be settled amicably between Seller and Buyer, shall be settled by arbitration in New York, by the American Arbitration Association, and in accordance with the laws of the State of New York.

**12) FORCE MAJEURE:**

Force Majeure, as used herein, shall mean a cause or causes beyond the will or control of any of the parties to this contract as the case may be, which wholly or in part, prevents the delivery of the commodity to be purchased and sold hereunder.

Examples of Force Majeure are the following:

Acts of God, insurrections, blockage of the loading port and/or the discharge port, declared or undeclared war, riots, strikes, lockouts, breakdown of or damage to or destruction of installations and/or machinery and/or plant, fires, accidents, epidemics, floods, natural or man-made disasters, actions and/or restrictions of government (or agencies thereof), or any like contingency beyond the reasonable control of Seller or Buyer.

If, because of Force Majeure, any party or parties to this agreement are unable to carry out their obligations, and if such party or parties immediately gives the other parties hereto written notices of such Force Majeure, then the obligations and liabilities of the party or parties giving such notice shall be relieved, but after the expiration of sixty (60) days, the party not claiming excuse under this provision may cancel the contract.

**13) JURISDICTION :**

The competent courts under the laws applicable in the State of New York, USA alone shall have the exclusive jurisdiction to decide all matters, disputes and controversies relating to this contract, including arbitration proceedings instituted or to be instituted pursuant to Clause 11 hereof. This contract is deemed to have been entered into in New York City, New York, USA.

**SELLERS:**                                          **BUYERS:**

SIMS GROUP                                            NURSAN CELIK METALURJI
GLOBAL TRADE CORPORATION                              ENDUSTRISI A.S.

SG-S-5054.07                     4

<u>IN THE SUPREME COURT OF GIBRALTAR</u>

<u>2007 – AJ – No. 3</u>

BETWEEN

**A/S DAMPSKIBSSELSKABET TORM**

<u>Claimant</u>

-and-

**THE OWNERS OF
THE CARGO ON BOARD
THE MV NEW FLAME**

<u>Defendants</u>

**EXHIBIT "PL5"**

This is the paper writing marked **"PL5"** in the Affidavit of Patrick Lennon.

SWORN by the above-named          )
Deponent at  *Sathport, CT*       )
                                  )
                                  )
This 13th day of November 2007 )

Before me

*Mary E. Schubak*

Commissioner for Oaths

*Commission Expires Nov 2011*

NOV. 13. 2007 10:39AM    FREEHILL HOGAN MAHAR    NO. 4263    P. 2

### Waiver of Service of Summons

TO:  Charles E. Murphy, Lennon, Murphy & Lennon, LLC

I acknowledge receipt of your request that I waive service of a summons in the action of *Nursan Metalurji Endustrisi, A.S. v. M/V Torm Gertrud et* which is case number 07 civ 7687, in the United States District Court for the New York . I have also received a copy of the complaint in the action, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not requiring that I (or the entity on whose behalf I am acting) be served with judicial process in the manner provided by Rule 4.

I (or the entity on whose behalf I am acting) will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against me (or the party on whose behalf I am acting) if an answer or motion under Rule 12 is not served upon you within 60 days after September 25, 2007 , or within 90 days after that date if the request was sent outside the United States.

11/18/07
_____
Date

Signature
Printed/typed name:  PETER J. GUTOWSKI
( as  Attorneys Only for Defendant
( of  Gladiator Navigation SA.

### Duty to Avoid Unnecessary Costs of Service of Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain parties to cooperate in saving unnecessary costs of service of the summons and complaint. A defendant who, after being notified of an action and asked to waive service of a summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return the waiver.

It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought in an improper place or in a court that lacks jurisdiction over the subject matter of the action or even its person or property. A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later object to the jurisdiction of the court or to the place where the action has been brought.

A defendant who waives service must within the time specified on the waiver form serve on the plaintiff's attorney (or unrepresented plaintiff) a response to the complaint and must also file a signed copy of the response with the court. If the answer or motion is not served within this time, a default judgment may be taken against the defendant. By waiving service, a defendant is allowed more time to answer than if the summons had been actually served when the request for waiver of service was received.

Effective A/s 12/1/93 in compliance with
Federal Rules of Civil Procedure 4
SDNY Web 4/99